# EXHIBIT A

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

KALSHIEX, LLC,

*Plaintiff - Appellant*,

v.

GEORGE ASSAD; CHANDENI K. SENDALL, Deputy City Attorney; NEVADA GAMING CONTROL BOARD; JENNIFER TOGLIATTI; ROSA SOLIS-RAINEY; BRIAN KROLICKI; GEORGE MARKANTONIS; ABBI SILVER; AARON D. FORD; NEVADA GAMING COMMISSION; MIKE DREITZER,

*Defendants - Appellees*,

NEVADA RESORT ASSOCIATION,

*Intervenor-Defendant - Appellees*.

No.25-7516

D.C. No.
2:25-cv-00575-APG-BNW

OPINION

Appeal from the United States District Court
for the District of Nevada
Andrew P. Gordon, District Judge, Presiding

Argued and Submitted April 16, 2026
San Francisco, California

Filed August 28, 2026

Before: Ryan D. Nelson, Bridget S. Bade, and Kenneth K. Lee, Circuit Judges.

Opinion by Judge R. Nelson;
Concurrence by Judge Lee

## SUMMARY*


### Commodity Exchange Act

The panel affirmed in part the district court's order dissolving a preliminary injunction in favor of KalshiEX, LLC, and remanded in part in Kalshi's action against the Nevada Gaming Control Board, which sent a cease-and-desist letter notifying Kalshi that it was running a sports betting platform in violation of Nevada statutes and gaming regulations.

Kalshi sought injunctive relief, arguing that it was not a sports betting platform, but rather a designated contract market ("DCM") under the Commodity Exchange Act ("CEA") offering legal sports event contracts. Kalshi argued that the Commodity Futures Trading Commission ("CFTC") had exclusive regulatory authority over its sports


* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

event contracts and, therefore, Nevada's gaming regulations did not apply.

The panel held that the district court did not abuse its discretion in dissolving the preliminary injunction because Kalshi did not show a likelihood that the CEA preempts state gaming regulations as applied to its sports event contracts.

As amended by the Dodd-Frank Act, the CEA provides that the CFTC has exclusive jurisdiction over "swaps," defined as "any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). The Dodd-Frank amendments made it "unlawful for any person, other than an eligible contract participant, to enter into a swap unless the swap is entered into on, or subject to the rules of, a [DCM]." In a Special Rule provision, Dodd-Frank also gave the CFTC the power to determine that certain swaps are contrary to the public interest and therefore cannot be listed on a DCM, if the swap involves "activity that is unlawful under any Federal or State law, terrorism, assassination, war, *gaming*, or other similar activity." 7 U.S.C. § 7a-2(c)(5)(C)(i)-(ii) (emphasis added).

A CFTC regulation, 17 C.F.R. § 40.11(a), categorically prohibits swaps based on an excluded commodity that involves, relates to, or references, among other things, gaming. A DCM can self-certify to the CFTC that any new contract complies with the CEA and CFTC regulations, but the CFTC may review and disallow a contract that involves an enumerated activity.

The panel held that it had the authority to determine what is and is not a swap under the CEA's definition in 7 U.S.C. § 1a(47)(A)(ii), and no claim under the Administrative Procedure Act was required, because Nevada was not attacking the CFTC's action or inaction.

The panel concluded that the CEA likely does not preempt Nevada's gaming regulations as applied to Kalshi's sports event contracts. As to express preemption, the panel concluded that, based on its plain wording, § 2 of the CEA expressly preempts state regulation of swaps that are "traded or executed" on a DCM. There was no dispute that Kalshi's sports event contracts were traded on a DCM. However, under the CEA's definition in § 1a(47)(A)(ii), the sports event contracts were not "swaps" because they were sports bets. In addition, the Special Rule in § 7a-2(c) did not establish that Congress intended the CFTC to make a public interest determination regarding swaps and event contracts involving "gaming" because Kalshi's self-certification and listing of the contracts was unlawful under the Special Rule and its associated regulation, 17 C.F.R. § 40.11.

As to conflict preemption, the panel rejected Kalshi's argument that it was impossible to comply with both Nevada law and the CEA, and that Nevada law posed an obstacle to the CEA's purposes. The panel also rejected Kalshi's argument that field preemption applied.

The panel held that, in dissolving the preliminary injunction, the district court also did not abuse its discretion in analyzing whether Kalshi showed that it was likely to suffer irreparable harm and that an injunction was both equitable and in the public interest.

The panel affirmed in part the district court's order dissolving the preliminary injunction enjoining Nevada from

enforcing state laws against Kalshi's sports-related event contracts. The panel remanded for the district court to consider Nevada's challenges to Kalshi's election contracts consistent with this opinion.

Concurring, Judge Lee wrote that he largely agreed with the majority's analysis of the relevant provisions of the CEA. He wrote that one statutory provision gave him pause because the Special Rule provision appears to give the CFTC discretion whether to ban gaming contracts altogether, and so the statute does not seem to categorically bar all gaming contracts. However, this question of statutory interpretation need not be resolved now because 17 C.F.R. § 40.11 currently bars gaming contracts.

---

## COUNSEL

William E. Havemann (argued), Joshua B. Sterling, Samantha K. Ilagan, and Neal K. Katyal, Milbank LLP, Washington, D.C.; Grant R. Mainland, Davis B. Campbell, and Andrew L. Porter, Milbank LLP, New York, New York; Paul C. Williams and Dennis L. Kennedy, Bailey Kennedy LLP, Las Vegas, Nevada; David Meister, Robert A. Fumerton, Chad E. Silverman, and Judith A. Flumenbaum, Skadden Arps Slate Meagher & Flom LLP, New York, New York; for Plaintiffs-Appellants.

Nicole A. Saharsky (argued), Minh Nguyen-Dang, Wajdi C. Mallat, and Matthew Bisanz, Mayer Brown LLP, Washington, D.C.; Alexander S. Mendelson and Rory K. Schneider, Mayer Brown LLP, New York, New York; Preston R. Michelson, Mayer Brown LLP, Chicago, Illinois; Abigail L. Pace and Sabrena K. Clinton, Attorneys; Devin

A. Oliver, Deputy Attorney General; Jessica E. Whelan, Chief Deputy Solicitor General, Litigation; Heidi P. Stern, Solicitor General; Aaron D. Ford, Nevada Attorney General; Office of the Nevada Attorney General, Las Vegas, Nevada; for Defendants-Appellees.

Adam Hosmer-Henner, A.G. Burnett, Katrina Weil, Thaddeus C. Houston, and Jane Susskind, McDonald Carano LLP, Reno, Nevada, for Intervenor-Defendant-Appellee.

Martin J. Minot (argued), Deputy General Counsel for Litigation, United States Commodity Futures Trading Commission, Washington, D.C., for Amicus Curiae United States Commodity Futures Trading Commission.

Tyler R. Green, Conor D. Woodfin, and Olivia C. Rogers, Consovoy McCarthy PLLC, Salt Lake City, Utah, for Amicus Curiae Paradigm Operations LP.

Andrew L. Schlafly, Attorney at Law, Far Hills, New Jersey, for Amici Curiae Stop Predatory Gambling, Texans Against Gambling, and The Association of American Physicians and Surgeons.

Joseph H. Webster, Jens W. Camp, Alexandra K. Holden, and Elizabeth A. Bower, Hobbs Straus Dean & Walker LLP, Washington, D.C.; Bryan Newland, Powers Pyles Sutter & Verville PC, Washington, D.C.; Scott Crowell, Crowell Law Office, Tribal Advocacy Group PLLC, Sedona, Arizona; Michael Hoenig, Yuhaaviatam of San Manuel Nation, Washington, D.C.; for Amici Curiae The Indian Gaming Association, National Congress of American Indians, United South and Eastern Tribes Sovereignty Protection Fund, Arizona Indian Gaming Association, California Nations Indian Gaming Association, Minnesota Indian Gaming

Association, Oklahoma Indian Gaming Association, Washington Indian Gaming Association, National Tribal Gaming Commissioners and Regulators, Native American Finance Officers Association, Tribal Alliance of Sovereign Indian Nations, San Manuel Gaming and Hospitality Authority, and 24 Federally Recognized Indian Tribes.

Todd Phillips, Atlanta, Georgia, for Amicus Curiae Todd Phillips.

Zachary P. Keller, Deputy Solicitor General; Mathura J. Sridharan, Solicitor General; Dave Yost, Ohio Attorney General; Office of the Ohio Attorney General, Columbus, Ohio; Stephen Ehrlich, Deputy Solicitor General; Jeremy M. Feigenbaum, Solicitor General; Jennifer Davenport, New Jersey Attorney General; Office of the New Jersey Attorney General, Trenton, New Jersey; Steve Marshall, Alabama Attorney General, Office of the Alabama Attorney General, Montgomery, Alabama; Stephen J. Cox, Alaska Attorney General, Office of the Alaska Attorney General, Anchorage, Alaska; Raúl R. Labrador, Idaho Attorney General, Office of the Idaho Attorney General, Boise, Idaho; Tim Griffin, Arkansas Attorney General, Office of the Arkansas Attorney General, Little Rock, Arkansas; Theodore E. Rokita, Indiana Attorney General, Office of the Indiana Attorney General, Indianapolis, Indiana; Kristin K. Mayes, Arizona Attorney General, Office of the Arizona Attorney General, Phoenix, Arizona; Philip J. Weiser, Colorado Attorney General, Office of the Colorado Attorney General, Denver, Colorado; Brian L. Schwalb, District of Columbia Attorney General, Office of the District of Columbia Attorney General, Washington, D.C.; Kathleen Jennings, Delaware Attorney General, Office of the Delaware Attorney General, Wilmington, Delaware; Kwame Raoul, Illinois Attorney General, Office of the Illinois Attorney General, Chicago,

Illinois; Kris W. Kobach, Kansas Attorney General, Office of the Kansas Attorney General, Topeka, Kansas; Liz Murrill, Louisiana Attorney General, Office of the Louisiana Attorney General, Baton Rouge, Louisiana; Aaron M. Frey, Maine Attorney General, Office of the Maine Attorney General, Augusta, Maine; Anthony G. Brown, Maryland Attorney General, Office of the Maryland Attorney General, Baltimore, Maryland; Dana Nessel, Michigan Attorney General, Office of the Michigan Attorney General, Lansing, Michigan; Keith Ellison, Minnesota Attorney General, Office of the Minnesota Attorney General, St. Paul, Minnesota; Andrea J. Campbell, Massachusetts Attorney General, Office of the Massachusetts Attorney General, Boston, Massachusetts; Brenna Bird, Iowa Attorney General; Office of the Iowa Attorney General, Des Moines, Iowa; Rob Bonta, California Attorney General, Office of the California Attorney General, Oakland, California; William Tong, Connecticut Attorney General, Office of the Connecticut Attorney General, Hartford, Connecticut; Anne E. Lopez, Hawaii Attorney General, Office of the Attorney General Hawaii, Honolulu, Hawaii; Lynn Fitch, Mississippi Attorney General, Office of the Mississippi Attorney General, Jackson, Mississippi; Raúl Torrez, New Mexico Attorney General, Office of the New Mexico Attorney General, Santa Fe, New Mexico; Letitia James, New York Attorney General, Office of the New York Attorney General, New York, New York; Dan Rayfield, Oregon Attorney General, Office of the Oregon Attorney General, Salem, Oregon; Peter F. Neronha, Rhode Island Attorney General, Office of the Rhode Island Attorney General, Providence, Rhode Island; Charity R. Clark, Vermont Attorney General, Office of the Vermont Attorney General, Montpelier, Vermont; Joshua L. Kaul, Wisconsin Attorney General,

Office of the Wisconsin Attorney General, Madison, Wisconsin; Marty Jackley, South Dakota Attorney General, Office of the South Dakota Attorney General, Pierre, South Dakota; Jeff Jackson, North Carolina Attorney General, Office of the North Carolina Attorney General, Raleigh, North Carolina; David W. Sunday Jr., Pennsylvania Attorney General, Office of the Pennsylvania Attorney General, Harrisburg, Pennsylvania; Alan Wilson, South Carolina Attorney General, Office of the South Carolina Attorney General, Columbia, South Carolina; Derek E. Brown, Utah Attorney General, Office of the Utah Attorney General, Salt Lake City, Utah; Gentner Drummond, Oklahoma Attorney General, Office of the Oklahoma Attorney General, Oklahoma City, Oklahoma; Jay Jones, Virginia Attorney General, Office of the Virginia Attorney General, Richmond, Virginia; Jonathan Skrmetti, Tennessee Attorney General and Reporter, Office of the Tennessee Attorney General, Nashville, Tennessee; Nicholas W. Brown, Washington Attorney General, Office of the Washington Attorney General, Olympia, Washington; Michael T. Hilgers, Nebraska Attorney General, Office of the Nebraska Attorney General, Lincoln, Nebraska; Keith G. Kautz, Wyoming Attorney General, Office of the Wyoming Attorney General, Cheyenne, Wyoming; for Amici Curiae New Jersey, Ohio, 37 Other States, and the District of Columbia.

Sarah A. Ferguson, and Ashley Nikkel, Parsons Behle & Latimer, Reno, Nevada, for Amici Curiae The Nevada Council on Problem Gambling and The Dr. Robert Hunter International Problem Gambling Center.

Dominick V. Freda, Dennis M. Kelleher, and Stephen W. Hall, Better Markets Inc., Washington, D.C., for Amicus Curiae Better Markets Inc..

Evan N. Bianchi, Spiro Harrison & Nelson LLC, New York, New York, for Amici Curiae North American Gaming Regulators Association and International Association of Gaming Regulators.

Lauren D. Wigginton, Holland and Hart LLP, Las Vegas, Nevada, for Amicus Curiae American Gaming Association.

---

**OPINION**

R. NELSON, Circuit Judge:

KalshiEX, LLC advertises itself as "the first app for legal sports betting in all 50 states." As the volume of activity on Kalshi's "sports betting" platform ballooned, the Nevada Gaming Control Board sent a cease-and-desist letter notifying Kalshi that it was violating Nevada statutes and gaming regulations. Kalshi sought injunctive relief, arguing that it is not a legal sports betting platform, but a designated contract market under the Commodity Exchange Act (CEA) offering legal sports event contracts. Kalshi argues that the Commodity Futures Trading Commission (CFTC) has exclusive regulatory authority over its sports event contracts and, therefore, Nevada's gaming regulations do not apply.

Because we disagree with Kalshi's overly broad reading of the CEA, and because CFTC regulations currently prohibit offering contracts related to gaming on prediction markets, we affirm the district court's order dissolving the injunction as to sports event contracts. We remand for the district court to consider Kalshi's election contracts.

# I

## A

A futures contract is a "standardized agreement" to buy or sell a "commodity" in the future for a price determined at the contract's inception. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 358 (1982). As "the weather and other imponderables affect[] supply and demand," the market price of the commodity could rise or fall before its promised delivery. *Id.* at 357. In the nineteenth and early twentieth centuries, futures markets thus developed to allow the "purchase or sale of a futures contract" and the ability to hedge against risks associated with these price fluctuations in agricultural markets, such as grain. *Id.* at 358. As time went on, these markets became an "opportunity to make a profit as a result of fluctuations in the market price" by "buying and selling 'futures contracts.'" *Id.* at 357.

Recognizing that futures contracts were "susceptible to speculation, manipulation, and control . . . detrimental to the producer or the consumer and the persons handling grain in interstate commerce," *Bd. of Trade of City of Chicago v. Olsen*, 262 U.S. 1, 37 (1923), Congress passed the Grain Futures Act of 1922. This Act authorized "the Secretary of Agriculture to supervise trading in grain futures on [designated] 'contract markets,'" or DCMs. *Dunn v. CFTC*, 519 U.S. 465, 475 n.11 (1997). "In 1936 Congress changed the name of the statute to the Commodity Exchange Act" or CEA. *Curran*, 456 U.S. at 362.

In 1974, Congress amended the CEA "to include nonagricultural commodities and, appropriately, replaced regulation by the Secretary of Agriculture with regulation by a new commission"—the Commodity Futures Trading

Commission (CFTC). *Dunn*, 519 U.S. at 475 n.11. The 1974 Amendments also gave the CFTC "exclusive jurisdiction" over certain derivatives, including "options." Pub. L. No. 93–463, § 201(b), 88 Stat. 1389 (1974) (codified at 7 U.S.C. § 2). A derivative is a "financial instrument whose value depends on or is derived from the performance of a secondary source, such as an underlying bond, currency, or commodity." *Derivative*, BLACK'S LAW DICTIONARY (12th ed. 2024).

In the wake of the 2008 financial crisis, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act. Pub. L. No. 111–203, 124 Stat. 1376 (2010). It was passed to, among other things, "promote the financial stability of the United States by improving accountability and transparency in the financial system." *Id.*

Dodd-Frank amended the CEA in three relevant ways. First, it added "swaps" to the CFTC's "exclusive jurisdiction." 7 U.S.C. § 2(a)(1)(A). It outlined an extensive, six-part definition of "swap" as "any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." § 1a(47)(A)(ii). Second, the Dodd-Frank amendments made it "unlawful for any person, other than an eligible contract participant, to enter into a swap unless the swap is entered into on, or subject to the rules of, a [DCM]." § 2(e). And third, it gave the CFTC the power to "determine" that certain swaps are "contrary to the public interest" and therefore cannot be listed on a DCM, if the swap involves "activity that is unlawful under any Federal or State law, terrorism,

assassination, war, *gaming*, or other similar activity. . . ." § 7a-2(c)(5)(C)(i)–(ii) (cleaned up) (emphasis added).

Soon after, the CFTC adopted a regulation categorically prohibiting swaps based on "an excluded commodity," that "involves, relates to, or references," among other things, "gaming." 17 C.F.R. § 40.11(a). Despite this prohibition, an excluded commodity may be offered because a DCM can self-certify to the CFTC in a "written certification" that "any new contract" complies with the CEA and CFTC regulations. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. §38.4(b). Once the self-certification is filed, the DCM can begin offering the new contract the next business day. 17 C.F.R. § 40.2(a)(2); 7 U.S.C. § 7a-2(c)(1)-(2). But "if a DCM nevertheless lists a contract that involves an enumerated activity or something similar . . . the CFTC may review it" and disallow it. *KalshiEX v. Hendrick*, 817 F. Supp. 3d 1014, 1036 n.13 (D. Nev. 2025) (*Hendrick II*); *see* 7 U.S.C. § 7a-2(c)(5)(C); 17 C.F.R. § 40.11(c).

The CFTC has noted that "its prohibition of certain 'gaming' contracts is consistent with Congress's intent to 'prevent gambling through the futures markets' and to 'protect the public interest from gaming and other events contracts.'" *Provisions Common to Registered Entities*, 76 Fed. Reg. 44776, 44786 (July 27, 2011).

B

Kalshi is a DCM registered with the CFTC. In January 2025, Kalshi self-certified to the CFTC, and began offering a new kind of contract: sports event contracts.[1] On Kalshi's DCM, individuals can buy and sell contracts based on nearly

---

[1] In June 2023, Kalshi began offering event contracts based on elections, which we discuss separately. *See infra*, at 41 n.7.

anything related to a sporting event, including, who will win the Super Bowl, who will be the first pick in the NFL Draft, and what song will open the Super Bowl halftime show. Kalshi's contracts also allow individuals to essentially place prop bets—bets based on outcomes within a game, such as over-under, score-specific spreads—and parlays (or "combos"), where users can link their trades for a larger payout if each leg hits. With all these offerings traded on the DCM, Kalshi advertises itself as "the first app for legal sports betting in all 50 states." Over 90% of Kalshi's trades in 2025, representing 95% of its revenue, were sports related.

In March 2025, the Nevada Gaming Control Board (the Board) sent Kalshi a cease-and-desist letter, demanding that it stop offering its elections and sports event contracts. The Board concluded that the sports event contracts were "a system or method of wagering on sporting events and other events," and that Kalshi was thus "operating as an unlicensed sports pool" in violation of Nevada's gaming regulations, Nev. Rev. Stat. § 463.160(1) and Nev. Rev. Stat. § 463.245(2). If Kalshi did not stop offering these event contracts in Nevada, the Board warned that it would pursue civil or criminal enforcement action.

C

Kalshi sued the Board, its members, the State of Nevada, and the Nevada Attorney General (collectively, Nevada) seeking a preliminary injunction to prevent Nevada from regulating the trading of sports and election event contracts on its DCM. *KalshiEX, LLC v. Hendrick*, 2025 WL 1073495, at *1 (D. Nev. Apr. 9, 2025) (*Hendrick I*). On an expedited schedule, the district court granted Kalshi's motion for a preliminary injunction. *Id.* Following that ruling, two other district courts ruled on the same issue,

coming to opposite conclusions. *KalshiEX, LLC v. Flaherty*, 2025 WL 1218313, at *4–7 (D.N.J. Apr. 28, 2025), *aff'd*, 172 F.4th 220 (3rd Cir. 2026); *KalshiEX, LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. Aug. 1, 2025).

In October 2025, another CFTC registered DCM, Crypto.com, moved for a preliminary injunction against Nevada, based on the reasoning in *Hendrick I*. *See N. Am. Derivatives Exch., Inc. v. Nevada on Rel. of Nevada Gaming Control Bd.*, 815 F. Supp. 3d 1169, 1175 (D. Nev. Oct. 14, 2025). It argued that its sports event contracts "are legal under federal law and that Nevada law is preempted due to the CFTC's exclusive jurisdiction over transactions on DCMs." *Id.*

The district court denied Crypto's motion for a preliminary injunction. *Id.* at 1175–76. The district court concluded that § 2 of the CEA gave the CFTC exclusive jurisdiction over swaps "traded or executed on exchanges that the CFTC has designated," *id.* at 1180, but "Crypto's contracts on the outcome of live events are not 'swaps'" under the CEA's definition of swap in 7 U.S.C. § 1a(47)(A)(ii). *Id.* at 1181, 1187. First, the district court concluded that the courts have the power to determine what is and is not a swap under the CEA. *Id.* at 1180–81. It then looked to the text of § 1a(47)(A)(ii) and its context, and reasoned that, unlike the swap definition in that subsection, Crypto's sports event contracts "turn on the *outcome* of the live event, not on the 'occurrence, nonoccurrence, or the extent of the occurrence' of a live event." *Id.* at 1183–84 (emphasis added). The district court observed that "equating an event with an outcome or result is an archaic use of the word 'event,' not the ordinary meaning." *Id.* at 1183. Under the district court's reading, whether the Super Bowl *happens* is the statutorily defined "occurrence of an event," while

whether a certain team will *win* that Super Bowl is not an "occurrence of an event," but the *outcome* of an event (the event being the Super Bowl).

The district court rejected Crypto's broad reading of the words in the statute because it "knows no limiting principle because anything could be defined as an event." *Id.* at 1184. According to the court, if it accepted Crypto's position that "its live presentation events contracts are swaps," then "nearly all sports wagering" would be swept "into the CFTC's exclusive jurisdiction" despite the historical regulation of gambling by states. *Id.* The district court concluded that Congress gave no indication in the CEA that it disrupted the careful state-federal balance on gaming and preempted all state gaming laws through its definition of swap, as doing so would be "hiding an elephant in a mousehole." *Id.* at 1185 (citing *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001)).

After that ruling, Nevada moved to dissolve Kalshi's preliminary injunction. *Hendrick II*, 817 F. Supp. 3d at 1021. The district court dissolved the injunction, incorporating the same reasoning from the Crypto denial. *Id.* at 1023. It concluded that Nevada was not required to challenge the CFTC's understanding of swap through an Administrative Procedure Act (APA) claim before it could begin enforcement of its state laws. *Id.* at 1023–26. It also concluded that the CEA's use of "associated with" in the definition of swap means that events underlying swaps must be "inherently joined or connected with a potential financial, economic, or commercial consequence," without looking to "potential downstream financial consequences." *Id.* at 1027. Thus, it concluded that because "Kalshi's event contracts are based on outcomes of sporting events or things that happen during a sporting event," they were not swaps with the

CEA's definition. *Id.* at 1026. The court also concluded that the sporting event contracts were not "contracts of sale of commodities for future delivery" under § 2(a)(1)(A). *Id.* at 1034. The district court also determined that the other preliminary injunction factors favored Nevada. *Id.* at 1034–37. This timely appeal followed.[2]

II

The district court had jurisdiction under 28 U.S.C. § 1331, as this action arises under the Supremacy Clause of the Constitution. U.S. Const. art. VI, cl. 2. We have jurisdiction to review the district court's order under 28 U.S.C. § 1292(a)(1).

We review the district court's order dissolving a preliminary injunction for abuse of discretion. *Tracer Rsch. Corp. v. Nat'l Env't Servs. Co.*, 42 F.3d 1292, 1294 (9th Cir. 1994). A district "court abuses its discretion if it commits

---

[2] While this appeal was pending, the Third Circuit affirmed the District of New Jersey's order granting Kalshi's motion for a preliminary injunction. *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 224 (3d Cir. 2026). The Fourth Circuit appeal remains pending. *See KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md Aug. 1, 2025) (denying Kalshi's motion for a preliminary injunction), *appeal docketed*, No. 25-1892 (4th Cir. Aug. 6, 2025). Several additional district court decisions have been issued, with varied results. *See, e.g.*, *KalshiEX LLC v. Orgel*, No. 3:26-CV-00034, 2026 WL 474869 (M.D. Tenn. Feb. 19, 2026) (enjoining the enforcement of Tennessee's gaming law); *KalshiEX LLC v. Schuler*, No. 2:25-cv-01165, 2026 WL 657004 (S.D. Ohio Mar. 9, 2026) (denying Kalshi's motion for a preliminary injunction to bar Ohio from enforcing its gaming laws); *KalshiEX LLC v. Johnson*, No. CV-26-01715, 2026 WL 1223373 (D. Ariz. May 5, 2026) (granting preliminary injunction enjoining enforcement of Arizona's gambling laws), *appeal docketed*, No. 26-2978 (9th Cir. May 11, 2026); *KalshiEX LLC v. Williams*, No. 25-cv-08846, 2026 WL 2017466 (S.D.N.Y. July 13, 2026) (denying Kalshi's motion for a preliminary injunction).

legal error." *NetChoice, LLC v. Bonta*, 152 F.4th 1002, 1012 (9th Cir. 2025). To warrant preliminary injunctive relief, Kalshi must show that it is "likely to succeed on the merits, that it is likely to suffer irreparable harm in the interim, and that an injunction is both equitable and in the public interest." *Id.*

III

The key question is whether Kalshi has shown a likelihood that the CEA preempts Nevada's gaming regulations. If Kalshi makes this showing, then the district court committed legal error, which is an abuse of discretion. *See id.* We conclude that Kalshi has not shown a likelihood that the CEA preempts state gaming regulations as applied to its sports event contracts and that the district court did not abuse its discretion by dissolving the injunction.

A

To begin, we have the authority to determine what is and is not a swap under the definition in § 1a(47)(A)(ii). Kalshi argues that, given the procedural posture of this case, we lack authority to determine this "threshold issue." Kalshi argues that by sending a cease-and-desist letter, Nevada is attempting to skirt the APA by using "a collateral proceeding to end-run the procedural requirements governing appeals of administrative decisions." *See Big Lagoon Rancheria v. California*, 789 F.3d 947, 953 (9th Cir. 2015) (en banc).

But this case does not resemble the kind of end-run discussed in *Big Lagoon*. In that case, the court relied on both Supreme Court and circuit precedent to conclude that the Bureau of Indian Affairs' final decision "to take land into trust was a garden variety APA claim," which California was attempting to attack collaterally. *Id.* at 953–54 (cleaned up).

Nevada is not challenging any determination by the CFTC about Kalshi's event contracts. *See* 5 U.S.C. § 706 (providing a cause of action to "set aside agency action" or to "compel agency action"). Kalshi self-certified its sports event contracts under § 7a-2(c)(1). Nor does Nevada allege any violation of the CEA in its cease-and-desist letter. Nevada is not attacking the CFTC's action or inaction but pursuing enforcement of its own state law about what qualifies as a bet or wager, not what the CFTC considers a swap.

Rather, Kalshi turned to the courts seeking injunctive relief. Kalshi asserts that § 2 of the CEA compels an injunction against Nevada's enforcement of its gaming laws against Kalshi and that the authority of the CFTC, an administrative agency, is at issue. Kalshi's reliance on the CEA as a sword, rather than a shield, distinguishes this action from an attempt by Nevada to "end-run the [APA's] procedural requirements." *Big Lagoon Rancheria*, 789 F.3d at 953. Kalshi's invocation of the CEA's definition of swap in § 1a(47)(A)(ii) in bringing this lawsuit invites this court, not Nevada or the CFTC, "to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

Courts routinely interpret statutory language to determine whether state law is preempted and the scope of that preemption. *See Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (examining "arguments about the [Atomic Energy Act's] preemptive effect much as [the Court] would any other about statutory meaning, looking to the text and context of the law in question and guided by the traditional tools of statutory interpretation"). The "very point of the traditional tools of statutory construction"—the tools courts use every day—"is to resolve [such] statutory ambiguities." *Loper Bright Enters. v. Raimondo*, 603 U.S.

369, 401 (2024). Even the CFTC, as an amicus, suggests that we can determine what constitutes a swap under the CEA.

B

The CEA likely does not preempt Nevada's gaming regulations as applied to Kalshi's sports event contracts. Kalshi argues that the CEA preempts Nevada's gaming laws through three forms of preemption: express, conflict, and field. We address each in turn.

1

a

To start, the CEA expressly preempts state law regulating swaps "traded or executed on" a DCM. § 2(a)(1)(A). "Express preemption arises when the text of a federal statute explicitly manifests Congress's intent to displace state law." *Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Bonta*, 33 F.4th 1107, 1114 (9th Cir. 2022) (quotation omitted). As Kalshi notes, § 2 of the CEA includes an express preemption provision granting the CFTC "exclusive jurisdiction" over all "transactions involving swaps" that are "traded or executed on a market designated" by the CFTC. § 2(a)(1)(A).

If we were to simply apply the presumption against preemption, as Nevada suggests, this would become a much easier case. But "the law remains troubling and confused" as to whether we apply a presumption against preemption to express preemption provisions. *California Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1108 (9th Cir. 2024) (O'Scannlain, J., concurring). The Supreme Court's most recent discussion of this presumption in *Commonwealth of Puerto Rico v. Franklin California Tax-free Trust* instructs,

although in passing, that courts generally "do not invoke any presumption against pre-emption but instead focus on the plain wording of the clause." 579 U.S. 115, 125 (2016). This is the approach the majority adopted in *California Restaurant*, where we looked to the statute's "text, structure, and context" "'without any presumptive thumb on the scale' for or against preemption." 89 F.4th at 1101 (quoting *R.J. Reynolds Tobacco Co. v. Cnty. of Los Angeles*, 29 F.4th 542, 553 n.6 (9th Cir. 2022)). Like *California Restaurant*, we decline to apply any presumption against preemption and instead "focus on the plain wording" of § 2. *Id.*

We conclude that, based on its plain wording, § 2 preempts state regulation of swaps that are "traded or executed" on a DCM. This section states that "[t]he [CFTC] shall have exclusive jurisdiction . . . with respect to . . . transactions involving swaps." § 2(a)(1)(A). "[T]he purpose of the exclusive-jurisdiction provision . . . was to separate the functions of the [CFTC] from those of the [SEC] and other regulatory agencies." *Curran*, 456 U.S. at 386. But the statute confers "exclusive" jurisdiction on the CFTC, which excludes all others, not just the SEC. "[T]he description of . . . jurisdiction as 'exclusive' necessarily denies jurisdiction" to other entities, which "follows from the plain meaning of 'exclusive.'" *Mississippi v. Louisiana*, 506 U.S. 73, 77–78 (1992).

Likewise, § 2(a)(1)(A)'s saving clause shows that Congress meant it to be a preemptive provision. After the sentence conferring "exclusive jurisdiction" on the CFTC, § 2(a)(1)(A) provides that "*[e]xcept as hereinabove provided*, nothing contained in this section shall . . . supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commisssion or other regulatory authorities under the laws of the United States *or*

*any State*." § 2(a)(1)(A) (emphasis added). If the exclusive jurisdiction provision was not intended to have preemptive effect, the "[e]xcept as hereinabove provided" clause would be superfluous. We decline to read into the statute that interpretive difficulty. *See Connell v. Lima Corp.*, 988 F.3d 1089, 1097 (9th Cir. 2021) ("In construing a statute we are obliged to give effect, if possible, to every word Congress used, without rendering words superfluous, void, or insignificant."). Congress can choose more explicit language for preemption, as it did in § 16(e)(2)'s explicit preemption of certain state gaming laws. 7 U.S.C. § 16(e)(2) ("This chapter shall supersede and preempt the application of any State or local law that prohibits or regulates gaming or the operation of bucket shops"). But there are no magic words that a statute must employ to preempt state law. Congress need only express through the plain text that a statute preempts state law, rather than use specific language. *Franklin*, 579 U.S. at 125 (explaining that the "plain wording" of a statute "necessarily contains the best evidence of Congress's pre-emptive intent"). And Congress did so in § 2(a)(1)(A).

b

While § 2(a)(1)(A) includes an express preemption provision, Kalshi overplays its hand when it argues that "state law is superseded as to [all] *on-DCM* transactions." Kalshi argues that "[b]ecause the saving[] clause clarifies that state law is not 'supersede[d]' as to *off*-DCM transactions, it confirms that state law is superseded as to *on*-DCM transactions." This argument fails because Congress declined to grant exclusive jurisdiction to all on-DCM transactions, as illustrated by "spot contracts," which can be traded on DCMs but are not subject to the CFTC's exclusive jurisdiction under § 2(a). *See e.g.*, CFTC, *Acting Chairman*

*Pham Announces First-Ever Listed Spot Crypto Trading on U.S. Regulated Exchanges* (Dec. 4, 2025), https://perma.cc/C9YZ-HJM5 (spot contracts on cryptocurrencies).

The CEA expressly gives the CFTC "exclusive jurisdiction" over only the enumerated transactions in § 2(a)(1)(A). The exclusive jurisdiction provision only applies (1) "with respect to . . . accounts, agreements . . ., and transactions involving swaps" and other enumerated transactions, (2) that are "traded or executed" on a DCM. § 2(a)(1)(A). Here, there is no dispute Kalshi's sports event contracts are traded on a DCM. Thus, the dispositive issue is whether the sports event contracts are "swaps" under the CEA's definition in 7 U.S.C. § 1a(47)(A)(ii). The parties cite various legislative history to define swap. But we do not use legislative history to "look over the heads of the crowd and pick out [our] friends." ANTONIN SCALIA, A MATTER OF INTERPRETATION 36 (1997) (quoting Judge Leventhal). We focus instead on the text. *See United States v. Myers*, 170 F.4th 1180, 1184 (9th Cir. 2026).

i

The CEA's definition of swap includes six parts. § 1a(47)(A). Kalshi relies on § 1a(47)(A)(ii), which defines a swap as "any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence."

We first consider the words occurrence, event, and contingency. Kalshi relies on dictionary definitions to support its broad reading of these words as "a thing that

happens or takes place." *See Event*, RANDOM HOUSE WEBSTER'S POCKET AMERICAN DICTIONARY (5th ed. 2008); *see also, e.g.*, *Event*, OXFORD AMERICAN DICTIONARY AND THESAURUS (2d ed. 2009) ("a thing that happens or takes place"); *Contingency*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003) ("something liable to happen as an adjunct to or result of something else."); *Event*, WEBSTER'S II NEW COLLEGE DICTIONARY (3d ed. 2005) ("[s]omething incidental to something else"). It also relies on definitions of an "event" as including "the outcome, issue, or result of anything."[3] *Event*, RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY (2d ed. 2001); *see also, e.g.*, *Event*, WEBSTER'S II NEW COLLEGE DICTIONARY (3d ed. 2005) ("[t]he actual outcome or final result").

If we only consider the dictionary definitions Kalshi cites, interpret the word "event" in isolation, and adopt its broadest meaning, we might be persuaded by Kalshi's argument that "event" means generally "something that happens," and thus, Kalshi's sports events contracts fit within the meaning of swap in § 1a(47)(A)(ii). This approach highlights the cursory plain-language appeal of Kalshi's interpretive argument, which the Third Circuit majority adopted. *See Flaherty*, 172 F.4th at 227–28. But here, the "isolated dictionary definitions contribute[] little to finding the ordinary meaning of" the statutory language. *Vericool World, LLC v. Igloo Prods. Corp.*, 175 F.4th 1045, 1057 (9th Cir. 2026).

This is, in part, where the confusion lies because an event could be described as an occurrence. But even conflating these terms, we do not refer to whether the Dodgers win the

---

[3] In its filings with the CFTC, Kalshi has described its sports event contracts as being "based on the outcome of recurrent event."

World Series, or how many touchdowns Fernando Mendoza might throw in a game, or how many points BYU Football will win by as an "event." That is because while the word "event" can be defined as "occurrence," *see, e.g.*, *Event*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003), that definition may not always correspond to its ordinary public meaning. And because the statutory definition of swap uses both event and occurrence, these words should have independent meaning to avoid rendering one term superfluous. § 1a(47)(A)(ii). *Yates v. United States*, 574 U.S. 528, 546 (2015) (declining to adopt a broad definition because it was an "unbounded reading" that would render "superfluous" other key statutory language). Dictionaries also note that defining "event" as a synonym for "outcome" is an archaic or rare usage. *See, e.g.*, *Event*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003). Because the definitions of event and occurrence do not resolve the issue before us, we must also consider the statutory context. *See Vericool World LLC*, 175 F.4th at 1057 ("Ignoring context in textual interpretation can lead to contorted statutory interpretations.") (citing *Bostock v. Clayton Cnty.*, 590 U.S. 644, 661–62 (2020)).

"The statute's language, structure, subject matter, context, and history are all factors that typically help courts determine a statute's objectives and thereby illuminate its text." *Zellmer v. Meta Platforms*, 104 F.4th 1117, 1124 (9th Cir. 2024) (cleaned up). That is particularly true when, as here, competing, reasonable interpretations of the same statutory text exist. And "a statute's meaning does not always turn solely on the broadest imaginable definitions of its component words." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018) (cleaned up). Instead, "[l]inguistic and statutory context also matter." *Id.* Statutory context matters

for our determination of ordinary meaning "because words are colored by their surroundings and the backdrop against which they were enacted." JUSTICE AMY CONEY BARRETT, LISTENING TO THE LAW: REFLECTIONS ON THE COURT AND CONSTITUTION 232 (2025).

The relevant backdrop includes legislation involving gambling, which weighs against giving the words in § 1a(47)(A)(ii) the broadest possible reading because, as discussed below, Kalshi's sports event contracts have the hallmarks of sports betting. Indeed, Kalshi advertised itself as "the first app for legal sports betting in all 50 states." And sports betting is a quintessential form of gambling.

"[T]he meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). In addition, we "must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency." *Id.* (citing *MCI Telecomms. Corp. v. AT&T*, 512 U.S. 218, 231 (1994)). Congress has spoken on gambling repeatedly, deliberately, and specifically. *See, e.g.*, the Professional and Amateur Sports Protection Act, 28 U.S.C. §§ 3701–3704, the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701–2721, and the Wire Act, 18 U.S.C. § 1084(a).[4]

---

[4] Kalshi argues that these laws are irrelevant because the Unlawful Internet Gambling Enforcement Act (UIGEA), 31 U.S.C. §§ 5361–5366, excludes DCM transactions from its definition of wager. True, courts do "not lightly assume that Congress silently attaches different meanings to the same term in . . . related statutes." *Azar v. Allina Health Servs.*, 587 U.S. 566, 574 (2019). But this presumption can yield to context, as

It is difficult, then, to conclude that Congress intended to upend its decades of careful regulation of gambling based on broad definitions of the words used in a Wall Street Reform Bill. "Congress, [the Supreme Court has] held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions." *Whitman*, 531 U.S. at 468. To conclude otherwise would assume Congress was "hiding an elephant in a mousehole," something we decline to do. *Id.*

The crucial context that leads us to resist the broadest possible reading is that Kalshi has a gambling problem. Kalshi describes and markets its sports event contracts offered on its DCM as "legal sports betting." Yet it argues that sports bets and sports event contracts are different.

But this argument strains credulity. A "wager" is defined as "[m]oney or other consideration risked on an uncertain event; a bet or a gamble," or otherwise as a "promise to pay money or other consideration on the occurrence of an uncertain event." *Wager*, BLACK'S LAW DICTIONARY (12th ed. 2024). The following hypothetical illustrates how Kalshi's sports event contracts fit within this definition. A customer at Caesars Sportsbook can place a sports bet on the Las Vegas Raiders winning a game by over 7.5 points, and if that happens, win a higher payout than the amount wagered. On the Kalshi app, that same customer can buy an event contract based on the Las Vegas Raiders winning a

courts understand that "most words have different shades of meaning and consequently may be variously construed . . . when they occur in different statutes." *Env't Defense v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007) (cleaned up). Because the UIGEA definitions are not meant to "alter[]" or "limit[]" other laws, other statutes likely deal with wagers in the ordinary sense, not with UIGEA's more specific, limited definition. § 5361(b).

game by over 7.5 points, and if that happens, receive a higher payout than the amount wagered. In either scenario, the customer's actions fit the definition of a gambling contract. *See Gambling Contract*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("An agreement to engage in a gamble; a contract in which two parties wager something, esp. money, for a chance to win a prize."). Thus, for Kalshi to deny that its sports event contracts are sports bets under a reasonable person's understanding is disingenuous. That Kalshi's sports event contracts are, in reality, sports bets is not just an "*I* know it when *I* see it" issue. *Hendrick II*, 817 F. Supp. 3d at 1029 (quoting *Jacobellis v. State of Ohio*, 378 U.S. 184, 197 (1964) (emphasis added)). Rather, *everyone,* including Kalshi, knows it when they see it.

The substance of the sports event contracts offered on Kalshi's DCM is sports gambling, regardless of whether Kalshi calls them swaps. Just as "[t]hat which we call a rose by any other name would smell as sweet," WILLIAM SHAKESPEARE, ROMEO AND JULIET act 2, sc. 2, placing sports bets, even when called by another name, is still gambling. Kalshi users can effectively place prop bets, bet the point spread, bet a specific score, or create a several-leg parlay. And the payout depends on the performance of a sports team or a player.

Interpreting swap broadly to include Kalshi's sports event contracts is contrary to the principle of statutory construction that "a word is known by the company it keeps." *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 575 (1995). The accompanying words in the CEA's definition of swap in § 1a(47)(A) include "any agreement, contract, or transaction" that provides for the exchange of payments "based on the value or level of . . . interest or other rates, currencies, commodities, securities, instruments of

indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind . . . and that transfers, as between the parties to the transaction . . . the financial risk associated with a future change in any value or level . . .” § 1a(47)(A)(iii). Kalshi’s sports event contracts are unlike these transactions. *See PGA Tour v. Martin*, 532 U.S. 661, 693–94 (2001) (Scalia, J., dissenting) (internal quotation marks omitted) (Statutory words “must be read in their context and with a view to their place in the overall statutory scheme.”). We have recognized that a “swap” allows two parties “to exchange (‘swap’)” cash flows on obligations such as “interest rates, currency rates and security or commodity prices,” to hedge risk on those obligations. *Thrifty Oil Co. v. Bank of Am. Nat’l. Tr. & Sav. Ass’n*, 322 F.3d 1039, 1042–32 (9th Cir. 2003). As Nevada points out, Kalshi’s sports event contracts do not help institutions or investors hedge against risk; they *create* risk, largely for ordinary consumers, where none previously existed.

Additionally, Kalshi’s attempts to distinguish its sports event contracts from sportsbooks betting are unpersuasive. Kalshi argues that “[u]nlike a traditional casino or ‘house,’ Kalshi’s DCM is not counterparty to any trade, does not set betting odds, does not profit when its customers lose, and has no incentives to favor itself at customers’ expense.” These are distinctions without differences. Most importantly, none of those distinctions have any connection to the statutory definition of “swap.” That Caesar’s or MGM are “market makers,” while Kalshi supposedly is not,[5] is not relevant to

[5] And this is a tenuous proposition, given the existence of Kalshi Trading, Kalshi’s affiliate that acts as a “significant player on the exchange,” largely as a market maker. *Who Are You Trading With*,

the CEA's definition of "swap" or of the ordinary meaning of "bet" or "wager." The CEA's definition of swap does not exclude a "contract, agreement, or transaction" if the counterparty is a casino or sportsbook. And that is even more significant considering that the CEA excludes swap-like agreements when there are certain specific counterparties. § 1a(47)(B)(ix) (excluding from the definition of swap "any agreement, contract, or transaction a counterparty of which is a Federal Reserve Bank, the Federal Government, or a Federal agency that is expressly backed by the full faith and credit of the United States.").

Moreover, Kalshi's broad definition of swap poses another problem—it lacks a limiting principle. Kalshi's broad interpretation of the definition of swap encompasses off-DCM transactions, yet the CEA makes it unlawful to enter into "swaps" outside of a DCM. Section 2(e) makes it "unlawful for any person, other than an eligible contract participant, to enter into a swap unless the swap is entered into on, or subject to the rules of, a board of trade designated as a contract market under section 7 of this title." § 2(e). If the CEA's definition of swap is read broadly to encompass Kalshi's sports event contracts, as Kalshi urges, then it can also be read to encompass other sports bets such that anyone who places an off-DCM sports bet that fits within § 1a(47)(A)(ii)'s definition of a swap would be violating the CEA.

---

KALSHI (Feb. 27, 2025), https://perma.cc/8QQD-8QXR. Although Kalshi removed all reference to Kalshi Trading from the *Who Are You Trading With* web page shortly after Nevada filed its brief, *see Who Are You Trading With*, KALSHI (Mar. 10, 2026), https://help.kalshi.com/en/articles/13823808-who-are-you-trading-with [https://perma.cc/QB4Q-9E9M], we use the link Nevada provided.

If there is not a difference under the CEA's swap definition between sports betting on Kalshi and sports betting in Caesar's Sportsbook, then every person placing a sports bet at Caesar's Sportsbook (or anywhere else for that matter) is violating the CEA. While the court in *Flaherty* rejected the argument that a broad definition of swap would lead to "bingo games and pingpong matches fall[ing] under the CFTC's jurisdiction," *Flaherty*, 172 F.4th at 228, such a reality is not far-fetched. Kalshi offers trading on the outcome of table tennis games. *See* TT Elite Series Men, KALSHI SPORTS (Feb. 2, 2026), https://perma.cc/V84S-3WBT. If Kalshi offers the opportunity to bet on the winner of a table tennis game, it can only do so because it certifies that event as a swap. And there is no distinction, in the statutes or regulations, between these games and the "friendly neighborhood ping pong match" the *Flaherty* dissent discussed. 172 F.4th at 233 (Roth, J., dissenting). Indeed, the majority wrote that in those scenarios, we should simply hope that the CFTC exercises its authority to regulate them out of the statutory definition. *Id.* at 228. If we can only rely on the CFTC's regulation to exclude them after the fact, then Congress's definition of swap would have to include all bets on "bingo games" and "pingpong matches" under the CFTC's jurisdiction. *Id.* We reject that overly broad reading.

Kalshi rejects the natural conclusion that a broad reading of swap encompasses a wide array of sports bets, and argues that the lack of a limiting principle is solved by the additional language in § 1a(47)(A)(ii)'s definition of swap, which requires that "the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency" be "*associated with a potential financial, economic, or commercial consequence*"; or the "economic consequence" requirement.

7 U.S.C. § 1a(47)(A)(ii). The majority in *Flaherty* relied on this reasoning. *Flaherty*, 172 F.4th at 227–28 (concluding that "[t]he outcome of sports event certainly can be associated with a potential financial, economic, or commercial consequence."). Kalshi argues that payment under its sports event contracts depends on the "outcome of sporting events" which are "connected with financial consequences" for "stakeholders[] team sponsors, advertisers, television networks, franchises, local communities, and more."

The district court rejected Kalshi's argument based on potential financial consequences that are "extrinsic to the parties to the contract." *Hendrick II*, 817 F. Supp. 3d at 1027. It concluded that, under Kalshi's argument, "anything imaginable about a potential downstream financial consequence" would satisfy the economic consequence requirement. *Id.* To avoid this absurdity, the district court concluded that "associated with" as used in § 1a(47)(A)(ii) "means that the event or contingency must be inherently associated with a potential financial [or economic] consequence, not just that the event or contingency have some potential downstream financial consequence." *Id.* at 1027–28.

This interpretation is supported by the plain meaning of "associate." *See Associate*, WEBSTER'S NEW WORLD COLLEGE DICTIONARY 86 (4th ed. 2004) ("connect" or "join together" or to "connect in the mind"); *Associate*, OXFORD ENGLISH DICTIONARY (2025), https://perma.cc/2SVL-6HSE ("[t]o connect in idea"). Kalshi contends that, under its theory, practically nothing "even in the abstract" is "not going to have even a potential financial or economic consequence." But reading the statute so expansively as to include any conceivable downstream economic consequence

would render the definition of swap so broad as to be meaningless. *See United States v. Lopez*, 514 U.S. 549, 565 (1995) (rejecting a "rationale [that] lacks any real limits because, depending on the level of generality, any activity can be looked upon as commercial"). We decline to read Congress's deliberately chosen words so broadly.

Additionally, we agree with the district court that, reading "associated with" narrowly is supported by the surrounding statutory language. *Hendrick II*, 817 F. Supp. 3d at 1027. As discussed, the other subparts of the definition of "swap" refer "almost exclusively to financial measures, indices, or instruments." *Id.*; 7 U.S.C. § 1a(47)(A). While some of the identified swaps, such as an emissions swap or a weather swap, do not refer to a financial instrument or measure, weather and emissions are unlike the winner of a sports game or the number of points scored during a game, or similar sports event contracts offered by Kalshi.

ii

Kalshi also asserts that "the Special Rule [in 7 U.S.C. § 7a-2(c)] is irrefutable textual proof that Congress intended the CFTC—not 50 states—to make a public-interest determination regarding swaps and event contracts involving 'gaming.'" But Kalshi's self-certification and listing of these contracts is unlawful under this Special Rule, and its associated regulation, 17 C.F.R. § 40.11.

When Kalshi registered as a DCM, it certified that it would abide by all CFTC regulations. The CEA provides that a "registered entity may elect to list for trading or accept for clearing any new contract . . . by providing to the Commission . . . a written certification that the new contract . . . complies with this chapter (including regulations under this chapter.)" § 7a-2(c)(1).

In a subsection titled "Prohibition," § 40.11 provides that "[a] registered entity *shall not* list for trading . . . [a]n agreement, contract, transaction or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, that involves, relates to, or references . . . gaming, or an activity that is unlawful under any State or Federal law"[6]). 17 C.F.R. § 40.11(a) (emphasis added). The CFTC included this prohibition to "prevent gambling through the futures markets." *Provisions Common to Registered Entities*, 76 Fed. Reg. 44776, 44786 (July 27, 2011) (internal quotation marks omitted). Kalshi, joined now by the CFTC, misreads the regulation and asserts that the Special Rule (1) allows contracts related to gaming, terrorism, and assassination *unless* the CFTC acts to remove them, and (2) that sports event contracts do not involve gaming. We disagree because this argument fails to properly account for § 40.11.

On the first point, the regulation is clear. "A registered entity *shall not list for trading* . . . a contract, transaction, or swap based on an excluded commodity," that "involves, relates to, or references terrorism, assassination, war, [or] gaming." 17 C.F.R. § 40.11(a) (emphasis added). And "[t]he word 'shall' has traditionally been interpreted as mandatory direction in a statute." *In re Thrift Shoe Co., Inc.*, 502 F.2d 1211, 1213 (9th Cir. 1974) (citation omitted); *see Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523

[6] The definition of "excluded commodity," includes "an occurrence, extent of an occurrence, or contingency . . . that is . . . beyond the control of the parties to the relevant contract, agreement, or transaction; and associated with a financial, commercial, or economic consequence." By citing to § 7a-2(c)(5)(C)(i), which uses a similar definition to refer to "event contracts," including "swaps in excluded commodities," Kalshi seems to characterize its sports event contracts as fitting within this definition of "excluded commodities." *See* § 7a-2(c)(5)(C)(i).

U.S. 26, 35 (1998) (referring to shall as "mandatory"). Giving the word "shall" its traditional statutory meaning, the regulation's use of the phrase "shall not" prohibits Kalshi from listing its sports event contracts on a DCM and "creates an obligation impervious to judicial discretion." *Lexecon*, 523 U.S. at 35. The CFTC's contrary view is not entitled to deference. *See Loper Bright*, 603 U.S. at 401.

The CFTC "may determine" that contracts involving "gaming" are "contrary to the public interest." § 7a-2(c)(5)(C)(i), (ii). Thus, in addition to prohibiting the listing of contracts that involve gaming, § 40.11(c) provides that "[t]he Commission *may* determine" that a contract relates to "an activity enumerated in § 40.11(a)," and subject it to a 90-day review. § 40.11(c). Following that review, the CFTC "shall issue an order approving or disapproving" the contract. § 40.11(c)(2). The CFTC never invoked the 90-day review or issued an order approving Kalshi's sports event contracts. CFTC Ltr. No. 25-36, Comm. Fut. L. Rep. ¶ 35563 (Sept. 30, 2025). Thus, Section 40.11(c)'s discretionary authority was never used—and § 40.11(a)'s prohibition on Kalshi listing for trading on its DCM sports event contracts, that are in substance gaming contracts, remains in effect. § 40.11(a).

Our sister circuit essentially disregarded § 40.11's prohibition on listing gaming-related transactions, when it said that the CFTC "has not yet acted to review or *prohibit* any sports-related event contracts." *Flaherty*, 172 F.4th at 227 (emphasis added). And the *Flaherty* majority's observation about the CFTC's lack of review proves our point. Although the CFTC has not initiated review of these specific sports event contracts, it published § 40.11(a), which prohibits Kalshi from listing them. The CFTC's Notice of Proposed Rulemaking (NPRM), which Kalshi

cited as supplemental authority under Fed. R. App. 28(j), reaffirms our view on the regulation as currently written. Until § 40.11(a) is amended in the manner described in the NPRM, it bars Kalshi's gaming-related contracts from being listed on a DCM. As of now, the existing regulation controls. *See Ctr. for Food Safety v. Vilsack*, 718 F.3d 829, 843 (9th Cir. 2013) ("[P]roposed regulations have no legal effect.").

The Special Rule did not give the CFTC any more preemptive authority over gaming than it gave the CFTC authority over terrorism or assassination and the other underlying "excluded commodities." To illustrate this, consider the CFTC's interpretation that "products historically treated as insurance products" are not considered swaps by the CFTC. *Further Definition of "Swap"*, 77 Fed. Reg. 48208, 48246 (Aug. 13, 2012). Suppose Kalshi, in violation of that understanding, self-certified a life-insurance contract, to be paid out to the buyer contingent on the occurrence of an "event" (someone's death) associated with a financial consequence (either the payout of the contract or some other downstream consequence). If the CFTC either failed or declined to remove this contract from Kalshi's DCM, as it has failed or declined to enforce § 40.11 regarding sports event contracts, we would not conclude that all 50 states and all non-CFTC federal agencies are prohibited from regulating these life insurance policies on the ground that they constitute swaps traded on a DCM. And Kalshi does not suggest as much. Kalshi's current argument about gambling contracts similarly fails. The CEA's scheme simply is not as expansive as Kalshi would like.

This prompts the question whether Kalshi's sports event contracts "involve[], relate[] to, or reference[] . . . gaming" under § 40.11(a). If not, then § 40.11(a) would not ban

listing them on DCMs. We do not defer to the CFTC's definition of gaming. *See Loper Bright*, 603 U.S. at 385. As discussed, under any reasonable interpretation, Kalshi's sports event contracts relate to gaming. If these are not "gaming" contracts, then the Special Rule has no relevance.

Before Kalshi tried to bootstrap these contracts onto the DCM, Kalshi shared our understanding. Two years ago, Kalshi asserted to the D.C. Circuit that "[t]he proper interpretation is again simple, 'gaming,' as used in the special rule refers to playing games or playing games for stakes." Brief for Appellee KalshiEX, LLC, *KalshiEx LLC v. Commodity Futures Trading Comm'n*, 119 F.4th 58 (D.C. Cir. 2024); No. 24-5205, 2024 WL 4802698, at *17, 41. In contrast to its current position, it contended that "[a]n event contract therefore involves 'gaming' if it is contingent on a game or a game-related event—like the Kentucky Derby, Super Bowl, or Masters golf tournament . . . ." *Id.* at * 17. Kalshi reiterated that "[a]n event contract thus involves 'gaming' if it is contingent on a game or a game-related event." *Id.* at *41. Kalshi concluded that "[t]he classic example is a contract on the outcome of a sporting event; as the legislative history directly confirms, Congress did not want sports betting to be conducted on derivatives markets." *Id.* We agree.

The change in Kalshi's arguments reflects its new business strategy—offering sports event contracts—and the reality that this strategy generates substantial and significant revenue. But this business strategy does not affect our duty "to say what the law is." *Marbury*, 5 U.S. (1 Cranch) at 177.

iii

Read purely in isolation, Kalshi's expansive reading of "swap" has "a colorable textual basis." *West Virginia v.*

*EPA*, 597 U.S. 697, 722 (2022). But "extraordinary grants of regulatory authority are rarely accomplished through modest words, vague terms, or subtle devices . . . Something more than a merely plausible textual basis for the agency action is necessary." *Id.* at 723 (cleaned up).

There is no such clear congressional authorization here. To be sure, "Congress can regulate sports gambling directly" should it choose to do so. *Murphy v. NCAA*, 584 U.S. 453, 486 (2018). But Congress has not done so directly, or indirectly through the CFTC. And "if it elects not to do so, each State is free to act on its own." *Id.* The Dodd-Frank Wall Street Reform Act cannot be read as a direct (or indirect) regulation of sports gambling, and the CFTC is not a national gambling regulator. No one suggested it was until over a decade after the law was passed. "If an agency wants to exercise expansive regulatory authority over" a major issue like gambling, "an *ambiguous* grant of statutory authority is not enough." *United States Telecom Ass'n v. FCC*, 855 F.3d 381, 421 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from the denial of rehearing en banc). Instead, "Congress must clearly authorize an agency to take such a major regulatory action." *Id.*

Finally, accepting Kalshi's argument that Congress delegated its power to regulate gambling (a power traditionally exercised by the States and Tribes) to the CFTC when it passed Dodd-Frank would create a major-questions problem. *See West Virginia*, 597 U.S. at 724 (explaining that the major questions doctrine refers to the problem of "agencies asserting highly consequential power beyond what Congress reasonably understood to have been granted"). This is because adopting Kalshi's view that sports event contracts are swaps results in a reading of the CEA that gives the CFTC regulatory authority over sports betting—an

area that has long been regulated by the States and Tribes. *See Ah Sin v. Wittman*, 198 U.S. 500, 505–06 (1905) (concluding that the regulation "of gambling is concededly within the police powers of a state"); *see also Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 737, 740 (9th Cir. 2003) (stating that the regulation of gambling, a "vice activity," is a "function that lies at the heart of a state's police power" and collecting cases upholding state laws regulating gambling); 15 U.S.C. § 3001(a)(1) (providing that "the States should have the primary responsibility for determining what forms of gambling may legally take place within their borders"); 25 U.S.C. § 2701 (Indian Gaming Regulatory Act).

Moreover, sports gambling involves "billions of dollars" and affects "millions of people." *See Brief of New Jersey, Ohio, 37 Other States, and the District of Columbia as* Amicus Curiae 22 (citing *King v. Burwell*, 576 U.S. 473, 485 (2015)). "Americans wagered almost $150 billion on sports in 2024." *Id.* (citation omitted). And states understandably feel protective of their longstanding regulatory authority, given the significant impact gambling has on society. *See id.* at 27, 29 ("Millions of Americans qualify as problematic or pathological gamblers. . . . And research reflects that those who start gambling at a young age run a higher risk of problematic gambling."). As a result, the stakes are high when it comes to gambling regulation. Thus, it is implausible that Congress intended to allow the CFTC to engage in the national regulation of gambling based on expansive definitions of the words "event" and "associated with" in a Wall Street reform bill.

When read "in their context with a view to their place in the overall statutory scheme," the words in the definition of swap in § 1a(47)(A)(ii) cannot bear the weight Kalshi puts

on them. *See West Virginia*, 597 U.S. at 721 (quoting *Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 809 (1989)). Congress does not "typically use oblique or elliptical language to empower an agency to make a radical or fundamental change to a statutory scheme." *Id.* at 723 (cleaned up). Federal and state statutory schemes regulate gaming. We have recognized that "[g]ambling does not involve an inherently national system of regulation, given the states' long-understood authority in this area." *Flynt v. Bonta*, 131 F.4th 918, 932 (9th Cir. 2025) (citing *Murphy*, 584 U.S. at 484). And the Supreme Court has said that "each State is free to act" in this area. *Murphy*, 584 U.S. at 486. Nevada has acted in this area and created a comprehensive regulatory regime, over a variety of gaming methods, that is recognized as the "gold standard in gaming regulation." Becky Harris & Husna Alikhan, *Part I: Nevada, Over 60 Years Regulating Gambling—A Jurisdictional Overview*, 23 GAMING L. REV. 645, 645–49 (2019). Regulation of gambling has been "vitally important to the economy of the State and the general welfare of the inhabitants" for over a century and a half; it is known around the world as the premiere destination for trying one's luck in a well-regulated environment. *See* Nev. Rev. Stat. Ann. § 463.0129(1)(a). In contrast, other states have banned the practice. *See Murphy*, 584 U.S. at 458–61 (stating that "Americans have never been of one mind about gambling" and discussing the evolution of gambling in the United States).

We are "reluctant to read into ambiguous statutory text" a "radical or fundamental change" to that longstanding statutory scheme. *West Virginia*, 597 U.S. at 723 (quotations omitted). Congress did not take a wrecking ball to all sports gambling regulations built up over decades by federal, state,

and tribal governments when it amended the CEA to add the definition of swap we are considering today.

The words "event" and "associated with" in the CEA's swap definition can yield competing, legitimate interpretations. *See* § 1a(47)(A)(ii). But because Congress has spoken on the issue of gambling in other statutes (and did not impliedly repeal or amend those statutes through Dodd-Frank), there is no limiting principle to Kalshi's broad reading of the definition of swap and adopting that reading would assume that, by granting the CFTC regulatory authority over gaming nationwide, Congress "hid an elephant in a mousehole." Thus, we conclude that these sports event contracts are likely not swaps under the CEA.[7]

2

Kalshi also argues that its contracts are "futures or options in 'excluded commodities.'" Excluded commodities include "occurrence[s]" that are "associated with a financial, commercial, or economic consequence." § 1a(19)(iv). First, there is a legitimate concern that the CFTC lacks exclusive jurisdiction over excluded commodities because they are not listed in § 2(a)(1)(A)'s exclusive jurisdiction grant. Kalshi argues that excluded commodities are a subset of commodity. We agree, however, with the district court that such a reading does "not grammatically or logically make sense." *Hendrick II*, 817 F. Supp. 3d at 1034.

Likewise, even if excluded commodities fell under the CFTC's exclusive jurisdiction, these contracts still would

[7] Because the district court did not analyze whether Kalshi's election contracts, which are illegal under Nevada law and a fraction of Kalshi's business, fit within the CEA's definition of swap, we remand for the district court to consider this issue in the first instance.

not qualify as excluded commodities because of the economic consequence language. Section 1a(19)(iv)(II) requires even excluded commodities under the CEA to be "associated with a financial, commercial, or economic consequence." This sets an even higher standard than the swap definition, which allows for "potential" consequences. § 1a(47)(A)(ii). For the reasons stated, Kalshi's sports bets do not clear this consequence hurdle. *See supra*, at Section III.B.1.b.i. As a result, Kalshi's excluded commodity argument fails.

C

We also reject Kalshi's argument that the state regulations are preempted under "conflict preemption," which "arises when state law conflicts with a federal statute." *Canards*, 33 F.4th at 1114 (citations omitted). One form of conflict preemption—impossibility preemption—"occurs when it is impossible for a private party to comply with both state and federal law." *Id.* (citation omitted).

Kalshi argues that it is impossible to comply with Nevada law and the CEA, and that Nevada law poses an obstacle to the CEA's purposes. It argues that it cannot provide its users with "impartial access" to its markets and services, as required by the CFTC's Core Principles, if it bars Nevada residents from trading in sports event contracts. *See* 17 C.F.R. §§ 38.150, 38.151(b). Section 38.151(b) provides that a DCM must "provide it members" and "persons with trading privileges . . . impartial access to its markets and services, including [a]ccess criteria that are impartial, transparent, and applied in a discriminatory manner." 17 C.F.R. § 38.151.

Kalshi's argument offers a false, all-or-nothing proposition. Kalshi contends that if Nevada's enforcement

action against it continues, it would no longer be able to offer sports event contracts in Nevada and, as a result, Kalshi would be arguably violating the CEA's "impartial access" requirement. But it does not explain *why* not offering sports events contracts in Nevada would run afoul of § 38.151(b). Moreover, "regulated entities" in Nevada use "geofencing." *Hendrick II*, 817 F. Supp. 3d at 1035. Kalshi could do the same; it just refuses to do so and instead seeks a competitive advantage over its competitors. Additionally, the district court considered this argument extensively and found no evidence that Kalshi would violate the CEA and thus be subject to adverse action from the CFTC if it complied with Nevada gaming laws. *Hendrick II*, 817 F. Supp. 3d at 1034–35 (finding no evidence that CFTC would act against registered entities if they complied with state law and court orders while this litigation is ongoing).

Indeed, as another district court has noted, the CEA's Special Rule authorizing the CFTC to disallow contracts "involv[ing] . . . activity that is unlawful under . . . state law" establishes that state law and the CEA can coexist. *Martin*, 793 F. Supp. 3d 2025) (concluding that "the statutory Special Rule in 7 U.S.C. § 7a-2(c) itself confirms that Congress intended for at least some state laws to operate alongside the CEA, not to be preempted by it"). Any other asserted differences between the CEA and state-law requirements show only that state law can be more protective than federal law, which does not inherently create a conflict. *See Wyeth v. Levine*, 555 U.S. 555, 573 (2009). Kalshi has not shown that complying with Nevada law would jeopardize its DCM status with the CFTC. On this record, we conclude that no conflict preemption arises.

D

We also reject Kalshi's argument that field preemption applies. "Field preemption prohibits state regulation of conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Canards*, 33 F.4th at 1114 (quotation omitted). Field preemption can apply when Congress enacts a regulatory scheme so comprehensive that it "has left no room for States to regulate." *Arizona v. United States*, 567 U.S. 387, 400 (2012). We agree with the Third Circuit's conclusion in *Flaherty* that the CEA is a comprehensive regulatory scheme and "preempts state law purporting to regulate futures trading." 172 F.4th at 229. For instance, a state would be both field and expressly preempted from regulating weather or interest rate swaps under § 1a(47)(A)(iii) and § 2(a)(1)(A).

But courts should be careful to not interpret "the scope of the preempted field too broadly." *Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680, 689 (3rd Cir. 2016). When conducting the field preemption analysis, we must "consider[] the *target* at which the state law *aims* in determining whether that law is pre-empted." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 385 (2015).

While the CEA preempts the field of regulating swaps traded on a DCM, § 2(a)(1)(A), the Nevada state laws and regulations at issue (as identified in the cease-and-desist letter the Board sent to Kalshi) regulate "gaming" activity," including operating an unlicensed "sports pool" in which "wagers" on "sporting events or other events" are accepted, a field which the CEA has not preempted. *See* Nev. Rev. Stat. §§ 463.160(1)(a), (4); 463.245(2); 465.086, 465.092. Congress has explicitly not occupied the field of gambling,

declaring that "the States should have the primary responsibility for determining what forms of gambling may legally take place within their borders." 15 U.S.C. § 3001(a)(1). The *Flaherty* majority's holding that field preemption applied depended on its determination that "Kalshi's sports-related event contracts are swaps" under the CEA. 172 F.4th at 229. Because we disagree on that point, *see supra*, at Section III.B, we similarly disagree with the conclusion that the CEA has preempted the field of all state gaming regulations.

For these reasons, Kalshi has failed to show a likelihood of success on the merits of its preemption claims.

E

To warrant preliminary relief, Kalshi must also show that it is likely to suffer irreparable harm in the interim, and that an injunction is both equitable and in the public interest. *NetChoice*, 152 F.4th at 1012. The district court did not abuse its discretion in analyzing these factors.

1

Kalshi argues that, absent an injunction, it will suffer irreparable harm, including the costs of geofencing and closing out contracts in Nevada, and the "Hobson's choice" of choosing to comply with state law or to risk potentially losing its DCM status. These are not irreparable harms. The costs of geofencing are unlikely to be too expensive for a company of Kalshi's size, and the other harms are either speculative or self-inflicted. *See Hendrick II*, 817 F. Supp. 3d at 1035 (noting that Kalshi "greatly expanded its offerings" despite knowing its sports contracts implicated state law).

Kalshi speculates that it may lose its DCM status. But it is "difficult to credit Kalshi's fear given its apparent willingness to risk its DCM status by listing contracts involving gaming (however defined) in the face of the CFTC's regulation that prohibits DCMs from doing so." *Hendrick II*, 817 F. Supp. 3d at 1035. Additionally, on September 30, 2025, the CFTC sent a letter to DCMs regarding "sport-related event contracts" to "caution" the DCMs that "State regulatory actions and pending and potential litigation, including enforcement actions, should be accounted for with appropriate contingency planning" and other measures including "close-out policies."

Kalshi offered its sports event contracts despite the CFTC's prohibition. § 40.11. "When a harm is largely self-inflicted, that fact severely undermines a claim for equitable relief." *Bennett v. Isagenix Int'l LLC*, 118 F.4th 1120, 1129 (9th Cir. 2024). And it is unlikely that any irreparable harm is done by what is likely a lawful state enforcement proceeding. The district court therefore did not abuse its discretion in concluding this factor supports Nevada. *Hendrick II*, 817 F. Supp. 3d at 1034–36.

2

The district court did not abuse its discretion on the public interest and balance of equities issue. *Id.* at 1035–37. It is true that "preventing a violation of the Supremacy Clause serves the public interest" and would tip the balance of equities in Kalshi's favor. *United States v. California*, 921 F.3d 865, 893–94 (9th Cir. 2019). But this issue, like irreparable harm, turns on our resolution of the likelihood of success on the merits. Because we conclude that Kalshi has not shown it is likely to succeed on the merits, the district court did not abuse its discretion in concluding that the

public interest and equities favor Nevada's ability to enforce its state law. *Cf. Bush v. Gore*, 531 U.S. 98, 112 (2000) (Rehnquist, C.J., concurring) ("In most cases, comity and respect for federalism compel us to defer to the decisions of state courts on issues of state law.").

IV

We affirm in part the district court's order dissolving the preliminary injunction enjoining the Nevada Gaming Control Board, the Nevada Gaming Commission, and their members in their official capacities from enforcing state laws against Kalshi's sports-related event contracts. The CEA grants the CFTC exclusive jurisdiction over "transactions involving swaps . . . traded or executed on" a DCM. § 2(a)(1)(A). When given its broadest reading, the definition of "swap" in § 1a(47)(A)(ii) might cover the sports event contracts here and thus preempt Nevada law. But that broad reading is not the best textual reading in context, does not square with the statutory scheme, does not have a limiting principle, and would raise concerns under the major-questions doctrine. Therefore, the district court did not err in its interpretation of the definition of swap. And because the district court did not abuse its discretion in concluding that the equities favor Nevada, we affirm the district court's order. We remand for the district court to consider Nevada's challenges to Kalshi's election contracts consistent with this opinion.

**AFFIRMED IN PART AND REMANDED IN PART.**

LEE, Circuit Judge, concurring.

I largely agree with Judge Nelson's excellent textual analysis of the relevant provisions of the Commodities and Exchange Act. The majority opinion rightfully avoids the Third Circuit's more literalist approach to textualism in *KalshiEx v. Flaherty*, 172 F. 4th 220 (3rd Cir. 2026), and instead interprets the text under its ordinary meaning and within the statutory context. *See* Antonin Scalia & Bryan A. Garner, Readling Law: The Interpretation of Legal Texts 56 (2012) ("The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means."); *id.* at 69 ("Words are to be understood in their ordinary, everyday meanings—unless the context indicates that they bear a technical sense.").

I thus agree with the majority opinion that the more natural reading of "event" under the statutory definition of a "swap" would not include the outcome of a sporting event—even if a broad and literal definition of "event" could encompass it. 7 U.S.C. § 1a(47)(A). Few people would describe, say, the New York Mets' latest loss of a game as an "event." Likewise, I do not think the outcome of a typical sports game is "associated with a potential financial, economic, or commercial consequence" as required under the definition of a swap. *Id.* at § 1a(47)(A)(ii). Going back to the Mets example, perhaps in an uber-technical sense a Mets' loss could have marginal economic impact as some fans guzzle more beer to drown away their sorrows. But it seems somewhat fanciful to say that the outcome of a single game in a 162-game season is likely "associated" with a "financial, economic, or commercial consequence" that one would expect in a swap contract.

Admittedly, reasonable people may disagree with these interpretations. But the major questions doctrine offers contextual clues for reading broad and abstract words so that we interpret them under their ordinary meaning. Stated differently, the major questions doctrine helps narrow the potential meaning of vague statutory terms from a universe of possible to a realm of probable when dealing with major governmental actions. Here, "the 'history and the breadth of the authority that the agency has asserted,' and the 'economic and political significance' of that assertion, provide a 'reason to hesitate before concluding that Congress' meant to confer such authority." *West Virginia v. EPA*, 597 U.S. 697, 700 (2022) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–60 (2000)) (internal brackets omitted). Given that sports gambling is a multibillion-dollar industry historically regulated by states and Indian tribes, it would seem odd to read abstract terms such as "event" and "financial, economic, or commercial consequence" as upending this longstanding regulatory regime.

One statutory provision, however, gives me pause. The Special Rule provision says that the "Commission *may* determine that [certain contracts or swaps] are contrary to the public interest if" they "involve . . . gaming." 7 U.S.C. § 7a-2(c)(5)(c)(i) (emphasis added). The statute thus appears to give the CFTC discretion whether to ban altogether gaming contracts. Put another way, the statute does not seem to categorically bar all gaming contracts, despite the text and contextual clues suggesting otherwise. So perhaps some unique sports events can be part of a swap trade if they meet the statutory requirements.

Neither party has focused much on this provision—for obvious reasons. Kalshi has not relied on this provision

because CFTC, exercising its authority under the Special Rule provision, has issued a rule banning gaming contracts. 17 C.F.R. § 40.11. Nevada has been largely quiet because the Special Rule complicates the statutory analysis.

Ultimately, I do not think we need to resolve this thorny statutory interpretation question right now because 17 C.F.R. § 40.11 bars gaming contracts. While CFTC has proposed revising that regulation, it remains in the books and controls the outcome of this appeal.