# Exhibit A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

Plaintiff,

v.

MICHELE SPAGNUOLO,

Defendant.

No. 1:26-cr-278 (AT)

**BRIEF OF *AMICUS CURIAE***
**U.S. COMMODITY FUTURES TRADING COMMISSION**
**IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS (COUNT ONE)**

**TABLE OF CONTENTS**

INTEREST OF AMICUS CURIAE AND INTRODUCTION ........ 1

BACKGROUND ........ 2

ARGUMENT ........ 5

I. The Google Search Contracts are swaps ........ 5

A. The “swap” definition makes no distinction between “events” and “outcomes” ........ 6

B. The “swap” definition requires only “potential” “financial, economic, or commercial consequence” ........ 9

C. Spagnuolo’s legislative history and Special Rule arguments fail ........ 15

II. Spagnuolo had fair notice that event contract insider trading is illegal ........ 17

CONCLUSION ........ 19

## TABLE OF AUTHORITIES

Cases

*Alabama Power Co. v. Costle*,
636 F.2d 323 (D.C. Cir. 1979).......................................................10

*Barbosa da Cunha v. Freden*,
175 F.4th 61 (2d Cir. 2026).......................................................15

*Bostock v. Clayton Cnty.*,
590 U.S. 644 (2020).......................................................15

*KalshiEX, LLC v. Assad,*
2026 WL 2543846 (9th Cir. Aug. 28, 2026).......................................................14, 15, 16

*KalshiEX LLC v. Flaherty*,
172 F.4th 220 (3d Cir. 2026).......................................................13, 14

*KalshiEX LLC v. Johnson*,
832 F. Supp. 3d 954 (D. Ariz. 2026).......................................................7, 8

*KalshiEX LLC v. Orgel*,
2026 WL 474869 (M.D. Tenn. Feb. 19, 2026).......................................................7, 10

*KalshiEX LLC v. Williams*,
2026 WL 1961872 (S.D.N.Y. July 7, 2026).......................................................1

*KalshiEX, LLC v. Hendrick*,
817 F. Supp. 3d 1014 (D. Nev. 2025).......................................................13

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014).......................................................13

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982).......................................................2

*Milner v. Department of Navy*,
562 U.S. 562 (2011).......................................................15

*Solid Waste Agency of N. Cook County v. U.S. Army Corps of Eng'rs*,
531 U.S. 159 (2001).......................................................17

*United States v. Coonan*,
143 F.4th 119 (2d Cir. 2025).......................................................15

*United States v. Kinzler*,
55 F.3d 70 (2d Cir. 1995) ............ 18

*United States v. Minnesota*,
__ F. Supp. 3d __, 2026 WL 2150211 (D. Minn. July 27, 2026) ............ 10, 12, 16

*United States v. O'Hagan*,
521 U.S. 642 (1997) ............ 19

*United States v. Phillips*,
155 F.4th 102 (2d Cir. 2025) ............ 3, 6, 16

*United States v. Reed*,
2022 WL 597180 (S.D.N.Y. Feb. 28, 2022) ............ 6, 17, 18

Statutes

7 U.S.C. §§ 1–26 ............ 1

7 U.S.C. § 1a ............ 6, 8, 13, 14, 15 17

7 U.S.C. § 2 ............ 3, 4, 14

7 U.S.C. § 7a-2(c) ............ 4, 16

15 U.S.C. § 8321(b) ............ 13, 15

15 U.S.C. §§ 8302(d)(1) ............ 13, 15

Regulations

17 C.F.R. § 1.6 ............ 19

17 C.F.R. § 40.2 ............ 4

Other Authorities

Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping,
77 Fed. Reg. 48,208 (Aug. 13, 2012) ............ 13

Prediction Markets; Public Interest Determinations,
91 Fed. Reg. 35,806 (proposed June 12, 2026) ............ 5

Data Reporting Requirements for Certain Event Contracts,
91 Fed. Reg. 40,102 (proposed July 1, 2026) ............ 5

Joint Request for Comment on Further Definition of "Swap" and "Security-Based Swap" and on Alternative Compliance,
91 Fed. Reg. 37,873 (request for comments June 24, 2026) ....................................................5

Concept Release on the Appropriate Regulatory Treatment of Event Contracts,
73 Fed. Reg. 25,669, 25,671 (request for comments May 7, 2008) ............................3, 4, 17, 18

Austin Wakeman Scott, *Fundamentals of Procedure* 4 (1922)....................................................7

Caitlin O'Kane, *The Federal Reserve says Taylor Swift's Eras Tour boosted the economy, One market research estimates she could add $5 billion*, CBS News (July 18, 2023)...............13

Jilliam Ambrose, *Oil prices dip below zero as producers forced to pay to dispose of excess,* The Guardian (Apr. 20, 2020)...............................................................................12

CFTC Staff Letter No. 93-66 (June 18, 1993) .............................................................................4

CFTC, Release Number 9199-26,
*CFTC and MLB Sign Groundbreaking MOU* (Mar. 19, 2026)...................................................4

CFTC, Release Number 9235-26,
*CFTC and National Hockey League Sign MOU Related to Integrity in Professional Hockey*, (May 21, 2026).....................................................................................................................4

## INTEREST OF *AMICUS CURIAE* AND INTRODUCTION

The Commodity Futures Trading Commission (the "CFTC" or "Commission") is the federal agency charged with administering and enforcing the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1–26. The CEA and the CFTC's rules provide the regulatory framework for the trading of commodity derivatives, including "swaps," in the United States.

This case is about a type of swap called an "event contract." While the Commission has regulated event contracts for decades in multiple jurisdictional forms, those contracts have expanded significantly in recent years. The Commission welcomes financial innovation and increased market participation, yet acknowledges that these contracts can be manipulated or abused by individuals who possess inside information about the underlying event. The Commission's Division of Enforcement has accordingly devoted significant resources to protecting the integrity of event contract markets. This case is the second[1] federal prosecution for the insider trading of event contracts and therefore will be a significant bellwether not only for the Commission's pending civil enforcement action against Defendant ("Spagnuolo"),[2] but also for future prosecutions and enforcement actions arising from event contracts.[3]

[1] The first such case is still pending in this District. *United States v. Van Dyke*, No. 1:26-cr-156 (S.D.N.Y.). On August 21, 2026, the CFTC submitted an amicus brief for Judge Garnett's consideration, which was accepted on August 24, 2026. *Id.* at Dkt. Nos. 28, 28-1, 30.

[2] *CFTC v. Spagnuolo*, No. 1:26-cv-4419 (S.D.N.Y.).

[3] There is ongoing civil litigation around the country about the scope of the Commission's jurisdiction with respect to event contracts. In this District, this Court assumed without deciding that event contracts are swaps, but held that the CEA does not preempt New York gambling law. *KalshiEX LLC v. Williams*, 2026 WL 1961872, at *5–9 (S.D.N.Y. July 7, 2026). Meanwhile, the United States and the Commission have moved to preliminarily enjoin New York from enforcing its gambling law as to transactions on CFTC-registered exchanges, which is pending before Judge Schofield. *United States v. New York*, No. 26-cv-3404 (S.D.N.Y.).

Spagnuolo moves to dismiss the CEA charge against him on the ground that the at-issue event contracts are not "swaps" subject to the CEA. Dkt. No. 41 (the "Mot."). That contention is wrong: Congress's definition of "swap" easily encompasses Spagnuolo's event contracts, and that result is amply reinforced by the CEA's broader context. Spagnuolo's distortion of the CEA's text, if accepted, would undermine the Commission's jurisdiction over a huge range of event contracts whose notional volume totals into the tens of billions of dollars. And if the Commission lacks regulatory and enforcement oversight in this space (which it does not), *no federal regulator* has oversight—a gaping hole in a national market.

Spagnuolo also maintains that the CEA's anti-fraud provision cannot constitutionally apply to his conduct. Again, that is not so: Spagnuolo had clear notice that event contracts are generally "swaps" based on the CEA's text and the Commission's regulatory actions, including about the specific platform on which Spagnuolo traded.

## BACKGROUND

**1.** Congress enacted the CEA almost 100 years ago to provide "a comprehensive regulatory structure to oversee" commodity derivatives markets. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982). A derivative is a financial instrument, the value of which depends on (*i.e.*, is derived from) the value of some underlying asset, index, or other measure (*i.e.*, the underlier). In general, market participants use derivatives to hedge risks or speculate on commodity price movements, the result of which is a process of information aggregation and price discovery that further aids the financial, economic, or commercial planning of market participants. The most common derivatives are "futures," "options," and "swaps."

The concept of a "derivative" has never been static. While futures exchanges were first created to foster hedging and speculation on agricultural products, futures markets quickly evolved

to encompass other types of underliers, such as physical commodities like metals, oil, and gas, and later, cash-settled futures linked to less tangible measures like interest rates and stock-market indices. Derivatives have also evolved in structure over time. Swaps were introduced to allow counterparties to exchange cash flows based on the value of an underlying commodity, like an interest rate, exchange rate, or even the weather. In the 2010 Dodd-Frank Act, Congress extended the Commission's "exclusive jurisdiction" to encompass "transactions involving swaps," 7 U.S.C. § 2(a)(1)(A), and it "defined 'swap' broadly," *United States v. Phillips*, 155 F.4th 102, 113 (2d Cir. 2025).

**2.** Event contracts are part of this tradition of innovation. An "event contract" is a CFTC-regulated "derivative contract whose payoff is based on a specified event, occurrence, or value."[4] Typically, they are based on yes-no scenarios and provide for a fixed payout (usually $0 or $1) at the expiration of an event. Here, for example, Spagnuolo purchased "YES" and "NO" shares on "whether certain individuals would or would not be the most 'searched' individuals on Google for 2025" (the "Google Search Contracts"). Dkt. No. 1, at ¶ 6(b). When the Google Search Contracts resolved in his favor, he received "approximately $1.2 million," *id.* at ¶ 8(e); had they not resolved in his favor, he would have received nothing.

While event contracts have become increasingly popular with the American public, these contracts are not recent innovations. "Since 1992, Commission-regulated exchanges have listed for trading a variety of commodity futures and options contracts with payout terms based on" events "as diverse as regional insured property losses, the count of bankruptcies, temperature volatilities, corporate mergers, and corporate credit events." 73 Fed. Reg. 25,669, 25,671 (request

[4] CFTC, *Contracts & Products*, https://www.cftc.gov/IndustryOversight/ContractsProducts/index.htm.

for comments May 7, 2008). In 1993, the Commission issued a no-action letter to Iowa Electronic Markets, allowing the facility to list event contracts tied to U.S. and Canadian elections.[5] And by 2005, event contracts encompassed "the accomplishment of certain scientific advances, world population levels, the adoption of particular pieces of legislation, the outcome of corporate product sales, the declaration of war and the length of celebrity marriages." 73 Fed. Reg. at 25,670. Dodd-Frank confirmed the Commission's jurisdiction over event contracts, as it created a "Special Rule" acknowledging that "[e]vent contracts" are "swaps" and granting the Commission discretionary authority to prohibit a subset of those event contracts that may be contrary to the public interest. *See* 7 U.S.C. § 7a-2(c)(5)(C).

The Commission exercises its exclusive jurisdiction over event contracts in myriad ways. Event contracts offered to the general public must be traded on a CFTC-registered exchange called a Designated Contract Market ("DCM"). 7 U.S.C. § 2(e). The Commission requires DCMs to complete a registration process with the Commission before listing products for trading, and it monitors their activity to ensure that they comply with the CEA's core principles. *See id.* § 7. It reviews self-certifications that DCMs file before listing a contract for trading. 17 C.F.R. § 40.2. It has signed Memoranda of Understanding with professional sports leagues to promote market integrity in sports-related event contracts.[6] And the Commission has pursued legal actions against Spagnuolo and others for insider trading and manipulative conduct on prediction markets. *See*

---

[5] CFTC Staff Letter No. 93-66 (June 18, 1993), https://www.cftc.gov/sites/default//files/idc/groups/public/@lrlettergeneral/documents/letter/93-66.pdf.

[6] CFTC, Release Number 9199-26, *CFTC and MLB Sign Groundbreaking MOU* (Mar. 19, 2026), https://www.cftc.gov/PressRoom/PressReleases/9199-26; CFTC, Release Number 9235-26, *CFTC and National Hockey League Sign MOU Related to Integrity in Professional Hockey*, (May 21, 2026), https://www.cftc.gov/PressRoom/PressReleases/9235-26.

*Spagnuolo*, No. 1:26-cv-4419; *CFTC v. Van Dyke*, No. 1:26-cv-3369 (S.D.N.Y.) (insider trading of event contracts related to the ouster of Nicolás Maduro); *Order Instituting Proceedings Pursuant to Section 6(c) and (d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions*, CFTC Dkt. No. 26-05 (July 31, 2026) (imposing penalties on former Congressman George Santos for manipulative activity around State of the Union event contracts); *Order Instituting Proceedings Pursuant to Section 6(c) and (d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions*, CFTC Dkt. No. 26-06 (Aug. 28, 2026) (imposing penalties on former presidential teleprompter operator for insider trading presidential speech event contracts).

The Commission is also engaged in significant rulemaking concerning event contracts. On June 12, 2026, it released a proposed rule that would deem certain event contracts presumptively against the public interest. *See* 91 Fed. Reg. 35,806 (proposed June 12, 2026). The CFTC and the SEC have issued a joint request for comment on definitional and regulatory clarity with respect to swaps. Joint Request for Comment on Further Definition of "Swap" and "Security-Based Swap" and on Alternative Compliance, 91 Fed. Reg. 37,873 (request for comments June 24, 2026). The CFTC also issued a Notice of Proposed Rulemaking concerning data-reporting requirements for certain event contracts, *see* 91 Fed. Reg. 40,102 (proposed July 1, 2026). Spagnuolo's baseless argument that event contracts are not swaps attempts to pull the rug out from under all these efforts.

## ARGUMENT

### I. The Google Search Contracts are swaps

Spagnuolo moves to dismiss Count One on the ground that the Google Search Contracts are not "swaps" under the CEA. Not so: the plain text of the "swap" definition straightforwardly encompasses event contracts based on valuable corporate activity, and other pieces of context in

the CEA amply reinforce that conclusion. *See United States v. Reed*, 2022 WL 597180, at *3 (S.D.N.Y. Feb. 28, 2022) (denying motion to dismiss where the alleged CEA regulatory classification "literally fell within the statutory definition").

Congress "defined 'swap' broadly." *Phillips*, 155 F.4th at 113. Among other things, the term includes "[1] any agreement, contract, or transaction" that "[2] provides for any purchase, sale, payment, or delivery … [3] that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency [4] associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Spagnuolo does not dispute that the Google Search Contracts satisfy the first two elements: they are [1] "contract[s]" [2] that provided for "payment."

Spagnuolo only disputes elements [3]—that the Google Search Contracts were "dependent on the occurrence, nonoccurrence, or extent of occurrence of an event or contingency"—and [4]—that the underlying events are "associated with potential financial, economic, or commercial consequences." *Id.* The language of both elements is unmistakably sweeping and encompasses the Google Search Contracts.

### A. The "swap" definition makes no distinction between "events" and "outcomes"

Spagnuolo argues that contracts based on 'outcomes' are not based on 'events' and therefore do not fit within the "swap" definition. Mot. 22-23. That distinction is pure semantics: "outcomes" *are* "events."[7] Thus, it is Spagnuolo's rhetorical games that would end up "trump[ing]

---

[7] *Event*, Webster's II New College Dictionary (3d ed. 2025) (defining "event" to mean "[t]he actual outcome or final result"); *Event*, Merriam-Webster, https://www.merriam-webster.com/dictionary/event (last visited Sept. 18, 2026) ("something that happens"); *Event*, Oxford, https://www.oed.com/search/dictionary/?scope=Entries&q=event (last visited Sept. 18, 2026) ("[s]omething that happens or takes place").

the language of the statute," *id.* at n.32; providing a ready path to escape federal regulation by reframing event contracts as based on "outcomes" rather than "events."

**1.** The "statute's text does not support [a] distinction" between "outcome" and "an 'occurrence' or 'event.'" *KalshiEX LLC v. Johnson*, 832 F.Supp.3d 954, 961 (D. Ariz. 2026). "Both terms plainly reach observable facts that come to pass." *Id.* (event contracts based on the "result of a game" and the game's taking place can both satisfy the "swap" definition). The Google Search Contracts were based on events because they were literally based on "observable facts that c[a]me to pass"—*i.e.*, whether certain individuals drove enough search traffic to appear on Google's Year in Search.

That conclusion is required by the fact that virtually *all* events are also outcomes or can be recharacterized as such. *See* Austin Wakeman Scott, *Fundamentals of Procedure* 4 (1922) (explaining that "every event is the result of an infinite train of causes"). A "three-hour-long game" (*i.e.*, Spagnuolo's "event") "and [a specific team] winning that game" (*i.e.*, Spagnuolo's "outcome") "are both occurrences of events." *KalshiEX LLC v. Orgel*, 2026 WL 474869, at *7 (M.D. Tenn. Feb. 19, 2026) ("President Trump winning the 2024 presidential election was an outcome, but also an event").[8] In this fashion, the contracts traded by Spagnuolo may be characterized as based on *either* "outcomes"—who did Google's Year in Search include—*or* "events"—whether a specific person appeared on Google's Year in Search.

[8] In fact, the Encyclopedia Britannica considers the "[e]lection of Donald Trump" one of the "26 Decade-Defining *Events* in U.S. History," along with the outcomes of *Dred Scott v. Sandford*, the Battle of Gettysburg, the Battle of the Little Bighorn, *Plessy v. Ferguson*, and the 1981 strike by the Professional Air Traffic Controllers Organization. Encyclopedia Britannica, *26 Decade-Defining Events in U.S. History*, https://www.britannica.com/story/25-decade-defining-events-in-us-history (last visited Sept. 18, 2026) (emphasis added).

Moreover, event contracts based on "outcomes" have traded on CFTC-regulated exchanges for decades without controversy. For example, a meeting of the Federal Reserve Board's Open Market Committee would constitute an "event," whereas, under Spagnuolo's interpretation, a decision to raise or lower interest rates at such meeting would be an "outcome." Or, an extreme weather "event" can also be the "outcome" of dueling weather systems. Nevertheless, those distinctions have never threatened to strip the Commission of jurisdiction over Fed rate decision contracts or weather contracts.

Finally, Spagnuolo's view of "event" and "outcome" would read out of the statute the words "or the extent of the occurrence of." 7 U.S.C. § 1a(47)(A)(ii). Unless "event" includes "outcomes," the "extent of the occurrence of an event" could refer only to partial occurrences, which is a strained interpretation with respect to many types of underliers. For example, if not referring to the "outcome" of a political election, how would the "extent of the occurrence" of an election be determined—the number of votes cast? A much less tortured interpretation is that, "if 'occurrence' and 'nonoccurrence' capture whether an event happens, 'the extent of the occurrence' extends to how an event resolves." *Johnson*, 832 F. Supp. 3d at 961-62.

**2.** If nothing else, the Google Search Contracts are swaps because they are based on a "contingency." 7 U.S.C. § 1a(47)(A)(ii). A "contingency" is something "that may but is not certain to occur" or "something liable to happen as an adjunct to or result of something else." *Contingency*, Merriam-Webster, https://www.merriam-webster.com/dictionary/contingency (last visited Sept. 18, 2026). That clearly encompasses "outcomes"—including whether a specific person appears on Google's Year in Search—since "outcomes" are "liable to happen as an adjunct to or result of" "events." Interpreting "contingency" to exclude "outcomes" would therefore collapse it into "event," rendering it meaningless.

**B. The "swap" definition requires only "potential" "financial, economic, or commercial consequence"**

Spagnuolo next insists that the Google Search Contracts do not have "potential financial, economic, or commercial consequences," because the "purpose and structure of the CEA leave no doubt" that (1) the term "associated with" requires "a close or inherent connection" between an event on which a contract is based and any "potential financial, economic, or commercial consequence" and (2) such connections must "allow[] for hedging or facilitate[] price discovery." Mot. 14. Spagnuolo's proffered amendment to the "swap" definition would thereby narrow CEA-jurisdictional swaps (event contracts or otherwise) to those—in his view—with associated "consequence[s that are not] so hypothetical or speculative [so as to have] no possibility or [are] incapable of coming to fruition in the future." *Id.* at 15.

However, Spagnuolo cannot square this extratextual limitation with the CEA's plain language, structure, and history. Besides, his arguments fail on their own terms—the Google Search Contracts *do* have "a close or inherent connection" with "potential financial, economic, or commercial consequences" that "allow[] for hedging or facilitate[] price discovery." *Id.* at 14.[9]

**1.** Congress opted to "use[] the term *potential* financial, economic, or commercial consequence," which means that even if the "financial consequences" of an event are not felt "right away"—indeed, even if those consequences *never actually occur*—a contract based on that event can still be a "swap." *KalshiEX LLC v. Orgel*, 2026 WL 474869, at *8 (M.D. Tenn. Feb. 19, 2026); *see Alabama Power Co. v. Costle*, 636 F.2d 323, 353 (D.C. Cir. 1979) (recognizing that "potential

[9] Spagnuolo erects a strawman in contrasting a swap underlier's "potential financial, economic, or commercial consequence" and consequences resulting from the "the act of purchasing or selling the contract itself." Mot. 13. The Government has not alleged that the "external market activity," *id.* at 16, of trading in the Google Search Contracts itself had "potential financial, economic, or commercial consequence" for purposes of the "swap" definition.

… will always and inherently exceed actual”). “[T]here [] can be no doubt that an array of transactions are ‘associated with’ [potential] financial consequences.” *United States v. Minnesota*, __ F. Supp. 3d __, 2026 WL 2150211, at *12 (D. Minn. July 27, 2026).

Spagnuolo agrees: “‘potential’ contemplates that the financial, economic, or commercial consequence need not be *certain* to occur.” Mot. 15. Nevertheless, in conclusory fashion, Spagnuolo claims Google’s Year in Search “is of no meaningful financial, economic, or commercial consequence to any market participant.” *Id.* at 18.

That conclusion is unsupported and unsupportable. Google’s advertising customers spent over $224 billion on Alphabet’s “Google Search & other” in 2025 alone.[10] In fact, several of the individuals and shows at issue in the Google Search Contracts are likely either themselves Google Search advertising customers or else are tied to Google Search advertising campaigns, emphasizing the economic impact of Google Search results. *See Spagnuolo*, 26-cv-04419, Dkt. No. 1, at ¶ 44 (Google Search Contracts included musical artists, like Taylor Swift and Kendrick Lamar; actors, shows, and television personalities, like Sydney Sweeney, Squid Game, and Jimmy Kimmel; and politicians, like President Trump and Zohran Mamdani). To the extent such individuals or shows drive organic Google Search traffic, which is what Google’s Year in Search measures, the commercial or political enterprises associated therewith could reduce their paid Google Search advertising or other marketing (or may need to increase them if Google’s Year in Search reveals lower-than-expected search traffic). Additionally, popularity—for which organic Google Search traffic is a close proxy—influences many types of deals. For example, one analytics company tracks the relative popularity of “TV, movies, talent, and sports,” using “search engines”

[10] Alphabet Inc., Annual Report, at 33 (Form 10-K) (Feb. 4, 2026).

as a "data source[]," so that entertainment professionals can better value their brands and content in making business decisions.[11] These hedging and price-discovery use cases are hardly "so hypothetical or speculative that [they] ha[ve] no possibility or [are] incapable of coming to fruition." Mot. 15.

Spagnuolo's unnaturally narrow reading of what may constitute a potential financial, economic, or commercial consequence suffers from another conceptual flaw. Congress's repeated amendment of the CEA to expand the scope of federal regulation—broadening the definition of "commodity," repealing the "economic purpose" test, Mot. 27-28, and adding a broad "swap" definition—indicates a statutory framework that does not assign jurisdiction based on underlier type (*i.e.*, tangible, intangible, etc.) or hedging or price-discovery conspicuousness (*i.e.*, "economic purpose"). That is for good reason, considering that CFTC-regulated market participants range from retail traders to small businesses to large corporations. Micro- and macro-level hedging or price-discovery functions that may appear "hypothetical or speculative" to one market participant are often concrete and actionable to another.

That hedging or price-discovery utility may differ based on factual context further demonstrates why non-"hypothetical or speculative" economic purpose is not and cannot be an element of the "swap" definition. The scope of what sorts of transactions fall under the CEA does not turn on how "hypothetical or speculative" a contract might be. And that is also for good reason: it may often be difficult to distinguish, *ex ante*, between a "speculative" eventuality and a realistic

[11] *Learn the methodology behind demand measurement*, Parrot Analytics (last visited Sept. 18, 2026), https://www.parrotanalytics.com/academy/learn-the-methodology-behind-demand-measurement ("Parrot Analytics systems collect and analyze … hundreds of millions of households' search, posts, reading and social interactions activity. Our data sources include search engines …").

one, even when that eventuality seems farfetched. For instance, negative oil prices would have once seemed fanciful. But, that is exactly what happened at the outset of the COVID-19 pandemic, when negative prices "forced [] oil producers to pay buyers to take the barrels they could not store."[12] In fact, hedging can be at its most useful with respect to supposedly inconceivable eventualities; one day's "hypothetical or speculative" use case is another's dire hedging or price discovery need.

**2.** Spagnuolo's related attempt to narrow the "swap" definition based on its "[o]ther components"—to include only events or outcomes with "inherent potential economic, financial, or commercial consequence, and not merely [those that] cause some attenuated or downstream economic impact or effect"—fares no better. Mot. 16-17. The use of the "associated-words canon" to limit the "swap" definition, Mot. 16-17, "risks making [subparagraph (ii)] do nothing more than reiterate what subparagraphs (i) and (iii) already accomplish: that reading would, in fact, create surplusage," *Minnesota*, 2026 WL 2150211, at *12-13.

And the CEA's broader context *undermines* Spagnuolo's made-up gloss. The statute's definition of "swap" includes any "transaction that is, or in the future becomes commonly known to the trade as a swap," and nothing about that language requires an event contract's underlying event to have "inherent" connection to its "potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(A)(47)(iv). And Congress *still* worried its "swap" definition was not expansive enough, as it instructed the Commission to "adopt a rule to further define the term[] 'swap'" in order to "include transactions and entities that have been structured to evade this

---

[12] Jillian Ambrose, *Oil prices dip below zero as producers forced to pay to dispose of excess*, The Guardian (Apr. 20, 2020).

subtitle." 15 U.S.C. § 8321(b); *see also id.* § 8302(d)(1) (CFTC and SEC have authority to "further define the term[] 'swap'").

**3.** A faithful interpretation of the "swap" definition does not require that it reach *any* event or contingency with "some attenuated or downstream economic impact or effect." Mot. 17 (citing *KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014, 1028 (D. Nev. 2025)). Like any causation requirement, the "swap" definition's "associated with" language presumptively incorporates proximate-cause principles, so potential consequences that are "too remote" from the event do not count. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014). Moreover, in "far-fetched scenarios, Congress's express delegation to the CTFC and the Securities and Exchange Commission to 'further define' swaps would prove useful." *Flaherty*, 172 F.4th at 228; 77 Fed. Reg. 48,208, 48,246 (Aug. 13, 2012) (excluding insurance and consumer transactions from the "swap" definition). While future edge cases may call for deeper analysis concerning whether certain underliers have potential consequences, this case is nowhere near the line—"confidential, commercially valuable internal data," Dkt. No. 1, ¶ 4, with clear marketing implications for business ventures driving *billions* of dollars[13] of economic activity, *supra* Section I(B)(1), cannot plausibly be described as overly "attenuated or downstream."

Nor does the Government's interpretation of the "swap" definition "produce absurd results" by "reach[ing] virtually every kind of wager that could possibly exist." Mot. 24 (quoting *Flaherty*, 172 F.4th at 233 (Roth, J., dissenting)). A casino-style wager is a bilateral transaction between the bettor and a "house," where the price (*i.e.*, the odds) is set by the "house" rather than by market

[13] For example, in 2023, a Taylor Swift musical tour generated enough economic activity to be cognizable to the Federal Reserve Bank of Philadelphia. *See* Caitlin O'Kane, *The Federal Reserve says Taylor Swift's Eras Tour boosted the economy. One market research estimates she could add $5 billion*, CBS News (July 18, 2023).

forces of supply and demand. Such bets (let alone casual wagers between friends) are therefore not readily susceptible to the CEA's exchange-trading requirement for swaps offered to retail participants.[14] *See* 7 U.S.C. § 2(e). The Google Search Contracts, by contrast, traded on a neutral exchange that matched counterparties and collected transaction fees, like other futures and swaps exchanges.[15] That the latter are within the Commission's jurisdiction does not demand the same of the former.

**4.** Spagnuolo invokes a series of cases discussing the "swap" definition in the context of state law preemption litigation about sports event contracts, advocating dismissal because—in his telling—the Google Search Contracts "are even more divorced from any potential financial, economic, or commercial consequences than contracts tried to the outcome of sporting events." Mot. 19-21; *see also* Dkt. No. 47 (citing *KalshiEX, LLC v. Assad*, __ F.4th __, 2026 WL 2543846 (9th Cir. Aug. 28, 2026)). Those cases deal specifically with sports event contracts and how those contracts relate to sportsbook gambling regulated by states, issues not present here. *See generally Assad*, 2026 WL 2543846 (holding that "sports event contracts are likely not swaps under the CEA," but remanding as to non-sports "election contracts"). Regardless, Spagnuolo's arguments that the Google Search Contracts lack potential financial, economic, or commercial consequences

[14] An exchange is a "trading facility," and Congress excluded from the definition of "trading facility" a platform that allows "participants to negotiate the terms of and enter into bilateral transactions as a result of communications exchanged by the parties and not from interaction of multiple bids and multiple offers within a predetermined, nondiscretionary automated trade matching and execution algorithm." 7 U.S.C. § 1a(51)(B)(i). Bets fit this exclusion.

[15] Trading facilities "accept[] bids or offers made by other participants that are open to multiple participants in the facility or system" or "through the interaction of multiple bids or multiple offers within a system with a pre-determined non-discretionary automated trade matching and execution algorithm." 7 U.S.C. § 1a(51)(A). Exchanges like Polymarket fit this mold.

are at odds with reality. *See supra* Section I(B)(1). It is simply not true, for example, that "[n]o advertiser's costs fluctuate based on [Google Search] ranking." Mot. 22.

**C. Spagnuolo's legislative history and Special Rule arguments fail**

**1.** With no foothold in the text, Spagnuolo pivots to Dodd-Frank's legislative history. Mot. 25-29. "As a threshold matter," however, Spagnuolo's "argument about the legislative history is irrelevant because the plain statutory text controls." *Barbosa da Cunha v. Freden*, 175 F.4th 61, 88 (2d Cir. 2026). "[A]mbiguous legislative history" cannot "muddy clear statutory language." *United States v. Coonan*, 143 F.4th 119, 127 (2d Cir. 2025) (quoting *Milner v. Department of Navy*, 562 U.S. 562, 572 (2011)).

In any event, Spagnuolo's premise—that the "swap" definition is limited to the types of contracts that existed when Congress enacted Dodd-Frank in 2010, Mot. 25-26—is demonstrably false. "[T]he fact that a statute has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity; instead, it simply demonstrates the breadth of a legislative command." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 674 (2020) (citation modified). That is especially true here: Congress defined "swap" to include contracts that "in the future" become known as a swap, 7 U.S.C. § 1a(47)(A)(iv), and it gave the Commission authority to further define the term, 15 U.S.C. §§ 8302(d)(1), 8321(b). And the statute's forward-looking breadth makes sense considering the "context in which the Dodd-Frank amendments were enacted." *Phillips*, 155 F.4th at 122. CEA coverage of novel transactions is therefore a feature, not a bug, of Congress's design.

**2.** Next, Spagnuolo perplexingly argues that Congress's inclusion of a *discretionary* "public interest" determination in a subpart of the CEA—the Special Rule—evinced an intent to "revive[] the same 'public interest' requirement" that the CFTC had previously understood was *mandatory* CEA-wide, the statutory basis for which was never reinstated. Mot. 27-28 ("CFMA

repealed this 'public interest' requirement"). By confusing a discretionary subpart of the current CEA[16] with the whole of a prior version of the CEA, it is Spagnuolo who "misreads the statutory history." Mot. 28; *see also Assad*, 2026 WL 2543846, at *19 (Lee, J. concurring) (the Special Rule "appears to give the CFTC discretion whether to ban altogether" contracts falling into its enumerated categories, suggesting that such contracts "can be part of a swap trade if they meet the statutory requirements.").

Either way, Spagnuolo mistakes regulatory discretion (*i.e.*, whether the Commission will allow the trading of certain types of event contracts) with jurisdictional determination (*i.e.*, whether such event contracts are swaps in the first place). "In combination with the congressional decision to give the CFTC exclusive jurisdiction over swaps, allowing the CFTC to either permit event contracts in these categories or declare them contrary to the public interest suggests, at least preliminarily, that Congress intended DCM-based transactions over these prediction markets to be governed by the CFTC." *Minnesota*, 2026 WL 2150211, at *13.

Spagnuolo's efforts to equate the Google Search Contracts with "gaming" also fails. Mot. 28. Apart from recycling his conclusory (and untrue) assertions about the Google Search Contracts' supposed lack of "potential financial, economic, or commercial consequence," Spagnuolo does not bother making a statutory argument that "gaming"—which Spagnuolo himself recognizes relates to "sporting event contracts"—covers the Google Search Contracts. There is none.

---

[16] *See* 7 U.S.C. § 7a-2(c) ("the Commission *may* determine that such … contracts … are contrary to the public interest" if the contracts fall into certain enumerated categories) (emphasis added).

## II. Spagnuolo had fair notice that event contract insider trading is illegal

Next, Spagnuolo argues that the CEA's anti-fraud provision cannot constitutionally apply to his conduct, because the "swap" definition is "too vague a statute to give fair notice that purchasing an event contract on Polymarket.com would constitute a 'swap.'" Mot. 33. The Court should reject this argument.

For the reasons discussed in Section I, event contracts in general and the Google Search Contracts in particular are squarely encompassed within, at least, the "swap" definition in § 1a(47)(A)(ii). *See Reed*, 2022 WL 597180, at *3-4 (denying motion to dismiss where "defendant had ample notice from the broad definition of commodities under the CEA that cryptocurrencies were within the definition"). While Congress undoubtedly wrote a broad definition of "swap," that breadth is well reflected in prior Commission actions and statements about event contracts.[17]

Indeed, the Commission has regulated event contracts in multiple jurisdictional forms since at least 1992, predicated on events as diverse as "the accomplishment of certain scientific advances," "the outcome of corporate product sales," "and the length of celebrity marriages." 73 Fed. Reg. at 25,670. And since Dodd-Frank was enacted, the Commission publicly rejected a DCM's request to list election-based event contracts—a clear indication that such contracts are CEA-jurisdictional products.[18] The diversity of event contract underliers at issue in prior

[17] Spagnuolo invokes Congress's "consider[ation] but not pass[age of] legislation that would bring prediction markets—and insider trading on such markets—within the CEA's jurisdiction" to suggest that he lacked fair notice that his conduct was illegal. But "[f]ailed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute." *Solid Waste Agency of N. Cook County v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 169–70 (2001). To wit, the mere proposal by some members of draft legislation on a particular topic does not command that prior statutes covering that conduct no longer do so.

[18] *See Order Prohibiting the Listing or Trading of Political Event Contracts* (Apr. 2, 2012), https://www.cftc.gov/stellent/groups/public/@rulesandproducts/documents/ifdocs/nadexorder040

Commission action gives lie to the notion that the Google Search Contracts' specific underlier created a fair notice defect. *See Reed*, 2022 WL 597180, at *2 ("'[I]t is immaterial that there is no litigated fact pattern precisely in point,' so long as the language of the statute provides notice.") (quoting *United States v. Kinzler*, 55 F.3d 70, 74 (2d Cir. 1995)).

In fact, Spagnuolo's claim that he had inadequate notice that the "event contracts *on Polymarket.com* would constitute a swap," Mot. 33 (emphasis added), is particularly outlandish considering that Spagnuolo elsewhere references a 2022 order settling claims against Polymarket, *id.* at 37.[19] First, that order states unequivocally that event contracts, both generally and on Polymarket.com, "constitute swaps under the CFTC's jurisdiction." *In re Blockratize, Inc. d/b/a Polymarket.com*, CFTC Dkt. No. 22-09, at 2 (Jan. 3, 2022). Second, the order highlighted the variety of swaps available on Polymarket, including those related to "current events," and did not indicate that the underlier's subject matter had jurisdictional ramifications. *See id.* at 2-3. Third, as Spagnuolo acknowledges, "'[e]xtraterritorial application of the statute also does not necessarily vitiate fair notice." *Id.* at 37.[20] Finally, to the extent Spagnuolo is arguing that he intentionally used

---

212.pdf (in accordance with the Special Rule, DCMs "shall not list for trading any contract based upon an excluded commodity" in certain categories that violate the public interest).

[19] While the Government's Opposition ably rebuts Spagnuolo's arguments concerning extraterritoriality, Dkt. No. 48, at 31-39, given discussion of the Commission's Polymarket order, the Commission emphasizes that just because "Polymarket.com [agreed] not [to] operate in the United States and employ[] a geo-block to prevent U.S. users from purchasing contracts on its website" does not make it so. Mot. 41-42. Indeed, Spagnuolo recognizes as much in conceding that "some counterparties to Mr. Spagnuolo's alleged [trades] included U.S.-based users." *Id.* at n.33.

[20] Nor did recent comments by the Commission's Chairman deprive Spagnuolo of fair notice on extraterritoriality grounds. Mot. 37-38. First, the Chairman's comments occurred in August 2026, well after Spagnuolo's trading, and are therefore incapable of creating a fair notice issue. *See Reed*, 2022 WL 597180, at *3 (CFTC commissioner statement that occurred after defendant's conduct "could not have created any [fair notice] doubt in the defendant's mind"). Second, as the Chairman noted at the beginning of the meeting, he was not speaking on behalf of

Polymarket.com because this order suggested that it would operate outside United States jurisdiction, such an argument would implicate the CFTC's anti-evasion rule. *See* 17 C.F.R. § 1.6 ("It shall be unlawful to conduct activities outside the United States, including entering into agreements, contracts, and transactions and structuring entities, to willfully evade or attempt to evade any provision of the Commodity Exchange Act").[21]

**CONCLUSION**

For these reasons, the Court should deny Defendant's motion to dismiss Count One and hold that the event contracts at issue are "swaps" under the CEA.

---

the Commission. *Chairman Selig Announces Inagural CFTC Innovation Advisory Committee Meeting on August 20*, YouTube, at 10:33-11:10 (Aug. 20, 2026), https://www.youtube.com/watch?v=9rTCARzj98I&t=10526s. Third, as the full clip reveals, the Chairman expressed no merits judgments about the locations of either Polymarket.com's operations or Spagnuolo's conduct. *Id.* at 2:53:58-2:55:45.

[21] Relatedly, Spagnuolo offers no case law to support his bizarre suggestion that third-party statements from Polymarket's CEO and Bill Ackman somehow deprived him of fair notice. Mot. 36-37. And, although such comments discussed trading by colloquial "insiders," neither comment delved into the legally relevant distinction between traders *lawfully entitled* to use asymmetrical informational advantages and those misappropriating material nonpublic information in violation of duties. *See United States v. O'Hagan*, 521 U.S. 642, 652 (1997) ("'misappropriation theory' holds that a person commits fraud … when he *misappropriates* confidential information … *in breach of a duty owed to the source of the information*") (emphasis added).

Dated: September 18, 2026

Respectfully submitted,

*/s/ Cameron J. Sinsheimer*
Tyler S. Badgley, General Counsel
M. Jordan Minot, Deputy General Counsel
Cameron J. Sinsheimer, Counselor
Henry J. Dickman, Sr. Assistant General Counsel

U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, NW
Washington, D.C. 20581
csinsheimer@cftc.gov
(646) 746-3928