**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>MICHELE SPAGNUOLO,<br><br>Defendant. | No. 26 Cr. 278 (AT) |

# MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT MICHELE SPAGNUOLO'S MOTION TO DISMISS THE INDICTMENT AND MOTION TO SUPPRESS POST-ARREST STATEMENTS AND FRUITS THEREOF

Shawn G. Crowley
Michael Ferrara
Andrew L. Chesley
Allison Durkin
Nicole Ng
J. Patrick Hornbeck II
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883
scrowley@heckerfink.com
mferrara@heckerfink.com

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ... 1

ARGUMENT ... 2

I. The Commodities Fraud Count Should Be Dismissed Because the CEA Does Not Apply to Year in Search Wagers ... 2

A. The Year in Search Wagers Must Be Closely or Inherently Associated with a Potential Economic, Financial or Commercial Consequence ... 3

1. The Government's Statutory Arguments Fail ... 4

2. The Government Distorts Key Precedent on the Definition of a Swap ... 13

B. The Indictment Does Not Allege That the Year in Search Wagers Are Associated with a Potential Financial, Economic, or Commercial Consequence ... 16

C. A Broad and Limitless Interpretation of the CEA Must Be Avoided ... 18

II. The Commodities Fraud Count Violates Mr. Spagnuolo's Due Process Rights and Should Be Dismissed ... 20

III. The Wire Fraud Count Should Be Dismissed Because the Year in Search Data Are Not "Property" ... 24

A. The Indictment Does Not Allege That the Secrecy of Google's Year in Search Data Has Commercial Value Under *Chastain* ... 24

B. The Government's Uncharged Counterparty-Money Theory Fails ... 26

IV. The Indictment Should Be Dismissed Because the Charges Are Impermissibly Extraterritorial ... 32

A. The CEA Has No Permissible Domestic or Extraterritorial Application to the Alleged Facts ... 33

1. No Permissible Domestic Application ... 33

2. No Permissible Extraterritorial Application ... 35

B. The Wire Fraud Charge Should Be Dismissed as Impermissibly Extraterritorial ... 36

V. The Court Should Suppress Mr. Spagnuolo's Post-Arrest Statements and Their Fruits 37

A. Mr. Spagnuolo Invoked His Right to Counsel ... 38

B. Mr. Spagnuolo Did Not Voluntarily Re-Initiate the Interview ... 43

C. Mr. Spagnuolo's Statements Were Not Voluntary ........ 44

D. The Court Should Suppress Evidence Derived from Mr. Spagnuolo's Post-Arrest Statements ........ 45

CONCLUSION ........ 47

# TABLE OF AUTHORITIES

***CASES***

*Abramski v. United States*,
573 U.S. 169 (2014) ........ 4

*Barton v. Barr*,
590 U.S. 222 (2020) ........ 9

*Bascuñán v. Elsaca*,
927 F.3d 108 (2d Cir. 2019) ........ 33, 37

*Bd. of Trade v. Christie Grain & Stock Co.*,
198 U.S. 236 (1905) ........ 7

*Carpenter v. United States*,
484 U.S. 19 (1987) ........ 26, 28

*Chevron USA Inc. v. Plaquemines Parish*,
608 U.S. 1 (2026) ........ 5

*Chiarella v. United States*,
445 U.S. 222 (1980) ........ 31

*Coinbase Fin. Mkts. v. Nessel*,
No. 25 Civ. 14092, 2026 WL 2295184 (E.D. Mich. Aug. 7, 2026) ........ 14

*Dowling v. United States*,
473 U.S. 207 (1985) ........ 3

*Dubin v. United States*,
599 U.S. 110 (2023) ........ 5, 18, 19

*Edwards v. Arizona*,
451 U.S. 477 (1981) ........ 43

*Green v. Scully*,
850 F.2d 894 (2d Cir. 1988) ........ 45

*Gustafson v. Alloyd Co.*,
513 U.S. 561 (1995) ........ 9

*Hill v. Colorado*,
530 U.S. 703 (2000) ........ 21

*Irvin v. Annucci*,
No. 22 Civ. 4887, 2025 WL 1626188 (S.D.N.Y. Mar. 25, 2025), *report and recommendation adopted*, 2025 WL 1404488 (S.D.N.Y. May 15, 2025)........................ 43

*Johnson v. United States*,
576 U.S. 591 (2015)........................................................................................... 21

*Jordon v. N.Y. Mercantile Exch.*,
571 F. Supp. 1530 (S.D.N.Y. 1983)....................................................................... 7

*KalshiEX LLC v. Bird*,
No. 26 Civ. 109, 2026 WL 2691009 (S.D. Iowa Sept. 8, 2026).................................. 8, 14

*KalshiEX LLC v. Cafferelli*,
No. 25 Civ. 2016, 2026 WL 2294589 (D. Conn. Aug. 10, 2026) ................................ 9, 14

*KalshiEX LLC v. Schuler*,
No. 26-3196, 2026 WL 2884087 (6th Cir. Sept. 25, 2026) ...................................... *passim*

*KalshiEX LLC v. Williams*,
No. 25 Civ. 8846, 2026 WL 2017466 (S.D.N.Y. July 13, 2026) .............................. 12, 15

*KalshiEX, LLC v. Assad*,
No. 25-7516, 2026 WL 2543846 (9th Cir. Aug. 28, 2026) ...................................... *passim*

*KalshiEX, LLC v. Flaherty*,
172 F.4th 220 (3d Cir. 2026) .............................................................................. 15

*KalshiEX, LLC v. Hendrick*,
817 F. Supp. 3d 1014 (D. Nev. 2025)................................................................ 8, 9, 13, 14

*KalshiEX, LLC v. Schuler*,
No. 25 Civ. 1165, 2026 WL 657004 (S.D. Ohio Mar. 9, 2026) ...................................... 14

*Kolender v. Lawson*,
461 U.S. 352 (1983)........................................................................................... 22

*Kulhawik v. Holder*,
571 F.3d 296 (2d Cir. 2009)................................................................................. 47

*L.S. v. Webloyalty.com, Inc.*,
954 F.3d 110 (2d Cir. 2020)................................................................................... 7

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)............................................................................................. 6

*Loughrin v. United States*,
573 U.S. 351 (2014) ........................................................ 32

*Maracich v. Spears*,
570 U.S. 48 (2013) ........................................................ 5

*Marinello v. United States*,
584 U.S. 1 (2018) ........................................................ 19

*Maryland v. Shatzer*,
559 U.S. 98 (2010) ........................................................ 40

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982) ........................................................ 7

*Morrison v. National Australia Bank,*
561 U.S. 247 (2010) ........................................................ 32, 33, 37

*N. Am. Derivatives Exch., Inc. v. Nevada ex rel. Nev. Gaming Control Bd.*,
815 F. Supp. 3d 1169 (D. Nev. 2025) ........................................................ 8

*Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*,
763 F.3d 198 (2d Cir. 2014) ........................................................ 35

*Prime Int'l Trading, Ltd. v. BP P.L.C.*,
937 F.3d 94 (2d Cir. 2019) ........................................................ 33, 34, 35

*QCX LLC v. Nessel*,
No. 26 Civ. 710, 2026 WL 1895958 (W.D. Mich. June 17, 2026) ........................................................ 10, 14

*San Francisco v. EPA*,
604 U.S. 334 (2025) ........................................................ 4

*Screws v. United States*,
325 U.S. 91 (1945) ........................................................ 22

*Snyder v. United States*,
603 U.S. 1 (2024) ........................................................ 22

*Stoller v. CFTC*,
834 F.2d 262 (2d Cir. 1987) ........................................................ 21

*United States v. Aleynikov*,
676 F.3d 71 (2d Cir. 2012) ........................................................ 3, 16

*United States v. Ali*,
718 F.3d 929 (D.C. Cir. 2013) ........ 33

*United States v. Berroa*,
856 F.3d 141 (1st Cir. 2017) ........ 32

*United States v. Blaszczak*,
56 F.4th 230 (2d Cir. 2022) ........ 29

*United States v. Bongiorno*,
No. 05 Cr. 390, 2006 WL 1140864 (S.D.N.Y. May 1, 2006) ........ 3

*United States v. Brathwaite*,
No. 17 Cr. 45, 2018 WL 1787943 (E.D.N.Y. Mar. 27, 2018), *report and recommendation adopted*, 2018 WL 1785484 (E.D.N.Y. Apr. 13, 2018) ........ 44

*United States v. Chastain*,
145 F.4th 282 (2d Cir. 2025) ........ 1, 24, 25, 26

*United States v. Choudhry*,
24 F. Supp. 3d 273 (E.D.N.Y. 2014) ........ 44

*United States v. Curcio*,
712 F.2d 1532 (2d Cir. 1983) ........ 22

*United States v. Delis*,
558 F.3d 177 (2d Cir. 2009) ........ 2

*United States v. DiCristina*,
726 F.3d 92 (2d Cir. 2013) ........ 2

*United States v. Figaro*,
568 F. Supp. 3d 459 (S.D.N.Y. 2021) ........ 41

*United States v. Gonzalez-Garcia*,
708 F.3d 682 (5th Cir. 2013) ........ 46

*United States v. Greenberg*,
835 F.3d 295 (2d Cir. 2016) ........ 30

*United States v. Grossman,*
843 F.2d 78 (2d Cir. 1988) ........ 26

*United States v. Hallford*,
816 F.3d 850 (D.C. Cir. 2016) ........ 46

*United States v. Heicklen*,
858 F. Supp. 2d 256 (S.D.N.Y. 2012)........................................................................ 3

*United States v. Hoskins*,
902 F.3d 69 (2d Cir. 2018)....................................................................................... 33

*United States v. Lights*,
208 F. Supp. 3d 568 (S.D.N.Y. 2016)................................................................ 39, 44

*United States v. Lysaght*,
No. 97 Cr. 644, 2018 WL 5928461 (S.D.N.Y. Nov. 14, 2018)........................................ 47

*United States v. Martoma*,
No. 12 Cr. 973, 2013 WL 6632676 (S.D.N.Y. Dec. 17, 2013) ....................................... 34

*United States v. Mastroianni*,
No. 20 Cr. 575, 2022 WL 17404783 (S.D.N.Y. Dec. 2, 2022) ....................................... 39

*United States v. McCourty*,
562 F.3d 458 (2d Cir. 2009)..................................................................................... 27

*United States v. Napout*,
963 F.3d 163 (2d Cir. 2020)..................................................................................... 37

*United States v. O'Hagan*,
521 U.S. 642 (1997)............................................................................................ 28, 29

*United States v. Patane*,
542 U.S. 630 (2004).................................................................................................. 46

*United States v. Peter*,
No. 17 Cr. 54, 2018 WL 5282878 (S.D.N.Y. Oct. 24, 2018) .......................................... 39

*United States v. Phillips*,
No. 22 Cr. 138, 2024 WL 1300269 (S.D.N.Y. Mar. 27, 2024) ....................................... 34

*United States v. Phillips*,
155 F.4th 102 (2d Cir. 2025) ............................................................... 12, 33, 35, 36

*United States v. Ramsey*,
No. 19 Cr. 268, 2021 WL 4244284 (E.D. Pa. Sept. 17, 2021) ........................................ 32

*United States v. Reed*,
No. 20 Cr. 500, 2022 WL 597180 (S.D.N.Y. Feb. 28, 2022).......................................... 22

*United States v. Rigas*,
490 F.3d 208 (2d Cir. 2007) ........ 27

*United States v. Rosenfeld*,
No. 23 Cr. 65, 2023 WL 8471947 (S.D.N.Y. Dec. 7, 2023) ........ 38, 43

*United States v. Santos*,
541 F.3d 63 (2d Cir. 2008) ........ 2

*United States v. Santos*,
553 U.S. 507 (2008) ........ 24

*United States v. Scott*,
624 F. Supp. 2d 279 (S.D.N.Y. 2008) ........ 44

*United States v. Seppala*,
No. 16 Cr. 436, 2017 WL 5633167 (S.D.N.Y. Nov. 22, 2017) ........ 38, 41, 42

*United States v. Sidorenko*,
102 F. Supp. 3d 1124 (N.D. Cal. 2015) ........ 33

*United States v. Velastegui*,
199 F.3d 590 (2d Cir. 1999) ........ 20

*United States v. Vilar*,
729 F.3d 62 (2d Cir. 2013) ........ 34

*United States v. Wang*,
No. 23 Cr. 118, 2024 WL 1251105 (S.D.N.Y. Mar. 22, 2024) ........ 40, 46

*United States v. Wisconsin*,
No. 26 Civ. 749, 2026 WL 2474512 (E.D. Wis. July 29, 2026) ........ 14

*Upton v. SEC*,
75 F.3d 92 (2d Cir. 1996) ........ 21, 23

*Van Buren v. United States*,
593 U.S. 374 (2021) ........ 19

*WesternGeco LLC v. ION Geophysical Corp.*,
585 U.S. 407 (2018) ........ 33, 37

*Wood v. Ercole*,
644 F.3d 83 (2d Cir. 2011) ........ 41, 42

***STATUTES***

7 U.S.C. § 1a(47) .......... 4, 9, 10

7 U.S.C. § 1a(51) .......... 20

7 U.S.C. § 2 .......... 19, 20, 35

7 U.S.C. § 5 .......... 7

7 U.S.C. § 7 .......... 11

7 U.S.C. § 7a-2 .......... 11, 12

7 U.S.C. § 9 .......... 34

15 U.S.C. § 8321 .......... 10

18 U.S.C. § 1343 .......... 31

18 U.S.C. § 1348 .......... 32

18 U.S.C. § 1349 .......... 32

Pub. L. No. 111-203, 124 Stat. 1376 (2010) .......... 13

***REGULATIONS***

17 C.F.R. § 1.6 .......... 23

17 C.F.R. § 40.11 .......... 11

***FEDERAL RULES***

Fed. R. Crim. P. 6(e)(3)(E) .......... 27

Fed. R. Crim. P. 12(b) .......... 3

***OTHER AUTHORITIES***

Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation, 76 Fed. Reg. 41398 (July 14, 2011) .......... 31

Brief of Amici Curiae of Seven Former Members of Congress in Support of Plaintiff-Appellee, *KalshiEX, LLC v. Flaherty*,
2025 WL 2306500 ........................................................................................................ 13

Concept Release on the Appropriate Regulatory Treatment of Event Contracts
73 Fed. Reg. 25669 (May 7, 2008) ............................................................................ 7, 23

Opposition to Motion to Dismiss, *United States v. Van Dyke*,
26 Cr. 156 (S.D.N.Y. Aug. 19, 2026) .......................................................................... 27

Provisions Common to Registered Entities,
76 Fed. Reg. 44776 (July 27, 2011) ............................................................................. 11

Reply in Support of Motion to Dismiss, *United States v. Van Dyke*,
26 Cr. 156 (S.D.N.Y. Aug. 26, 2026) .......................................................................... 27

**PRELIMINARY STATEMENT**

The government contends that the Indictment alleges a "straightforward[]" violation of insider trading statutes, but its opposition to Michele Spagnuolo's motion to dismiss shows otherwise. Opp'n 1.[1] As to Count One, the government stretches the text of the Commodity Exchange Act ("CEA") beyond its limits, disregards the weight of authority holding that analogous prediction market contracts are not swaps, misunderstands Google's Year in Search campaign, and adopts a reading of the CEA that fails to provide fair notice and invites arbitrary enforcement.

As for Count Two, the government fails to distinguish this case from binding Second Circuit precedent that forecloses the government's theory of wire fraud, because the Indictment does not allege that the confidentiality of Year in Search ranking had any commercial value to Google. *See United States v. Chastain*, 145 F.4th 282, 297 (2d Cir. 2025). The government's newly minted theory that Mr. Spagnuolo obtained "money or property" from his alleged trading counterparties cannot save Count Two. That uncharged theory was almost certainly never presented to the grand jury, misreads cases concerning the misappropriation theory of insider trading, and would render superfluous decades of case law on the property element of wire fraud. Nor can the government evade the territorial limits of either the CEA or the wire fraud statute by contending that this case involves a domestic application of both statutes because purported trading counterparties were located in the United States. The Court should put an end to the government's overreaching and dismiss the Indictment.

---

[1] "Opp'n" refers to the government's Omnibus Memorandum of Law in Opposition to Defendant's Pretrial Motions, Dkt. No. 48. "Mot. to Dismiss" refers to Mr. Spagnuolo's memorandum of law in support of his Motion to Dismiss the Indictment, Dkt. No. 41. "Mot. to Suppress" refers to Mr. Spagnuolo's memorandum of law in support of his Motion to Suppress Post-Arrest Statements and Fruits Thereof, Dkt. No. 44. Exhibit numbers refer to exhibits to the Mot. to Dismiss and Mot. to Suppress. Mr. Spagnuolo also addresses arguments set forth in the amicus brief the Commodity Futures Trading Commission has requested leave to file, Dkt. No. 49-1 ("CFTC Br.").

The government's response to Mr. Spagnuolo's suppression motion similarly makes plain that it seeks to wield its enforcement power beyond what the law permits. The government ignores or mischaracterizes Mr. Spagnuolo's clear invocation of the right to counsel and defends taking advantage of his confusion about the legal process to press him to talk without counsel. But the record is clear that Mr. Spagnuolo asked for a lawyer and never retracted his invocations, and the agents continued to question him anyway. The circumstances of Mr. Spagnuolo's arrest, his unfamiliarity with the U.S. legal process, and the agents' conduct leave no doubt that Mr. Spagnuolo's statements were legally involuntary. The Court should suppress Mr. Spagnuolo's post-arrest statements in their entirety and their fruits.

## ARGUMENT

### I. The Commodities Fraud Count Should Be Dismissed Because the CEA Does Not Apply to Year in Search Wagers

In insisting that the Indictment alleges a violation of the CEA, the government contends that Mr. Spagnuolo "invites the Court to depart from the clear text of the CEA" and "to usurp the role of the fact-finder." Opp'n 15. But the CEA does not apply to the conduct alleged in the Indictment because, under any reasonable interpretation the statute, the Year in Search wagers are not "swaps." That is a question of statutory interpretation—a question of law—that the Court can and should decide now. *See United States v. DiCristina*, 726 F.3d 92, 105 (2d Cir. 2013) (holding that "whether poker constitutes gambling for purposes of the [Illegal Gambling Business Act] is a pure question of statutory interpretation and thus a question of law"); *see also United States v. Delis*, 558 F.3d 177, 180 (2d Cir. 2009) ("[A] matter of statutory interpretation . . . is purely a question of law."); *United States v. Santos*, 541 F.3d 63, 67 (2d Cir. 2008) ("[S]cope of the statutory requirement" is a "question[] of law.").

Because federal crimes "are solely creatures of statute," *Dowling v. United States*, 473 U.S. 207, 213 (1985) (cleaned up), an "indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute," *United States v. Aleynikov*, 676 F.3d 71, 75-76 (2d Cir. 2012); *see* Fed. R. Crim. P. 12(b) ("[A] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."). Thus, in *Aleynikov*, the Second Circuit held that an indictment "failed to state an offense" because uploading purely intangible source code did not constitute a stolen good within the meaning of the National Stolen Property Act or a trade secret related to a product produced for or placed in interstate commerce under the Economic Espionage Act. *Id.* at 75-76 & n.2, 79.

Mr. Spagnuolo's challenge to the Indictment is no different. As much as the government gestures at factual issues that may be raised at trial, Mr. Spagnuolo's motion presents an antecedent legal question: whether the instruments that he is alleged to have bought are "swaps" under the CEA. Because no reasonable interpretation of the CEA would encompass the Year in Search bets, the "facts alleged [in the Indictment] do not constitute an offense as a matter of law." *United States v. Heicklen*, 858 F. Supp. 2d 256, 262 (S.D.N.Y. 2012). The viability of the government's novel, untested theory should be decided now. Indeed, "it would be a waste of judicial resources to conduct a trial, only to rule on a post-trial motion that the government's criminal liability fails, no matter what facts it was able to establish at trial." *Id.* at 262 n.5; *see United States v. Bongiorno*, No. 05 Cr. 390, 2006 WL 1140864 at *4 (S.D.N.Y. May 1, 2006).

### A. The Year in Search Wagers Must Be Closely or Inherently Associated with a Potential Economic, Financial or Commercial Consequence

A contract that allows users to wager on whether a specific individual will be announced as the top-trending person on Google is not a swap under the CEA, because Congress intended the definition of a swap in § 1a(47)(A)(ii) to reach financial instruments tied to the "occurrence" of

"event[s]" that are closely or inherently connected with a "potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). In resisting that conclusion, the government does not, and cannot, identify a reasonable construction of the CEA that would embrace the Year in Search bets on Polymarket. Instead, it engages in rigid textualism that runs afoul of elementary principles of statutory interpretation and ignores the structure and purpose of the CEA. And it selectively construes the decisions of multiple federal courts, including the Ninth Circuit, that have adopted the same interpretation of the CEA that Mr. Spagnuolo urges here.

Just last week, the Sixth Circuit reached that same conclusion, holding that "for an 'event' to be 'associated with a potential financial, economic, or commercial consequence,' the event must be intrinsically associated with a financial consequence such that [courts] can reasonably understand why hedging financial risk or ascertaining pricing information for the occurrence of that event would be desired and beneficial." *KalshiEX LLC v. Schuler*, No. 26-3196, 2026 WL 2884087, at *8 (6th Cir. Sept. 25, 2026). None of the government's arguments to the contrary is availing.

**1. The Government's Statutory Arguments Fail**

First, the government contends that the occurrence of the event need not have a close or inherent connection to a potential economic consequence, because the definition uses the phrase "associated with," which the government describes as a "materially looser link." Opp'n 8-9. The government focuses on these words in isolation, but it is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *San Francisco v. EPA*, 604 U.S. 334, 350 (2025) (cleaned up). Relevant words are interpreted "not in a vacuum, but with reference to the statutory context, structure, history, and purpose." *Abramski v. United States*, 573 U.S. 169, 179 (2014) (cleaned up).

Time and again, the Supreme Court has rejected reading terms like "associated with" "in isolation." *Maracich v. Spears*, 570 U.S. 48, 59-60 (2013). That is because, if terms like "'relate to' were taken to extend to the furthest stretch of [their] indeterminacy, then for all practical purposes there would be no limits." *Dubin v. United States*, 599 U.S. 110, 119 (2023) (cleaned up); *see Chevron USA Inc. v. Plaquemines Parish*, 608 U.S 1, 12 (2026) ("'Relating to' requires a connection that is not tenuous, remote, or peripheral." (cleaned up)). Instead, these terms are "context sensitive" and require "look[ing] to statutory context" to determine "the kind of relationship required [and] its nature and strength." *Dubin*, 599 U.S. at 119. Here, that context—as informed by the neighboring provisions of the definition of a swap, the CEA's findings and purpose, and the objective of the statute—makes plain that the occurrence of the event must have a close or inherent connection to a potential financial economic, or commercial consequence to facilitate hedging or price discovery. *See* Mot. to Dismiss 13-17.

As both the Sixth and Ninth Circuits recently explained in adopting this same construction of Section 1a(47)(A)(ii), "reading the statute so expansively as to include any conceivable downstream economic consequence would render the definition of swap so broad as to be meaningless." *KalshiEX, LLC v. Assad*, No. 25-7516, 2026 WL 2543846, at *11-12 (9th Cir. Aug. 28, 2026); *see Schuler*, 2026 WL 2884087, at *11 ("The best reading of the statute thus requires that the qualifying event be inherently associated with a 'potential financial, economic, or commercial consequence,' such that it would be common understanding that hedging financial risk or deriving pricing information for that event would be beneficial and would promote market stability."). In other words, a limiting principle is required. The government identifies none.

Even the proposed amicus brief of the Commodity Futures Trading Commission ("CFTC") recognizes that some limiting principle is required and that "potential consequences that are 'too

remote' from the event do not count." CFTC Br. 13 (noting that "associated with" "presumptively incorporates proximate-cause principles"). Instead of explaining how the CEA provides cognizable standards for whether an event satisfies its undefined "proximate-cause" test, the CFTC simply states that in "far-fetched scenarios," the Commission itself can exercise its authority to "further define swaps." *Id.* (cleaned up). It is not an answer to the statutory-interpretation question to say that the CFTC should be trusted to define the outer-bounds of imaginable economic consequence that are sufficient to make a chance-based bet a swap. *See Schuler*, 2026 WL 2884087, at *11 ("[I]t is unclear what chance-based event contract, if any, would not result in some attenuated downstream financial consequence, at least until the CFTC says it does not."); *cf. Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412-13 (2024) (reaffirming that courts "must exercise their independent judgment in deciding whether an agency has acted within its statutory authority," even when a statute is ambiguous).

The government cannot avoid identifying a limiting principle by pointing to the CEA's use of the word "potential." Opp'n 9. Swaps are forward-looking instruments with payouts contingent on whether the referenced event occurs. Section 1a(47)(A)(ii)'s use of "potential" to describe the "financial, economic, or commercial consequence" reflects that the event or contingency specified in the contract may or may not occur, and therefore the consequences of that event need only be "potential" ones, i.e., capable of coming to fruition but not necessarily certain to occur. "Potential" does not alter the nature of the relationship between the occurrence of the event and the potential economic consequence that follows. *See Schuler*, 2026 WL 2884087, at *11 (explaining that "'potential' is better understood as modifying 'consequence,' not 'associated with'—meaning the financial consequence need not actually come to fruition, but it still must be inherently associated with the event").

Next, the government rejects that a swap must have some utility for hedging or price discovery, accusing Mr. Spagnuolo of "inserting text in congressionally approved language." Opp'n 9. The government is wrong. The "[f]indings and purpose" provision of the CEA expressly states that transactions subject to the statute "provid[e] a means for managing and assuming price risks, discovering prices, or disseminating pricing information through trading in liquid, fair and financially secure trading facilities." 7 U.S.C. § 5(a); *see Schuler*, 2026 WL 2884087, at *13; *see also L.S. v. Webloyalty.com, Inc.*, 954 F.3d 110, 115-16 (2d Cir. 2020) (relying on "findings and declaration of purpose" in analyzing statutory context and purpose). Hedging and price discovery are at the core of the CEA and the transactions it regulates. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 358-59 (1982); Concept Release on the Appropriate Regulatory Treatment of Event Contracts, 73 Fed. Reg. 25669, 25672 (May 7, 2008) (identifying "hedging and price basing" as "two critical functions of the commodity derivatives markets"). Tellingly, the government does not even attempt to address this provision of the CEA or its purpose.

Instead, the government claims that determining whether a contract is used for hedging or price discovery "makes little practical sense" because that "relates to the subjective intent of the traders," and "there is no mechanism in the CEA for assessing traders' intentions." Opp'n 9. But courts and even the CFTC have long distinguished between futures trading and purely speculative gambling, without needing to inquire into the intent of individual traders. *See, e.g.*, *Bd. of Trade v. Christie Grain & Stock Co.*, 198 U.S. 236, 248-49 (1905); *Jordon v. N.Y. Mercantile Exch.*, 571 F. Supp. 1530, 1555 (S.D.N.Y. 1983) (noting economic-purpose test required that exchange "demonstrate that its proposed contracts will be used for base-pricing and hedging, not just for speculation"). What matters is whether the event contract has potential utility for hedging real

exposure or price discovery: a premise that even the CFTC appears to accept. CFTC Br. 2-3, 11-12.

The government's response to Mr. Spagnuolo's structural arguments fares no better. The government contends that the neighboring definitions of a swap in subparts (i), (iii), and (v) of § 1a(47)(A), which generally concern rates, currencies, and indices, cannot limit the definition in subpart (ii) because that would create "surplusage." Opp'n 10. But the surplusage problem the government purports to identify is far more acute in its own capacious interpretation of subpart (ii) than in the interpretation Mr. Spagnuolo and the Ninth and Sixth Circuits have advanced. If the definition of a swap in this subpart were broad enough to include event contracts associated with any conceivable financial or economic consequence, that would subsume all other subparts of the definition and render them entirely superfluous. The other subparts all encompass events with some downstream financial consequence—there would be "no reason for Congress to have included narrower definitions—with dozens of examples" in subparts (i) and (iii). *KalshiEX LLC v. Bird*, No. 26 Civ. 109, 2026 WL 2691009, at *11 (S.D. Iowa Sept. 8, 2026); *see Schuler*, 2026 WL 2884087, at *13. Likewise, if "everything a person can conceive of happening is an event or contingency," there would have been no reason for Congress to have defined other kinds of swaps, as the broad definition of an "event" would encompass all other swaps. *KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014, 1031 (D. Nev. 2025); *see N. Am. Derivatives Exch., Inc. v. Nevada ex rel. Nev. Gaming Control Bd.*, 815 F. Supp. 3d 1169, 1184 (D. Nev. 2025). The limiting principles that Mr. Spagnuolo advances thus give meaning to the words and phrases in Congress's definition of a swap.

Consistent with basic principles of statutory interpretation, subpart (ii) must be read in the context of the full definition of a swap to "avoid ascribing to [it] a meaning so broad that it is

inconsistent with its accompanying words." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995). And the other types of swaps described in subparts (i), (iii), and (v) support that "associated with a potential financial, economic, or commercial consequence" in subpart (ii) "means that the event or contingency must be inherently associated with a potential financial consequence" and "not just . . . have some potential downstream financial consequence." *Hendrick*, 817 F. Supp. 3d at 1028; *see KalshiEX LLC v. Cafferelli*, No. 25 Civ. 2016, 2026 WL 2294589, at *9-10 (D. Conn. Aug. 10, 2026) (concluding that "surrounding statutory text, which primarily concerns financial instruments and economic measures," demonstrates that subpart (ii) "captures events that are connected to financial, economic, or commercial consequences by their own nature"). That there may be some overlap between the definition in subpart (ii) and its neighboring definitions is of no serious concern. *See Schuler*, 2026 WL 2884087, at *12-13 (observing that "the simple fact that a particular financial instrument could satisfy more than one of the statutory definitions provided for by the Act does not undercut our interpretation of the meaning of [subpart] (ii)"). Indeed, the government acknowledges that "'redundancies are common in statutory drafting.'" Opp'n 11 (quoting *Barton v. Barr*, 590 U.S. 222, 239 (2020)). The choice here is between one set of redundancies that causes subpart (ii) to swallow the other definitions, or another that reads a reasonable scope into subpart (ii) in light of the other provisions.

Subpart (iv) of the swaps definition, which provides that a swap includes an "agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap," 7 U.S.C. § 1a(47)(A)(iv), does not change the analysis. The CFTC contends that this provision demonstrates the breadth of the definition of a swap and does not require that an event have an "inherent connection to its potential financial, economic, or commercial consequence." CFTC Br. 12, 15. But subpart (iv) is a gap-filling provision intended to "ensure that new forms of swaps were

regulable as soon as they emerged." *Schuler*, 2026 WL 2884087, at *13. The CEA's recognition that the definition of a "swap" could evolve as new instruments become common is not equivalent to a rejection of any reasonable limits on the bounds of a swap.[2]

Nor does the government's reliance on weather and emissions swaps help it. The government contends that limiting a swap in subpart (ii) to events with a close or inherent potential economic consequence would make *ultra vires* these long-recognized swaps, "neither [of which] has a 'close or inherent connection' to economic occurrences." Opp'n 11. But the government's "underinclusivity" concern is "irrelevant," because weather swaps and emissions swaps are expressly enumerated as swaps in a different part of the definition, in subpart (iii). *QCX LLC v. Nessel*, No. 26 Civ. 710, 2026 WL 1895958, at *7 (W.D. Mich. June 17, 2026); *see* 7 U.S.C. § 1a(47)(A)(iii)(XVII), (XXI).

In any event, weather swaps and emissions swaps *are* associated with an inherent economic consequence and facilitate price discovery or hedging. Take, for example, a weather swap tied to the heating degree days (i.e., how much average temperature deviates below a baseline temperature). Heating degree days are inherently connected to a financial, economic, or commercial consequence for many businesses, particularly in weather-sensitive industries like energy utilities, agriculture, and tourism, where revenue and profitability depend heavily on temperature variability. An energy company might protect against financial losses associated with an unusually warm winter, which would reduce the demand for heating, by buying a weather swap

---

[2] The CFTC's reliance on its authority to define the term "swap" to "include transactions and entities that have been structured to evade this subtitle," 15 U.S.C. § 8321, is entirely misplaced. This provision gives the CFTC authority to define a swap to limit the engineering of products to avoid regulatory scrutiny, but that is not the situation presented by prediction markets. Instead, the CFTC is seeking to expand its jurisdiction under an expansive definition of a "swap."

based on heating degree days.[3] Emissions swaps are based on the price or value of carbon or emission allowances traded pursuant to cap-and-trade programs.[4] These allowances are closely associated with an economic consequence because they bear on the financial cost of carbon obligations, and companies subject to carbon compliance programs can hedge against changes in emissions needs and costs and carbon price risk. The same cannot be said for Year in Search wagers, which "do not help institutions or investors hedge against risk" but "create risk, largely for ordinary consumers, where none previously existed." *Assad*, 2026 WL 2543846, at *10.

The government does not dispute that the CEA's Special Rule gives the CFTC the authority to prohibit event contracts that lack economic purpose, such as those that are akin to "gaming," because they are "contrary to the public interest." *See* 7 U.S.C. § 7a-2(c)(5)(C)(i). Instead, the government argues that the discretionary authority of the Special Rule "does not support" that swaps must have a "purpose" related to hedging or price discovery. But the CEA's former statutory "public interest" requirement, 7 U.S.C. § 7(7) (1994 & Supp.), which was repealed and then revived with the discretionary Special Rule, always contemplated that every proposed futures contract would serve an economic purpose, i.e., a price discovery or hedging function. *See* Mot. to Dismiss 27-28. And, since 2011, the CFTC has in fact exercised its authority under the Special Rule to prohibit contracts involving gaming, in order to "prevent gambling through the futures markets." Provisions Common to Registered Entities, 76 Fed. Reg. 44776, 44786 (July 27, 2011) (cleaned up); *see* 17 C.F.R. § 40.11 ("[A] registered entity shall not list for trading . . . [a]n agreement, contract, transaction or swap based upon an excluded commodity, as defined in Section

---

[3] *Weather Derivatives Grow as Risks Intensify*, CME Group (Sept. 3, 2024), https://www.cmegroup.com/openmarkets/energy/2024/Weather-Derivatives-Grow-as-Risks-Intensify.html; *The Financial Impact of Weather Derivatives: An Overview*, Investopedia (July 30, 2026), https://www.investopedia.com/terms/w/weatherderivative.asp.

[4] *See Role of Derivatives in Carbon Markets*, International Swaps & Derivatives Association (Sept. 2021), https://www.isda.org/a/soigE/Role-of-Derivatives-in-Carbon-Markets.

1a(19)(iv) of the Act, that involves, relates to, or references . . . gaming."); *Assad*, 2026 WL 2543846, at *12-13.

The government and the CFTC both suggest that the Special Rule's inclusion of contracts involving "gaming" that the CFTC is authorized to prohibit "shows that Congress contemplated that event contracts that had features akin to traditional gaming transactions could qualify as 'swaps.'" Opp'n 10; *see* CFTC Br. 16. This argument makes too much of the Special Rule because its "definition of 'event contracts' sweeps more broadly" than "swaps." *Schuler*, 2026 WL 2884087, at *15. The Special Rule defines "event contract" as "agreements, contracts, transactions, *or* swaps." 7 U.S.C. § 7a-2(c)(5)(C)(i) (emphasis added). As the Sixth Circuit explained, "just because the CFTC may prohibit gaming-related event contracts does not mean [that] sports-event contracts are *necessarily* swaps. They may be regulated instead because they are an 'agreement[],' 'contract[],' or 'transaction[]' that falls within the Special Rule's reach." *Schuler*, 2026 WL 2884087, at *15.

The government's response on legislative history requires only brief discussion. The government does not dispute that the Dodd-Frank Act was a response to the 2008 financial crisis and sought to regulate swaps as part of promoting financial stability, *see United States v. Phillips*, 155 F.4th 102, 113 (2d Cir. 2025), nor does it dispute that the legislative debates demonstrate that Congress sought to prohibit event contracts tied to the outcome of sports events akin to gambling, *see KalshiEX LLC v. Williams*, No. 25 Civ. 8846, 2026 WL 2017466, at *6 (S.D.N.Y. July 13, 2026) (Torres, J.). Indeed, the government concedes that "this tells part of the story," and its only response is to point to "a group of former members of Congress" who stated in a 2025 amicus brief that the Dodd-Frank Act "was intended to capture . . . event contracts related to gambling and

sports betting." Opp'n 16.[5] There can be no serious suggestion that a post-hoc rationalization drafted over a decade after Dodd-Frank was enacted bears more weight than the contemporaneous legislative record.

For its part, the CFTC's only response to Mr. Spagnuolo's reliance on the Dodd-Frank Act is to misconstrue his argument. Mr. Spagnuolo is not arguing that "the 'swap' definition is limited to the types of contracts that existed when Congress enacted Dodd-Frank in 2010," as the CFTC contends. CFTC Br. 15. Instead, as other courts have found, the Dodd-Frank Act's purpose is further evidence that, in regulating swaps, Congress was not seeking to "enabl[e] nationwide gambling on CFTC-designated exchanges" reaching every kind of wager regardless of their conceivable economic purpose, *Hendrick*, 817 F. Supp. 3d at 1031, but was instead seeking to facilitate hedging and price discovery and "'promote the financial stability of the United States by improving accountability and transparency in the financial system,'" *Schuler*, 2026 WL 2884087, at *13 (quoting Pub. L. No. 111-203, 124 Stat. 1376 (2010)). That context makes clear that Congress did not intend the CEA to reach purely speculative bets like Year in Search. *See Assad*, 2026 WL 2543846, at *14 ("The Dodd-Frank Wall Street Reform Act cannot be read as a direct (or indirect) regulation of sports gambling, and the CFTC is not a national gambling regulator.").

**2. The Government Distorts Key Precedent on the Definition of a Swap**

Most striking is the fact that the government's opposition utterly fails to contend with the fact that the overwhelming majority of courts to consider the issue have adopted the very construction of § 1a(47)(A)(ii) that Mr. Spagnuolo urges here—that for an event to be "associated with a potential financial, economic, or commercial consequence," the event must be closely or

---

[5] As disclosed in the brief the government cites, one of the former Senators who signed onto the brief has a paid "consulting arrangement[]" with Kalshi. *See* Brief of Amici Curiae of Seven Former Members of Congress in Support of Plaintiff-Appellee, *KalshiEX, LLC v. Flaherty*, 2025 WL 2306500, at *2 n.2.

"inherently associated with a potential financial or economic consequence," and not just have "some potential downstream financial consequence." *Id.* at *12 (cleaned up); *see also Schuler*, 2026 WL 2884087, at *8; *Cafferelli*, 2026 WL 2294589, at *10; *Hendrick*, 817 F. Supp. 3d at 1026-27 (D. Nev. 2025); *QCX LLC v. Nessel*, 2026 WL 1895958, at *3, *6, *8; *KalshiEX, LLC v. Schuler*, No. 25 Civ. 1165, 2026 WL 657004, at *5-6 (S.D. Ohio Mar. 9, 2026); *United States v. Wisconsin*, No. 26 Civ. 749, 2026 WL 2474512, at *10-11 (E.D. Wis. July 29, 2026) , *appeal filed*, No. 26-2675 (7th Cir. Aug. 14, 2026); *Coinbase Fin. Mkts. v. Nessel*, No. 25 Civ. 14092, 2026 WL 2295184, at *8-9 (E.D. Mich. Aug. 7, 2026); *Bird*, 2026 WL 2691009, at *11. All of these courts came to this conclusion by examining the CEA's text, purpose, structure, and history. But the government never grapples with their reasoning and does not even acknowledge that these courts adopted the interpretation it now seeks to reject. Instead, the government selectively discusses only the decisions' treatment of the definition of an "event" and "occurrence." *See* Opp'n 14-15. That omission is telling.

The government casts these opinions aside because they arose in the context of litigation over whether the CEA preempts state regulation of prediction markets, specifically event contracts relating to sporting events, such as gambling. *Id.* at 14. In the government's view, these decisions are a "poor guide" because they are "animated by the underlying view that regulation of sports gambling is a province long left to the states." *Id.* But the legal question presented in those cases is the same as the one presented here: the meaning of "swap" in § 1a(47)(A)(ii). *See Assad*, 2026 WL 2543846, at *7 (noting that determining whether state law is preempted requires the court to "determine what constitutes a swap under the CEA"). That is precisely why this Court assumed without deciding that sports-event contracts are swaps before holding that the CEA did not preempt

state law. *Williams*, 2026 WL 2017466, at *6.[6] And courts that have reached the issue did not decide the meaning of a "swap" as defined in § 1a(47)(A)(ii) based on the "historical context" of state gambling regulation. *See* Opp'n 14-15. They analyzed the statutory text in context, gave independent meaning to the statutory terms, and identified reasonable textual limits on what the statute encompasses to avoid rendering its terms "so broad as to be meaningless." *Assad*, 2026 WL 2543846, at *12; *see Schuler*, 2026 WL 2884087, at *10 (interpreting § 1a(47)(A)(ii) based on the "text, structure, and context of the CEA").

The government's attempt to dismiss these courts' careful interpretation out of hand ultimately collapses because, in the same breath, it urges this Court to follow the Third Circuit's interpretation in *KalshiEX, LLC v. Flaherty*, 172 F.4th 220 (3d Cir. 2026), which arose in precisely the same sports-betting context the government contends is a "poor guide." Opp'n 7, 14-15. If that context "bears little on the question pending before this Court," the government cannot selectively embrace the one circuit decision that happens to favor its position while summarily dismissing the decisions of the Sixth and Ninth Circuits and the district courts that reached the opposite conclusion. *Id.* at 15.

In short, as much as the government might wish to avoid reality, Mr. Spagnuolo's interpretation is consistent with the weight of authority. And unlike *Flaherty*'s "cursory plain-language" reasoning, *Assad*, 2026 WL 2543846, at *8, the Sixth and Ninth Circuits and these district courts "rightfully avoid[] the Third Circuit's more literalist approach to textualism . . . and instead interpret[] the text [of the CEA] under its ordinary meaning and within the statutory

---

[6] The Court did not "reject[]" the "premise that preemption turns on whether sports-related event contracts are 'swaps,'" as the government contends, Opp'n 14, but recognized that courts have reached different conclusions on whether "sports-event contracts are swaps within the meaning of the CEA" and assumed without deciding that they are swaps "[f]or the purposes of resolving Kalshi's motion." *Williams*, 2026 WL 2017466, at *6 & n.5.

context," *id.* at *18 (Lee, J., concurring), reaching the same interpretation that Mr. Spagnuolo urges here.

**B. The Indictment Does Not Allege That the Year in Search Wagers Are Associated with a Potential Financial, Economic, or Commercial Consequence**

The Indictment does not allege a violation of the CEA because the Year in Search wagers do not satisfy the statutory requirement that the occurrence of the event be closely or inherently connected to a potential financial, economic, or commercial consequence. The government's attempt to dismiss this argument as "fact-dependent" is unavailing, Opp'n 11, as the Indictment must "allege a crime within the terms of the applicable statute," *Aleynikov*, 676 F.3d at 76.

The government points to the Indictment's allegations that "Google's core business is search," that Google derives revenue from "advertising products that depend on user engagement, and that Year in Search is relevant to "[m]aintaining that user engagement." Opp'n 11. But those allegations misunderstand Year in Search and fail to connect it to anything of economic or commercial consequence to Google. The "occurrence of the event" specified in the Year in Search contracts is whether a certain person would or would not be announced as the top-trending person on Google in 2025. It is not sufficient for the government to allege that Google has a commercial interest in its search business writ large or that the Year in Search marketing campaign drives user engagement for Google. Both allegations may be true without establishing that the Year in Search contracts are connected to a potential economic, commercial, or financial consequence.

Indeed, the government recognizes that what matters in determining whether Year in Search wagers are swaps is whether there are "economic reasons investors would buy event contracts tied to Year in Search." *Id.*; *see Schuler*, 2026 WL 2884087, at *15 (noting § 1a(47)(A)(ii) reaches "events that are commonly understood to require financial hedging or price discovery"). And its only argument on this point is to gesture at the "search engine

marketplace . . . a $224 billion business," and the "multi-billion-dollar market" for "search engine optimization" that "companies, celebrities, and others utilize for promotion or commercial activity." Opp'n 11-12. (emphases omitted). But the Indictment does not reference the "search engine marketplace" or "search engine optimization" industry at all, let alone the utility that Google's Year in Search campaign has for hedging or price discovery for participants in this market or industry. In any event, the size of the industry associated with an event contract is not sufficient to satisfy the statutory requirement. *See Schuler*, 2026 WL 2884087, at *11 (rejecting the notion that "the very fact that an industry is a 'huge business' means any contract related to that industry satisfies [§ 1a(47)(A)(ii)'s] statutory test").

The CFTC's arguments that the Year in Search wagers have a "financial, economic, or commercial consequence" should be disregarded because they are factual and the government does not advance them. In any event, they suffer from a similar misunderstanding that Year in Search bears directly on Google's search or ad business. The CFTC suggests that the Year in Search rankings may affect advertising costs or an advertiser's decisions about Google Search advertising campaigns because Year in Search "measures" "organic Google Search traffic." CFTC Br. 10. That is incorrect: It captures the top 10 people in various categories who *increase* in interest the most in a given year, compared to the previous year.[7] Year in Search does not reveal data about Google Search volumes or traffic for a given individual that would provide any utility for an advertiser. Google does in fact make available to the public data about search trends that provide insight into what people are searching for in real-time and can inform advertising decisions.[8] But

[7] *The Year in Search Film, Social and Lists Data Methodology*, Google Trends, https://trends.withgoogle.com/year-in-search/data-methodology/ (last accessed Sept. 25, 2026).

[8] *See* Google Trends, https://trends.google.com/trends/ (last accessed Sept. 25, 2026); *Understanding Demand: How Search Data Can Improve Your Marketing Performance*, Google Ads (Jan. 2023), https://business.google.com/uk/resources/articles/how-search-data-improves-marketing-performance/.

that entirely public data is not Year in Search, which is no more than a corporate announcement about "the breakout questions, moments, and individuals the world searched for throughout the year."[9]

In sum, the Indictment fails to allege that the identity of 2025's top-trending person was of any meaningful financial, economic, or commercial consequence to any market participant. Even as alleged, Polymarket.com's Year in Search contracts are nothing more than a vehicle for betting on a marketing announcement with no utility for hedging or price discovery, and therefore fall well outside the bounds of the CEA.

**C. A Broad and Limitless Interpretation of the CEA Must Be Avoided**

When confronted with the fact that interpreting the alleged bets in this case to be swaps would bring every conceivable wager within the CEA's ambit and produce absurd results, *see Assad*, 2026 WL 2543846, at *11, the government simply insists that this Court "is not being asked to define the limits of the CEA." Opp'n 16. But the government cannot escape the overbreadth concerns of its interpretation by dismissing them as "hypotheticals . . . for another day." *Id.* Courts must "avoid[] reading incongruous breadth into opaque language in criminal statutes," *Dubin*, 599 U.S. at 130, and reject interpretations of criminal statutes that would have "far-reaching consequences," *Van Buren v. United States*, 593 U.S. 374, 393-94 (2021). The Supreme Court has considered hypotheticals in rejecting the government's overbroad reading of criminal statutes, precisely because the government's interpretation would "attach criminal penalties to a breathtaking amount of commonplace . . . activity." *Id.* at 393; *see Marinello v. United States*, 584 U.S. 1, 9-10 (2018) (rejecting the government's reading of a statute about obstructing administration of the Tax Code that would have swept in the "person who pays a babysitter $41

---

[9] *The Year in Search Film, Social and Lists Data Methodology*, *supra* n.7.

per week in cash without withholding taxes," as well as someone who "leaves a large cash tip in a restaurant, fails to keep donation receipts from every charity to which he or she contributes, or fails to provide every record to an accountant"); *Dubin*, 599 U.S. at 130-31 (rejecting the Government's interpretation of the aggravated identity fraud statute that "would sweep in the hour-inflating lawyer, the steak-switching waiter, the building contractor who tacks an extra $10 onto the price of the paint he purchased").

That is exactly the consequence of the government's limitless interpretation of a swap under § 1a(47)(A)(ii), because absent any limit on the definition of an "event . . . associated with a potential financial, economic, or commercial consequence," the CEA would "likely cover all sorts of commonplace gambling activity" and "expose countless Americans to potential criminal liability" for not engaging in this activity on a federally regulated designated contract market under 7 U.S.C. § 2(e), which prohibits entering into a swap transaction unless the swap is registered on a designated contract market. *Schuler*, 2026 WL 2884087, at *14; *see Assad*, 2026 WL 2543846, at *11.

The CFTC contends that the Court need not consider the myriad wagers that could be swept within § 2(e)'s prohibition, because "casino-style wager[s]" or "casual wagers between friends" are "bilateral transactions" "not readily susceptible to the CEA's exchange-trading requirement for swaps offered to retail participants." CFTC Br. 12-13. The CFTC's reliance on the definition of a "trading facility," 7 U.S.C. § 1a(51)(B)(i), and argument that the CEA requires only tradable instruments to be traded on designated contract market are unavailing. The definition of a "swap" does not turn on whether the swap was entered into on or off a trading facility or exchange, nor does § 2(e) speak of any exclusion for transactions that are not tradable. *See Schuler*, 2026 WL 2884087, at *15 (rejecting the argument that only tradable instruments have to be traded on

designated contract markets and concluding that "the CEA's swap definition does not depend on the venue on which the swap was entered into—on-exchange or off-exchange"). Section 2(e)'s prohibition is absolute: It is unlawful for any person, other than eligible contract participants (i.e., non-retail participants), "to enter into a swap unless the swap is entered into on, or subject to the rules of, a board of trade designated as a contract market under section 7 of this title." 7 U.S.C. § 2(e).

The Court cannot adopt an interpretation of a statute with absurd, limitless consequences on the reasoning that these consequences do not matter because they may come to bear only down the road. What matters is whether the government's interpretation admits of any principled limit. The government's response effectively concedes that there is none.

## II. The Commodities Fraud Count Violates Mr. Spagnuolo's Due Process Rights and Should Be Dismissed

As a matter of law, the government's interpretation of the CEA fails to provide fair notice and invites arbitrary enforcement. *See United States v. Velastegui*, 199 F.3d 590, 593 (2d Cir. 1999) ("[A] motion to dismiss on grounds that a criminal statute provides insufficient notice raises a question of law . . . .").

More than just a matter of "first impression," Opp'n 18, Mr. Spagnuolo challenges a novel application of a statute that has repeatedly been interpreted in a manner that would foreclose criminal liability. And contrary to the government's suggestion that "[j]udicial disagreements" do not evidence vagueness, *id.*, the Supreme Court has held that they do, *see Johnson v. United States*, 576 U.S. 591, 598, 601 (2015) ("pervasive disagreement" among courts and "repeated attempts and repeated failures to craft a principled and objective standard . . . confirm [a statute's] hopeless indeterminacy").

The government takes aim at Mr. Spagnuolo's examination of the CFTC's failure to regulate swaps at the time of the alleged conduct by arguing that the CFTC's position is "clear" by virtue of its lawsuit against Mr. Spagnuolo, a 2008 Concept Release, and its January 2022 enforcement order regarding against Polymarket.com. Opp'n 18. Each of these was insufficient to supply fair notice of the CFTC's enforcement policy at the time of the alleged conduct, particularly in the face of the substantial evidence of the CFTC's uncertain and inconsistent approach to regulating event contracts in 2024 and up through this year. *See* Mot. to Dismiss 35-36; *Upton v. SEC*, 75 F.3d 92, 98 (2d Cir. 1996) (SEC censure violated due process where there was "substantial uncertainty" in agency's interpretation of the applicable rule and "substantial change in its enforcement policy that was not reasonably communicated to the public"); *Stoller v. CFTC*, 834 F.2d 262, 265-66 (2d Cir. 1987) ("[I]f the Commission suddenly changes its view, . . . it may not charge a knowing violation of that revised standard and thereby cause undue prejudice to a litigant who may have relied on the agency's prior policy or interpretation.").

For its part, the CFTC's due process argument concerns only fair notice and disregards the other prong of due process: arbitrary enforcement. *Hill v. Colorado*, 530 U.S. 703, 732 (2000). And unlike in *United States v. Reed*, the only case the CFTC cites in support of its fair notice argument, the applicable statutory language is far from "clear." 20 Cr. 500, 2022 WL 597180, at *2-4 (S.D.N.Y. Feb. 28, 2022) (denying motion to dismiss because the relevant "conduct . . . fell within the plain language of the statute," and "clear" statutory language overcame absence of "additional clarity from interpretive decisions").

Due process imposes limits on the unfettered discretion of prosecutors as well as law enforcement. *See Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (to avoid "arbitrary enforcement," a statute must "establish minimal guidelines to govern law enforcement," to prevent "a

standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections" (cleaned up)); *cf.* Opp'n 18 ("[T]he void-for-vagueness doctrine polices statutes that give law enforcement no standards to apply," but "does not invalidate prosecutorial decisions made under a statute that does supply standards."). The government says the CEA "does supply standards," but it makes no effort to elucidate them. *Id.* at 16, 18. Indeed, the statute leaves individuals "entirely at sea" to guess what standards prosecutors will apply, *Snyder v. United States*, 603 U.S. 1, 16 (2024), to what conduct, in what country, and to whom.

It is no answer to say that the government's requirement to prove willfulness "cabins discretion." Opp'n 19. While willfulness can mitigate vagueness concerns, it does not eliminate them, and the fundamental requirement that a statute provide fair notice and meaningful constraints on enforcement discretion remains. *United States v. Curcio*, 712 F.2d 1532, 1543 (2d Cir. 1983) (Friendly, J.) ("'The requirement that the act must be willful or purposeful may not render certain, for all purposes, a statutory definition of the crime which is in some respects uncertain.'" (quoting *Screws v. United States*, 325 U.S. 91, 102 (1945) (plurality opinion))).

The CFTC makes three additional points in response to Mr. Spagnuolo's due process arguments that merit response. First, contrary to the CFTC's characterization, nowhere does Mr. Spagnuolo suggest that he "intentionally used Polymarket.com" to "'willfully evade'" the CEA. CFTC Br. 18-19 (quoting 17 C.F.R. § 1.6). The CFTC's apparent suggestion that a foreign citizen must have used a foreign website in order to avoid jurisdiction in the United States is a baseless attempt to twist Mr. Spagnuolo's well-founded constitutional arguments. Second, the CFTC attempts to run from its Chairman's comments that market manipulation on foreign prediction markets like Polymarket.com is "fake news" because the alleged activity "occurred offshore." *See* Mot. to Dismiss 37-38. The CFTC does so by insisting that the Chairman made these statements

in August 2026 after Mr. Spagnuolo's alleged trading occurred and that Mr. Selig, incredibly, "was not speaking on behalf of the Commission" at a meeting of the CFTC Innovation Advisory Committee. Br. 18-19 n.20.[10] But regardless of the timing of the statements, "substantial uncertainty" remains regarding the Commission's interpretation of the CEA, which requires Count I's dismissal. *Upton*, 75 F.3d at 98.

Finally, the CFTC tries to rewrite its regulatory history. Misleadingly citing its 2008 Concept Release, the CFTC writes in its amicus brief that it has "regulated event contracts . . . since at least 1992" concerning "events as diverse as 'the accomplishment of certain scientific advances,' 'the outcome of corporate product sales,' 'and the length of celebrity marriages.'" CFTC Br. 17 (quoting 73 Fed. Reg. at 25670). However, the CFTC quotes only from the Concept Release's purpose section. The Release went on to explain that it was seeking public comment because the Commission had received "a substantial number of requests for guidance" since 2005, and thus was undertaking a "comprehensive review" to assess, among other questions, "[w]hether event contracts [were] within the Commission's jurisdiction and . . . why (or why not)." *Id.* at 25673. The CFTC's brief also reached back to a 1993 no-action letter that purposefully and explicitly did not "assert[] jurisdiction or describe[e] the potential parameters of the Commission's regulatory purview over the market." *Id.* at 25670. In any event, none of this regulatory background would have provided Mr. Spagnuolo fair notice that he would be subject to criminal enforcement, nor does it provide minimal guidelines to avoid arbitrary enforcement of the CEA.

The government concedes that application of the rule of lenity is warranted where the law is in "genuine equipoise." Opp'n 17. While Mr. Spagnuolo argues that the contracts at issue fall

[10] *See* Caitlin Ostroff & Vicky Ge Huang, *CFTC Committee Discussion on Prediction Markets Gets Heated*, Wall St. J. (Aug. 20, 2026), https://www.wsj.com/livecoverage/stock-market-today-dow-sp-500-nasdaq-08-20-2026/card/cftc-committee-discussion-on-prediction-markets-gets-heated-yQwCEYhWu7zrrUU7vg67.

outside the CEA's definition of swap, to the extent the Court finds there to be equipoise as to the question, the "the tie must go to the defendant." *United States v. Santos*, 553 U.S. 507, 514 (2008) (plurality opinion). The law here—with district courts and circuits on both sides of an evolving, novel issue of statutory interpretation—is clearly at least in equipoise as to whether the CEA applies to the Year in Search contracts.

## III. The Wire Fraud Count Should Be Dismissed Because the Year in Search Data Are Not "Property"

The government's wire fraud case rests on the theory that Mr. Spagnuolo misappropriated Google's confidential business information. That is what the Indictment charges, and that is the theory the government must defend. In its opposition, the government does two things: It tries to save that charged theory under *United States v. Chastain*, 145 F.4th 282 (2d Cir. 2025), and related cases, and it introduces—for the first time—a fallback argument that Mr. Spagnuolo separately obtained "money or property" from his alleged trading counterparties. Both arguments fail. The Indictment does not allege that the *secrecy* of the specific Year in Search content had commercial value to Google as required by *Chastain*. And the novel, uncharged counterparty-money theory fails for independent reasons: It appears to have never been presented to the grand jury, misreads the law on the misappropriation theory of wire fraud insider trading, and, if accepted, would render a string of case law on that theory dating back to the late-1980s entirely toothless.

### A. The Indictment Does Not Allege That the Secrecy of Google's Year in Search Data Has Commercial Value Under *Chastain*

The holding of *Chastain* is straightforward: Confidential business information qualifies as property under the wire fraud statute only if its confidentiality has commercial value to the company that holds it. 145 F.4th at 291-92. The government devotes considerable space to the procedural posture of the Second Circuit's decision, but *Chastain* announced a rule and what matters is whether the Indictment satisfies it.

It does not. The government points to the commercial importance of Google's search business, the resources Google invests in the Year in Search campaign, and the value Google derives from a coordinated public release. *See* Opp'n 25-27. But none of those arguments establishes that Google derives commercial value from the secrecy of the specific content Mr. Spagnuolo allegedly used: the identities and rankings of the most-searched persons. The Indictment alleges that Google's search data "is commercially valuable proprietary information central to [Google's] business." Dkt. No 17 ¶ 2. But that describes Google's search data generally, not the specific information at issue, which is who fell where in a year-end list of trending searches. *See* Mot. to Dismiss 47-50; *supra* pp. 16-18.

In *Chastain*, OpenSea's featured-NFT program had commercial relevance to the company, but the secrecy of which NFT would be featured was "so tangential to OpenSea's business that it lacked commercial value to the company." 145 F.4th at 297. OpenSea collected the same "standard 2.5 percent fee" regardless of which NFT was featured. *Id.* at 297, 305. The parallel to this case is exact: Google's advertising revenue, media coverage, and user engagement do not turn on the identity of the top-trending person. Google earns the same revenue from its search platform whether the Year in Search list is topped by one public figure or another.

The government's opposition urges that this case is more like *Carpenter v. United States*, 484 U.S. 19 (1987). But the analogy collapses on inspection. In *Carpenter*, *The Wall Street Journal*'s (the "*Journal*") prepublication stock columns were literally its "stock in trade, to be gathered at the cost of enterprise, organization, skill, labor, and money, and to be distributed and sold to those who will pay money for it." *See* 484 U.S. at 25-26 (cleaned up). Google gives the Year in Search rankings away for free. Year in Search is not a commodity to Google. No one pays

Google for the right to learn who was top-trending person, like subscribers paid the *Journal* for information about the stocks featured in "Heard on the Street."

The government's reliance on *United States v. Grossman*, 843 F.2d 78 (2d Cir. 1988), fares no better. There, the law firm's client confidences, if disclosed, would cause the firm to "lose its clients," *id.* at 86: concrete commercial harm flowing directly from the breach of secrecy. *See Chastain*, 145 F.4th at 293. The Indictment's allegations here—that premature disclosure of Year in Search data "could reduce or eliminate anticipated user engagement, undercut the media interest that sustains brand value, and diminish advertiser revenue tied to the launch," Dkt. No. 17 ¶ 3—are, even accepted as true, the same kind of speculative, downstream, reputational harms that *Chastain* held are "too 'ethereal' to qualify as a traditional property interest." 145 F.4th at 297 (quoting *Carpenter*, 484 U.S. at 25).

**B. The Government's Uncharged Counterparty-Money Theory Fails**

The government's newly elaborated theory—that Mr. Spagnuolo "exploited [an] informational advantage to induce his Polymarket counterparties to take the losing side of wagers he already knew he would win," Opp'n 28—amounts to a material alteration of the charged scheme. Count Two alleges that Mr. Spagnuolo, "knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises," used "valuable confidential business information, which was subject to a duty of confidentiality," and "used that information to obtain cryptocurrency in breach of his duties." Dkt. No. 17 ¶ 11. The Indictment does not allege that Mr. Spagnuolo schemed to obtain money from trading counterparties; it does not even identify a counterparty. It does not allege any deceptive communication or omission directed at a counterparty. And it does not describe a mechanism by which a counterparty was induced to transfer funds. It is almost certainly the case that the grand jury was asked to approve the

Indictment charging a scheme like the one charged in *Chastain* and alleging misappropriation of Google's confidential information.[11] It was not asked to approve a theory that Mr. Spagnuolo defrauded anonymous prediction-market counterparties. The government should not be permitted to "'broaden the possible bases for conviction from that which appeared in the indictment'" through a brief filed in opposition to a motion to dismiss. *United States v. McCourty*, 562 F.3d 458, 470 (2d Cir. 2009) (quoting *United States v. Rigas*, 490 F.3d 208, 225 (2d Cir. 2007)).[12]

Even if the government's new counterparty-money theory were properly charged in the Indictment, it would fail on its merits. The deception in a "misappropriation theory" insider trading case (like the government's case against Mr. Spagnuolo) runs to the source of confidential information misappropriated for the purposes of making trades. *United States v. O'Hagan*, 521 U.S. 642, 652 (1997). In *O'Hagan*, the Supreme Court explained that a fiduciary who trades on misappropriated information "pretends loyalty to the principal while secretly converting the principal's information for personal gain" and thereby "defrauds the principal of the exclusive use of that information." 521 U.S. 642, 652-54 (1997) (cleaned up). Misappropriation-theory insider trading cases thus turn on fraud to someone *other than* "the other party to the trade," who "is, instead, the source of the nonpublic information." *Id.* at 656.

The government does not dispute this doctrinal foundation or that its case against Mr. Spagnuolo falls under the "misappropriation theory." Instead, it argues that the money held by Mr.

[11] To the extent it would aid in the Court's consideration of the government's alternative wire fraud theory, Mr. Spagnuolo moves for disclosure of the grand jury minutes under Federal Rule of Criminal Procedure 6(e)(3)(E).

[12] The government raised the same novel wire fraud theory in opposing the motion to dismiss filed by the defendant in *United States v. Van Dyke*, No. 26 Cr. 156 (S.D.N.Y.), the other active prediction-market insider trading case pending in this district. Indeed, the government's opposition to Mr. Van Dyke's motion to dismiss is similar to the brief filed in this case on this point. *Compare* Opp'n 28-31, *with* Opp'n to Mot. to Dismiss at 36-38, *United States v. Van Dyke*, 26 Cr. 156 (S.D.N.Y. Aug. 19, 2026), Dkt. No. 25. The two briefs share not only the same legal theory but the same paragraph structure, the same string citations, and an identical footnote (with an identical typo). And in both *Van Dyke* and this case, the theory may not have been charged in the grand jury. *See* Reply in Supp. of Mot. to Dismiss 18-19, *United States v. Van Dyke*, 26 Cr. 156 (S.D.N.Y. Aug. 26, 2026), Dkt. No. 31.

Spagnuolo's alleged trading counterparties was an additional, independent object of the fraudulent scheme, separate from his alleged misappropriation of confidential business information from his employer. While the government argues that its new theory is "precisely the type of scheme to defraud that *O'Hagan* and *Carpenter* describe," Opp'n 28, neither case held that a counterparty's money independently satisfies the property requirement of the wire fraud statute. Indeed, the government's attempt to cast their new theory as consistent with those cases would render unnecessary those cases' extensive progeny.

In *Carpenter*, the defendants engaged in "an ongoing scheme to share profits from trading" in stocks. 484 U.S. at 27. The Court analyzed whether the *Journal*'s information was property, *not* whether counterparty money was separately obtained through fraud. The government itself concedes as much: "[I]n *Carpenter* the Government's theory was solely that the misappropriated information was the 'property' that was the object of the scheme." Opp'n 29. If the fact that the *Carpenter* insiders obtained money from their trading counterparties had satisfied the wire fraud's property requirement, there would have been no need for the Supreme Court to conclude that the confidential information they obtained from the *Journal* was property.

*O'Hagan* is even clearer on this point. The Court understood and described the average "investor's informational disadvantage vis-à-vis a misappropriator," noting that such disadvantage "stems from contrivance, not luck" and "cannot be overcome with research or skill." 521 U.S. at 658-59. But the Court located the fraud in the deception of the source of the confidential information—not the deception of the counterparty. In both *Carpenter* and *O'Hagan*, the Court had every opportunity to conclude that fraudulently obtaining a trading counterparty's money satisfied the wire fraud's property requirement. It did not.

Moreover, accepting the government's theory would render decades of wire fraud property analysis superfluous. If trading profits obtained from counterparties automatically supplied the "money or property" that the wire fraud statute requires, then the property analyses in *Carpenter* and *O'Hagan* (not to mention more recent Second Circuit cases such as *United States v. Blaszczak*, 56 F.4th 230 (2d Cir. 2022), and *Chastain*) would have been entirely unnecessary. In each of those cases, the defendant sought trading profits from the scheme, but in each case, the court examined whether the information itself was the source's property. The government cannot invoke the very decisions that required thoughtful careful property analysis and that have built to the current careful jurisprudence on the misappropriation theory of wire fraud to justify a theory that makes that analysis superfluous.

The government's position proves too much. Under its theory, every misappropriation of confidential information followed by a profitable trade would satisfy the wire fraud statute's property element regardless of whether the information itself qualifies as property. That result would nullify *Chastain*'s holding and erase the distinction the Second Circuit drew between information with commercial value and information that is merely tangential to the company's business. If the counterparty-money theory supplied an independent basis for the property element, no court would ever need to undertake the commercial-value inquiry that *Chastain* requires.

The convergence cases do not rescue the government's theory. The government relies on *United States v. Greenberg*, 835 F.3d 295, 306-07 (2d Cir. 2016), for the proposition that wire fraud does not require "convergence"—that is, it does not require the party deceived and the party from whom money is obtained to be the same. Opp'n 29. Mr. Spagnuolo does not dispute that holding and, indeed, most misappropriation theory wire fraud cases involve defrauding one party of information and obtaining trading profits from another. But *Greenberg*—which was a traditional

wire fraud case—does not stand for the proposition that the trading counterparty in an insider trading case can supply the property element for wire fraud without more.

In *Greenberg* and the other non-insider-trading cases the government cites, the schemes involved deception that operated upon or through a mechanism authorizing the transfer of funds: unauthorized credit-card charges, false representations to payment processors, and misrepresentations to regulators who controlled access to funds. *See Greenberg*, 835 F.3d at 306-07; *see also* Opp'n 29-30. Here, by contrast, the alleged concealment from Google did not induce any counterparty's wager or payment. Anonymous Polymarket.com bettors took positions in binary event contracts based on their own assessments of probability; no deceptive act was directed at any of them.

In sum, the Supreme Court's recognition in *O'Hagan* that counterparties suffer an informational disadvantage does not convert that disadvantage into a freestanding property deprivation under the wire fraud statute. Without alleging that Mr. Spagnuolo stole Google's property—without a showing that the Year in Search rankings are "property" under *Chastain*—there is no predicate fraud; there is only an informational advantage of the kind that markets tolerate every day. This is particularly true in the commodities and prediction-market contexts. Unlike securities markets, derivatives markets have long operated in a way that permits market participants to trade on the basis of lawfully obtained material nonpublic information. *See* Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation, 76 Fed. Reg. 41398, 41403 (July 14, 2011) (codified at 17 C.F.R. pt. 180) (CFTC adopting release, recognizing that commodities markets, unlike securities markets, allow and encourage trading on lawfully obtained material nonpublic information). Traders trade based on informational advantage in markets every day without

committing a federal crime. *See Chiarella v. United States*, 445 U.S. 222, 233 (1980) (recognizing, in securities fraud context, that there is no "general duty between all participants in market transactions to forgo actions based on material, nonpublic information"). If the Year in Search rankings are not Google's "property," then Mr. Spagnuolo's use of that information to trade is not wire fraud.

The government's new fraud theory fails for the independent reason that it does not satisfy the statutory requirement that the property be obtained "by means of" the fraudulent scheme. 18 U.S.C. § 1343. The government contends that "by means of" requires only "that the obtaining of money naturally flow from the fraud." Opp'n 30-31. That phrase does not appear in the cases the government cites, which instead explain that there must be a "sufficiently direct causal nexus," *United States v. Berroa*, 856 F.3d 141, 152 (1st Cir. 2017), to satisfy the Supreme Court's decision in *Loughrin v. United States*, 573 U.S. 351 (2014). *Loughrin*, which concerned the bank fraud statute, explained that "not every but-for cause" will satisfy the "by means of" requirement. *Id.* at 363. Instead, in the bank fraud context, the "language is satisfied when . . . the defendant's false statement is the mechanism naturally inducing a bank . . . to part with money in its control." *Id.* Adapting this standard to the wire fraud context, as the government admits is appropriate, Mr. Spagnuolo made no false statements or misrepresentations to trading counterparties on Polymarket to induce them to enter into their trades. The Indictment contains no allegations that he represented he did not have access to inside information. Indeed, for the reasons mentioned above, it would not be surprising to participants in an alleged commodities market that they would be trading against individuals with different information than they possessed. *See* Mot. to Dismiss 36-37.

Accordingly, Mr. Spagnuolo did not obtain his alleged trading counterparties' money "by means of" any fraudulent scheme and the government's alternative theory cannot stand.[13]

## IV. The Indictment Should Be Dismissed Because the Charges Are Impermissibly Extraterritorial

The Indictment should be dismissed because the commodities and wire fraud charges are impermissibly extraterritorial. As a preliminary matter, extraterritoriality may be addressed before trial without aid of factual development. The government insists that, because *Morrison v. National Australia Bank* determined extraterritoriality to be a "merits question," 561 U.S. 247, 254 (2010) (affirming grant of motion to dismiss), extraterritoriality "is not a basis for dismissing an indictment," Opp'n 32. But where, as here, the indictment reaches conduct that is indisputably extraterritorial as a matter of law, the court may dismiss on this basis. *See, e.g.*, *United States v. Hoskins*, 902 F.3d 69, 95-97 (2d Cir. 2018) (affirming dismissal of portions of indictment in part due to presumption against extraterritoriality); *United States v. Sidorenko*, 102 F. Supp. 3d 1124, 1127-32 (N.D. Cal. 2015); *United States v. Ali*, 718 F.3d 929, 942 (D.C. Cir. 2013).

[13] The government's citation to *United States v. Ramsey*, No. 19 Cr. 268, 2021 WL 4244284 (E.D. Pa. Sept. 17, 2021), at the end of its discussion of the "by means of" requirement is peculiar. *Ramsey* is an unpublished, out-of-circuit opinion concerning securities fraud under 18 U.S.C. §§ 1348, 1349, and did not discuss the issue of whether trading profits from counterparties were obtained "by means of" misappropriated confidential information. In any event, even though Ramsey was not prosecuted under the wire fraud statute, it is obvious that the court thought that the misappropriated information was "property" as that term is used in federal fraud statutes. *See id.* at *7. It thus does not provide support for the government's attempt to introduce a new form of wire fraud liability where there is no misappropriated property under the standard announced in *Chastain*.

### A. The CEA Has No Permissible Domestic or Extraterritorial Application to the Alleged Facts

#### 1. No Permissible Domestic Application

The government attempts to sidestep the extraterritorial provision of the CEA, and the standard it imposes, by insisting that the "CEA Count charges a domestic application of the statute." Opp'n 34.[14] It does not.

A court must assess if there is a permissible domestic application of a statute by asking "whether the conduct relevant to [the statute's] 'focus' occurred in the United States." *Bascuñán v. Elsaca*, 927 F.3d 108, 121 (2d Cir. 2019). The Second Circuit has held that the "focus" of the CEA is "manipulation in commodities markets." *Prime Int'l Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94, 107 (2d Cir. 2019). Here, the only conduct relevant to that focus—the alleged misappropriation of data and placing of Polymarket.com bets—is alleged to have occurred abroad. This conduct has "'primacy' for purposes of the extraterritoriality analysis." *WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407, 416 (2018) (quoting *Morrison*, 561 U.S. at 267). Because this "conduct abroad relevant to the focus of the commodities fraud statute has 'primacy,'" the government's attempt to craft a domestic application of the CEA fails. *United States v. Phillips*, No. 22 Cr. 138, 2024 WL 1300269, at *3-10 (S.D.N.Y. Mar. 27, 2024) (quoting *Bascuñán*, 927 F.3d at 122) (rejecting domestic application of the CEA and evaluating extraterritoriality under § 2(i)). Indeed, if the alleged conduct could give rise to domestic application of the statute, it is hard to imagine any circumstance where § 2(i) would be applicable.

In attempting to craft a domestic application, the government relies on cases analyzing the statutory focus of other insider trading laws, particularly § 10(b), which are not relevant here.

[14] As a preliminary matter, § 2(i) governs the extraterritoriality analysis of commodities trading abroad. *See Phillips*, 155 F.4th at 117 ("Congress's choice of wording [in § 2(i)] suggests that it *intended to regulate commodities trading abroad* that has" sufficient connections to the United States. (emphasis added)). There is no domestic application here.

Opp'n 34-35. The "irrevocable liability" test the government invokes, for example, is a method to assess whether the defendant "engaged in fraud in connection with (1) a security listed on a U.S. exchange, or (2) a security purchased or sold in the United States" for purposes of § 10(b) and Rule 10b-5 thereunder. *United States v. Vilar*, 729 F.3d 62, 67 (2d Cir. 2013); *see United States v. Martoma*, No. 12 Cr. 973, 2013 WL 6632676, at *4-5 (S.D.N.Y. Dec. 17, 2013). None of the cases the government cites concern § 6(c)(1) of the CEA, and the Second Circuit has rejected attempts to analogize to § 10(b) in determining § 6(c)(1)'s focus. In *Prime International Trading*, the Second Circuit explained that

> the language of Section 6(c)(1) crucially differs from Section 10(b), as the latter prohibits "us[ing] or employ[ing], in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered[,] . . . any manipulative or deceptive device," 15 U.S.C. § 78j, while Section 6(c)(1) contains no mention of a 'national securities exchange."

937 F.3d at 107. The Circuit rejected the suggestion that the focus of § 6(c)(1) "is the locus of the transaction" or "purchases and sales of securities in the United States," as examination of § 10(b) might suggest. *Id.* The Court held that the focus is rather "manipulation in commodities markets." *Id.* That distinction mattered for the extraterritoriality analysis in *Prime*, and it matters here too.

As in *Prime*, "[a]ll of the conduct relevant to *that* focus occurred abroad." *Id.* (rejecting domestic application despite allegations of economic loss to U.S. traders). Accordingly, the government's reliance on the "irrevocable liability" test is baseless.[15] There can be no domestic application of the CEA here.

---

[15] Even if this were the appropriate test, it would not be satisfied. Under the § 10(b) analysis, a "domestic transaction" is not enough; charges will be dismissed as impermissibly extraterritorial if they are "predominantly foreign." *Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 216 (2d Cir. 2014) ("Because, in the case of securities not listed on domestic exchanges, a domestic transaction is necessary but not necessarily sufficient to make § 10(b) applicable, we need not decide whether the plaintiffs' transactions satisfy the standards . . . for domestic transactions, because we think it clear that the claims in this case are so predominantly foreign as to be impermissibly extraterritorial.").

### 2. No Permissible Extraterritorial Application

The government next argues that the charged conduct satisfies the extraterritorial provision of the CEA because the conduct had a "direct and significant connection with activities in . . . commerce of the United States," 7 U.S.C. § 2(i)(1), relying primarily on the presence of trading counterparties in the United States. Opp'n 37.

The presence of U.S. counterparties does not establish that "activity outside the United States directly and immediately affected activity in commerce of the United States without deviation or interruption," *Phillips*, 155 F.4th at 120-21 (cleaned up). Any connection to U.S. counterparties—who were trading on the site illegally, via a VPN, in contravention of Polymarket.com's geo-block and the CFTC's order—could be no more than "random, fortuitous, attenuated or merely incidental." *Id.* at 115 (cleaned up). Unlike in *Phillips*, where a U.S.-based financial institution "took on the risk" in the transaction in a manner that was "standard practice in the business" and "an integral part of the swap," *id.* at 123 (cleaned up), here these counterparties would have been unforeseen, there by happenstance, and entirely incidental to the bets. The government further suggests that the Court should evaluate the alleged bet's significance with respect to "an individual trader." Opp'n 37. But the Second Circuit has rejected this argument, explaining that significance "is measured by its effect on U.S. commercial activities," and "from the perspective of U.S. commercial activities"—not from the perspective of an individual trader. *Phillips*, 155 F.4th at 119.

The government also wrongly insists that the alleged conduct had a "'direct and significant . . . effect on[] commerce of the United States.'" Opp'n 38 (quoting 7 U.S.C. § 2(i)(1)). In so doing, the government points to agency guidance and asks the Court to consider "insider trading with counterparties in the United States . . . as a class," as opposed to looking solely at the alleged conduct. *Id.*

The government's reading is "divorced from the plain meaning" of § 2(i), *Phillips*, 155 F.4th at 117, disregards Second Circuit precedent, and would result in extraterritorial application of the CEA in every case involving a violation of the statute, no matter the effect of the alleged conduct. As the court explained in *Phillips*:

> Congress's choice of wording suggests that it intended to regulate commodities trading abroad that has a direct and significant connection with commercial activities occurring in the United States, but when there is no such connection, to regulate *only* trading with a direct and significant effect on the U.S. economy. *In other words, Congress set a far higher bar for the government to clear before it may regulate conduct that lacks direct and important ties to the United States*.

*Id.* at 117 (emphasis added). Based on that standard, the Second Circuit rejected that Phillips's conduct met the more exacting "effect on the U.S. economy" standard, concluding that his conduct "lacked a significant *effect on* U.S. commerce writ large," because "he committed a $20 million fraud in a multi-trillion-dollar industry." *Id.* The government's reading of § 2(i) here would substantially lower the "high[] bar" Congress set, *id.*—a result that *Phillips* disapproved—by bringing all insider trading on commodities markets anywhere in the world within the scope of the CEA.

**B. The Wire Fraud Charge Should Be Dismissed as Impermissibly Extraterritorial**

It is undisputed that the wire fraud statute does not apply extraterritorially. Where a law has only domestic application, a court is required to examine the "statute's focus" to assess if "the case involves a permissible domestic application of the statute." *United States v. Napout*, 963 F.3d 163, 178 (2d Cir. 2020) (cleaned up). "[A] claim predicated on . . . wire fraud involves sufficient domestic conduct when (1) the defendant used . . . wires in furtherance of a scheme to defraud, *and* (2) the use of the mail or wires was a *core component of the scheme to defraud*." *Bascuñán*, 927 F.3d at 122 (emphasis added).

The Indictment does not allege the essential use of any wires in furtherance of a domestic scheme, nor has the government identified the wire communications on which it intends to rely at trial. Here, the alleged use of wires in the United States—supposedly arising from the presence of a handful of U.S. residents as counterparties—is "merely incidental" to the alleged "scheme to defraud." *Napout*, 963 F.3d at 179 (cleaned up). The Indictment does not identify any events in the United States pertaining to the wire fraud charge that "have 'primacy' for purposes of the extraterritoriality analysis." *WesternGeco*, 585 U.S. at 416 (quoting *Morrison*, 561 U.S. at 267). Because the Indictment does not facially describe a domestic application of the wire fraud statute, Count Two must be dismissed. "This ensures that the domestic tail not wag, as it were, the foreign dog." *Napout*, 963 F.3d at 179.

## V. The Court Should Suppress Mr. Spagnuolo's Post-Arrest Statements and Their Fruits

The government's arguments in opposition to Mr. Spagnuolo's motion to suppress his post-arrest statements and the evidence derived from them also lack merit. The Court should suppress those statements and their fruits because Mr. Spagnuolo unambiguously invoked his right to counsel by saying that he "would like to have a lawyer" and that it "would make [him] feel better" if a lawyer were present. Ex. C ("Tr.") at 4-5. Mr. Spagnuolo's other remarks confirmed that it was his intention to exercise his right to counsel. But far from honoring his invocations, the agents leveraged Mr. Spagnuolo's lack of familiarity with the U.S. legal system to keep him talking. Mr. Spagnuolo never retracted his invocations, and his statements were not voluntary. And as to the fruits of those statements, the government barely addresses Mr. Spagnuolo's argument—building on this Court's own recent logic—that *Miranda* and *Edwards* violations are not similarly situated in relation to the exclusionary rule.

**A. Mr. Spagnuolo Invoked His Right to Counsel**

The government misrepresents Mr. Spagnuolo's argument that he invoked the right to counsel. As Mr. Spagnuolo's opening brief explains, he unambiguously invoked that right twice. Just minutes into the interrogation, he told the agents: "I would like to have a lawyer." Mot. to Suppress 7 (citing Tr. 4). Then, shortly thereafter, he said, "[I]t would just be, make me feel better if there's like a lawyer present." *Id.* (citing Tr. 5). The government all but ignores the second of Mr. Spagnuolo's invocations, confuses the issue by mischaracterizing comments that Mr. Spagnuolo purportedly made while being transported to 26 Federal Plaza and after arriving there, and fails to address Mr. Spagnuolo's demeanor and lack of prior criminal history.

Mr. Spagnuolo first invoked when he said, as to the criminal complaint against him, "I feel that since it is accusing me, ***I would like to have a lawyer*** for that." Tr. 4 (emphasis added). Courts in this District have regularly treated statements such as "I would like to have a lawyer" as unambiguous invocations. *See United States v. Rosenfeld*, No. 23 Cr. 65, 2023 WL 8471947, at *6 (S.D.N.Y. Dec. 7, 2023); *United States v. Seppala*, No. 16 Cr. 436, 2017 WL 5633167, at *3 (S.D.N.Y. Nov. 22, 2017).

The government argues that Mr. Spagnuolo's invocation was equivocal because he went on to say that "at the same, at the same time I am aware of the story" and that he "would love to see . . . evidence." Opp'n 52 (quoting Tr. 4) (emphasis omitted). The government cites no legal authority for its assertion that these subsequent statements somehow rendered Mr. Spagnuolo's invocation equivocal. *See id.* at 52-54. To be sure, courts have found it insufficient where a suspect has merely referred ambiguously to an attorney, *e.g.*, *United States v. Mastroianni*, No. 20 Cr. 575, 2022 WL 17404783, at *6 n.8 (S.D.N.Y. Dec. 2, 2022), or mused about whether he could call an attorney, *United States v. Lights*, 208 F. Supp. 3d 568, 572, 575 (S.D.N.Y. 2016). *See also United States v. Peter*, No. 17 Cr. 54, 2018 WL 5282878, at *3 n.3 (S.D.N.Y. Oct. 24, 2018) (collecting

cases). Mr. Spagnuolo's statement that he "would like to have a lawyer" falls into neither of these categories.

The government does not attempt to make (nor could it make) a similar argument about Mr. Spagnuolo's second invocation. In fact, the government hardly addresses it. *See* Opp'n 52-54. Mr. Spagnuolo and the agents had this exchange:

> MS: Sorry, how does it work with lawyers? Let's say that, so, how long does it take to, uh, just have someone present so I can just talk with you? I mean, it, ***it would just be, make me feel better if there's like a lawyer present*** and then I just, I'd like to just openly talk with you, cooperate with you.
>
> A2: OK. Yeah, it's just like, ***that won't happen like now***. So like this, this part, you can elect to either proceed without the lawyer or not proceed at all. And that's your right as, as I've outlined a few times now, umm, you just need to choose one way or the other. You can stop at any time, like I said, but it's entirely your decision. If at a later time you want to meet with a lawyer and with us, you could do that later with the lawyer.
>
> MS: But how does it work with the lawyer… how long does it take to, to arrange a lawyer? I just…
>
> A2: So, to have a meeting with us, you're, you're not going to be able to, [MS crosstalk: "in the meantime also"] ***you're not going to be able to have a lawyer to meet with us prior to court***. So, we still have to process you or bring you to court. You'll have a lawyer at the court hearing and after that your lawyer, whether it's the appointment…

Tr. 5-6 (emphases added).

Here, Mr. Spagnuolo explained that he wanted "a lawyer present" so that he could "openly talk with [the agents], cooperate with [them]." Tr. 5. He viewed a lawyer's presence as a precondition to having a substantive conversation with the agents. That is not an equivocal position. Moreover, it is broadly consistent with Mr. Spagnuolo's first invocation, where, as just noted, he asked for a lawyer while also referring to the agents' evidence.

But after his second invocation, the agents discouraged him from further pursuing his request for a lawyer. They first said, "[T]hat won't happen like now," and then: "[Y]ou're not

going to be able to have a lawyer to meet with us prior to court." Tr. 5-6. Despite quoting at length from the recording of the interview, the government tellingly paraphrased this line. *See* Opp'n 48-49 & n.8. It was only after these manipulative exchanges that Mr. Spagnuolo began answering the agents' substantive questions about the case. Thus, as Mr. Spagnuolo explained in his opening brief and as the government does not refute, the agents took advantage of his confusion about the U.S. legal process to keep him talking. *See* Mot. to Suppress 10. The agents' "persistence in trying to get [him] to talk" paradigmatically gives rise to a "presumption of involuntariness." *Maryland v. Shatzer*, 559 U.S. 98, 105 (2010).

Moreover, the agents' subtle efforts to get Mr. Spagnuolo to discuss the merits of their investigation by noting that he could not get a lawyer "now" or "prior to court," Tr. 6, undermine the government's reliance on the fact that they read him his *Miranda* rights. Opp'n 46. They explained to him that he had a right to speak with a lawyer but then convinced him not to exercise that right due to invented timing concerns, when their real motivation was the fact that they knew they would lose their opportunity to question him as soon as Mr. Spagnuolo spoke to a lawyer. *See United States v. Wang*, No. 23 Cr. 118, 2024 WL 1251105, at *10 n.7 (S.D.N.Y. Mar. 22, 2024) (Torres, J.) ("As a practical matter, once an arrestee has invoked the right to counsel, the police know that the interview is the last opportunity they will have to interrogate the arrestee without counsel." (cleaned up)).

The handful of cases that the government cites do not undermine the conclusion that Mr. Spagnuolo invoked. *See* Opp'n 54-55. In *United States v. Figaro*, the defendant asked if he needed a lawyer and later stated that he wanted to call a lawyer, but ended up calling his girlfriend instead. 568 F. Supp. 3d 459, 465 (S.D.N.Y. 2021). The court concluded that the defendant did not invoke his right to counsel. *Id.* at 469. Here, however, Mr. Spagnuolo did not merely *ask* if he *needed* a

lawyer; he said that he would "like to have" one and would "feel better" if a lawyer were present, Tr. 4-5, specifically so that he could continue talking with the agents. In *Seppala*, agents ignored the defendant's question as to whether he would have the opportunity to call an attorney. 2017 WL 5633167, at *3. Similarly here, the agents shunted Mr. Spagnuolo's requests aside by telling him, after the second time he invoked, that getting a lawyer "won't happen like now." Tr. 5. And *Wood v. Ercole* illustrates precisely what should have happened in this case. There, the defendant said, "I think I should get a lawyer," and the interrogating officer immediately handed him a telephone and left the room. 644 F.3d 83, 87, 91 (2d Cir. 2011). Here, the agents did not stop the interrogation, did not give Mr. Spagnuolo a phone, and instead sought to capitalize on his uncertainty.

What is more, the government ignores or mischaracterizes the context of Mr. Spagnuolo's invocations. *First*, the government incorrectly claims that Mr. Spagnuolo's contention is that his purported remarks to the agents who transported him to 26 Federal Plaza and his question, upon arriving, about how he would know if his wife had been "able to get [him] a lawyer for now" were invocations of the right to counsel. *See* Opp'n 51-52. That is not Mr. Spagnuolo's argument. *See* Mot. to Suppress 7-9. Rather, as Mr. Spagnuolo laid out in his opening brief in support of his motion to suppress, these are just two of the circumstances that, apart from his two later invocations, evince his intention to invoke the right to counsel. *Id.* According to the agents, on the way to 26 Federal Plaza, Mr. Spagnuolo told them "that he did not know what to do and whether or not he should talk to a lawyer first." Ex. A at USA02_02_0000000157. At the start of the interrogation, immediately after being given the *Miranda* warnings in English, he asked if his wife would be able to get him a lawyer. Tr. 2. And after more than 75 minutes of questioning, Mr. Spagnuolo again stated that he "would also like to be able to talk with someone, with a, with a lawyer." Tr. 54. These remarks form an important part of "[t]he circumstances surrounding the

interrogation" and affect whether a "reasonable police officer" would have understood Mr. Spagnuolo to have invoked. *See Wood*, 644 F.3d at 91.

*Second*, the government hardly addresses Mr. Spagnuolo's argument that his "demeanor and lack of prior criminal history counsel resolving any doubts in his favor." Mot. to Suppress 9. In other parts of the government's opposition, it concedes (as it must) that Mr. Spagnuolo was "never before arrested" and is "an Italian citizen." Opp'n 57. It contends that he was "calm and collected throughout the interview." *Id.* at 56. But the government's clinical descriptions of Mr. Spagnuolo's interrogation fly in the face of the evidence. He was rousted out of his hotel room by FBI agents early in the morning while on vacation in a foreign country. As the Court will see from watching them, *see* Exs. B & F, the recordings of his arrest and interrogation show that, far from being "calm and collected," Opp'n 57, he was in fact "visibly bewildered" and "confused" by what was happening, *see Seppala*, 2017 WL 5633167, at *1, 3. For instance, the government itself acknowledges that Mr. Spagnuolo "stammer[ed]" and sometimes used "overlapping and unintelligible" words. *See* Opp'n 49. All this, considered against the backdrop of Mr. Spagnuolo's patent lack of experience with the U.S. legal system, weighs in favor of finding that he invoked. *See Seppala*, 2017 WL 5633167, at *3; *Irvin v. Annucci*, No. 22 Civ. 4887, 2025 WL 1626188, at *11 (S.D.N.Y. Mar. 25, 2025), *report and recommendation adopted*, 2025 WL 1404488 (S.D.N.Y. May 15, 2025).

For these reasons, Mr. Spagnuolo invoked his right to counsel prior to answering any of the agents' substantive questions. Because the agents did not stop questioning him after he invoked, they obtained all of his subsequent statements in violation of the Fifth Amendment.

### B. Mr. Spagnuolo Did Not Voluntarily Re-Initiate the Interview

The government contends that, even if he invoked his right to counsel, Mr. Spagnuolo retracted his invocations by reinitiating the interview. Opp'n 55-56. This argument is as wrong factually as it is legally.

For starters, the government claims that Mr. Spagnuolo "himself continued the conversation" by making certain comments to the agents. *Id.* at 56. But, as the recording plainly shows, Mr. Spagnuolo made each of the comments the government quotes *before* he said that it would "make [him] feel better if there's like a lawyer present." *See* Tr. 4-5. This "subsequent initiation" was not in fact subsequent. *See* Opp'n 56.

But even if the government were right on the facts, the law is clear that Mr. Spagnuolo could not retract his invocations by merely "respond[ing] to further police-initiated custodial interrogation." *Edwards v. Arizona*, 451 U.S. 477, 484 (1981). The agents, not Mr. Spagnuolo, initiated a discussion of the merits of the case when they asked him—after his second invocation—whether he was aware of their investigation. *See* Tr. 6. At that point in the interrogation, Mr. Spagnuolo was still asking questions about the legal process. He "did not retract his previous demand for a lawyer and he did not jump start a conversation about the merits." *E.g.*, *Rosenfeld*, 2023 WL 8471947, at *8. Unlike statements that courts have found to constitute retractions, such as "I'd like to speak to an attorney, *but it's f[ine]*," Mr. Spagnuolo never said he found it acceptable that no lawyer was present. *See United States v. Brathwaite*, No. 17 Cr. 45, 2018 WL 1787943, at *8-9 (E.D.N.Y. Mar. 27, 2018), *report and recommendation adopted*, 2018 WL 1785484 (E.D.N.Y. Apr. 13, 2018); *see also Lights*, 208 F. Supp. 3d at 575-76 (finding retraction where defendant asked to call attorney but then said, "I ain't gonna call him yet").

One of the government's cases proves the point. In *United States v. Choudhry*, 24 F. Supp. 3d 273, 279-80 (E.D.N.Y. 2014), there was no question that the defendant invoked the right to

counsel. After he did so, "the agents strictly refrained from asking the Defendant any questions about the case or taking any actions to elicit statements," but "[f]or reasons only known to the Defendant, he then began to make spontaneous, unprovoked, and incriminating statements." *Id.* at 280. During his 10-minute "tirade," Choudhry was not "questioned, confronted with events, or even encouraged to be honest." *Id.* Here, by contrast, the agents failed to respect Mr. Spagnuolo's invocation and told him instead that he could not have a lawyer at that time. *See* Tr. 5-6. Mr. Spagnuolo did not thereafter make "spontaneous" or "unprovoked" statements but discussed the case only in response to the agents. *See id.* And he was sharply "questioned" and "encouraged to be honest," *Choudhry*, 24 F. Supp. 3d at 280, with the agents at one point threatening him with a false statements charge and at another point telling him they "want[ed] the truth." Tr. at 35, 49.

**C. Mr. Spagnuolo's Statements Were Not Voluntary**

The government requests that, if the Court suppresses Mr. Spagnuolo's statements for use in its case-in-chief under *Edwards*, the Court should still permit the introduction of those statements for impeachment purposes if Mr. Spagnuolo testifies. Opp'n 56-57. The Court should deny that request because Mr. Spagnuolo's statements were legally involuntary. *See, e.g.*, *United States v. Scott*, 624 F. Supp. 2d 279, 284 (S.D.N.Y. 2008).

The Second Circuit has long employed a "totality of the circumstances rule" to determine whether purportedly incriminating statements were made involuntarily. *Green v. Scully*, 850 F.2d 894, 901 (2d Cir. 1988). It has identified three primary sets of circumstances: "(1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials." *Id.* at 901-02. Here, as to Mr. Spagnuolo's characteristics, neither his "experience" nor his "background" suggests that he spoke voluntarily. *See id.* at 902. The government does not contest that Mr. Spagnuolo entirely lacked experience with the U.S. legal system, nor could it. *See* Opp'n 57. Mr. Spagnuolo explained to the agents that he did not "have

any legal background" and that his knowledge of U.S. legal process was based only on what he had heard "from the movies." Tr. 3. While the government is correct that Mr. Spagnuolo speaks English at work, *see* Opp'n 57, that does not mean that statements he made in one of the most charged moments of his life, after he had been awakened early in the morning by federal agents pounding on his hotel room door, were voluntary. And as to the agents' conduct, *see Green*, 850 F.2d at 902, Mr. Spagnuolo has already explained that they capitalized on his confusion to keep him talking. *See* Mot. to Suppress 10.

Any "single factor or a combination of factors considered together may inevitably lead to a conclusion that under the totality of circumstances a suspect's will was overborne." *Green*, 850 F.2d at 902. Here, the proper way to balance the relevant factors is clear. Mr. Spagnuolo was arrested in his hotel room, on vacation, by agents of a foreign government. Having never previously been arrested, he showed his unfamiliarity with the U.S. legal process to the agents who questioned him. They confusingly told him that it would not be possible for him to get a lawyer before his court appearance and steered the conversation back to the merits, Tr. 6, later invoking his potential exposure to further criminal charges, *id.* at 35. All these circumstances make his statements involuntary, regardless of the fact that he was seated unrestrained in a "soft-backed office chair" and given "two bottles of water and several packages of snacks." Opp'n 46.

**D. The Court Should Suppress Evidence Derived from Mr. Spagnuolo's Post-Arrest Statements**

The government barely engages with Mr. Spagnuolo's arguments that evidence it later obtained from Google should be suppressed under the fruit of the poisonous tree doctrine. *See* Opp'n 57-58; *see also id.* at 44-45. Mr. Spagnuolo showed that it is an open legal question, under both Supreme Court and Second Circuit precedent, whether evidence obtained as a result of an *Edwards* violation must be suppressed. Mot. to Suppress 12-13. He contended that such evidence

should be suppressed because the failure to stop an interrogation after a suspect has invoked the right to counsel violates a core guarantee of the Fifth Amendment and because applying the exclusionary rule to evidence obtained from an *Edwards* violation serves the rule's goal of deterring police misconduct. *Id.* at 13-16. Hence, Mr. Spagnuolo argued, all the statements that he made after requesting a lawyer were involuntary, and the government should not be allowed to benefit from violating his right to counsel. *Id.* at 17-18.

The government attempts to brush Mr. Spagnuolo's arguments aside by asserting, *ipse dixit*, that it follows from "well settled law" that "if *Miranda* violations are not subject to the" exclusionary rule, "*Edwards* violations would not be, either." Opp'n 57. But the government's sole citation in the cursory paragraph of analysis that it devotes to this issue is to this Court's opinion in *United States v. Wang*, 2024 WL 1251105. Contrary to the government's view, the Court expressly held that the Second Circuit "has *not yet determined* whether the same standards of voluntariness apply for statements obtained in violation of *Edwards*" as for statements obtained in violation of *Miranda*. *Id.* at *10 (emphasis added).[16] And the Court went on to suggest that "[t]here is reason to believe that the answer may be different" because, among other things, "[t]here is no incentive to cease questioning if the arrestee can be induced . . . to reveal information which leads to physical evidence that can be admitted in a subsequent criminal case." *Id.* at *10 n.7 (cleaned up). The Court's discussion at minimum calls into question, if not outright undermines, the government's view of the law.

[16] The government's discussion of applicable law, earlier in its brief, is not to the contrary. Opp'n 44-45. As Mr. Spagnuolo showed in his opening brief, neither the Supreme Court nor the Second Circuit has decided whether the reasoning of the plurality opinion in *United States v. Patane*, 542 U.S. 630 (2004), which pertained to the fruits of *Miranda* violations, also applies to the fruits of *Edwards* violations. Mot. to Suppress 13-16. The Court is not bound by the two other cases on which the government relies, *United States v. Gonzalez-Garcia*, 708 F.3d 682 (5th Cir. 2013), and *United States v. Hallford*, 816 F.3d 850 (D.C. Cir. 2016), and neither is persuasive. *Gonzalez-Garcia* devotes a sole, barely reasoned paragraph to this issue, *see* 708 F.3d at 687, and *Hallford* does not concern *Edwards* at all.

Finally, the government goes on to declare in a footnote without any legal citation that the "independent source and inevitable discovery exceptions would apply" to the evidence the agents obtained as a result of violating Mr. Spagnuolo's right to counsel. *See* Opp'n 58 n.9. The government's footnote includes several assertions about material seized from Mr. Spagnuolo's phone and the course of the government's investigation. But "[i]t is well-settled that '[a]n attorney's unsworn statements in a brief are not evidence.'" *United States v. Lysaght*, No. 97 Cr. 644, 2018 WL 5928461, at *1 n.1 (S.D.N.Y. Nov. 14, 2018) (quoting *Kulhawik v. Holder*, 571 F.3d 296, 298 (2d Cir. 2009)). Accordingly, the Court should not consider whether any exception to the exclusionary rule might apply here without allowing Mr. Spagnuolo to contest the factual assertions in that footnote.

## **CONCLUSION**

For the foregoing reasons, the Court should dismiss the Indictment in its entirety and suppress Mr. Spagnuolo's post-arrest statements and their fruits.

Dated: New York, New York
September 30, 2026

Respectfully submitted,

Shawn G. Crowley
Michael Ferrara
Andrew L. Chesley
Allison Durkin
Nicole Ng
J. Patrick Hornbeck II
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883
scrowley@heckerfink.com
mferrara@heckerfink.com

*Attorneys for Michele Spagnuolo*